**EXHIBIT A**

**COMPLAINT**

**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

JAN 2 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Robert Alvarez,
1419 Southeast 43rd Terrace,
Ocala, FL 34471,
individually, and on
behalf of all others similarly
situated,

         Plaintiff,

v.

CIGNA and
The Insurance Company of
North America,

         Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

CASE NUMBER 1:06CV00145

JUDGE: Emmet G. Sullivan

DECK TYPE: Contract

DATE STAMP: 01/27/2006

*JURY ACTION*

## CLASS ACTION COMPLAINT

Plaintiff, Robert Alvarez (hereinafter referred to as "Alvarez" or "plaintiff"), individually and on behalf of all others similarly situated (hereinafter referred to as "the Class"), by his undersigned counsel brings this action as a class action against defendants, CIGNA and The Insurance Company of North America (hereinafter referred to collectively as "defendants" or individually as "CIGNA," and "INA," respectively), and alleges as follows:

## NATURE OF THE ACTION

(1)    Alvarez brings this suit individually and on behalf of all others ("the Class") who purchased guaranteed renewable long-term care ("LTC") and/or nursing care insurance policies, including, but not limited to, policy forms TL-003039, TL-001455, and/or TL-004043, from defendants and their agents (hereinafter the "LTC policies") and whose annual long-term care policy premiums were increased by defendants during the period from 2004 to the present.

(2)    LTC insurance generally refers to the category of insurance products that provide coverage for a wide range of maintenance and health services for the elderly who need assistance in daily living. The purpose of LTC insurance is to provide policyholders with coverage for their long-term nursing home care and/or other related needs.

(3)    CIGNA and INA sold and renewed the LTC policies, which were meant to provide long-term nursing and related care to policyholders when the need arose, to Alvarez and the Class with the representation that those policies were guaranteed renewable policies, advising policyholders that:

> Your coverage will automatically be renewed provided the required premium is paid and benefits have not been exhausted.

See Alvarez's LTC Policy Form 003039, attached as Exhibit A. CIGNA and INA represented that the LTC policies would remain in force provided that Alvarez and the Class continued to make their annual premium payments to defendants. This is an important sales device as LTC insurance is worthless unless the insured can afford to keep it in force for the rest of their life or until it is needed.

(4)    Despite CIGNA's and INA's affirmative representations to Alvarez and the Class regarding the LTC policies being guaranteed renewable policies that Alvarez and the Class could maintain for the remainder of their lives, the LTC policies were, in fact, defective from the outset. The policies were and underpriced, a condition which meant that the original premiums for the LTC policies would not be sufficient to support future claims on the LTC policies. However, in order for the LTC policies to remain in force as defendants originally represented to Alvarez and the Class, it was CIGNA's and INA's plan to pass the cost of the defective underpricing of the LTC polices back to Alvarez and the Class through premium increases.

(5)     At no time prior to Alvarez's and the Class' execution of their LTC policy contracts did CIGNA or INA disclose the known risk of premium increases, the plan to increase premiums, and the resulting unaffordability of the LTC policies to Alvarez and the Class.

(6)     At no time prior to Alvarez's and the Class' renewal of their LTC policy contracts did CIGNA or INA disclose the known risk of premium increases, the plan to increase premiums, and the resulting unaffordability of the LTC policies to Alvarez and the Class.

(7)     At all relevant times, CIGNA and INA knew that they would increase premiums on the LTC policies, but nevertheless sold and renewed the LTC policies without disclosing this to Alvarez and the Class.  By failing to disclose this material information, CIGNA and INA fraudulently induced Alvarez and the Class to purchase and renew these seemingly lower priced LTC policies instead of purchasing alternative LTC insurance policies or no LTC insurance at all.

(8)     Not only did CIGNA and INA fail to disclose the anticipated premium increases, but in 1992 CIGNA and INA ceased selling the LTC policies, an act known as "closing the block" of business in the insurance industry.  This fact was never disclosed to the policyholders.  By "closing the block," the defendants capped its pool of insureds under these policies and barred new insureds from purchasing LTC policies.  When an insurance company fails to properly price a LTC policy and fails to properly establish reserves for a block of LTC insurance business, closing the block can lead to a "death spiral" that will guarantee that the premium rates on the LTC policies will increase at an even greater rate. Closing the block is particularly significant in LTC insurance situations, where the pool is largely comprised of senior citizens.  This is due to the fact that policyholders in the closed block are forced to pay the higher premiums that arise from such block closings or risk losing their LTC coverage altogether should they cease paying the increased premiums. This is because their age and/or medical history prevents them from obtaining alternative LTC insurance elsewhere once the premiums begin to increase.

(9)     As a direct and proximate result of CIGNA's and INA's wrongful course of conduct, Alvarez and the Class were damaged in that they were required to pay exorbitant premium increases in order to keep their LTC policies in force or give up their coverage, thereby leaving Alvarez and the Class without the insurance coverage they contracted for with defendants, despite their years of paid-up premiums.

## PARTIES

### *Plaintiff*

(10)     Robert Alvarez ("Alvarez") is currently a Florida resident living at 1419 Southeast 43rd Terrace, Ocala, Florida. Alvarez was born on February 6, 1921. He is currently 84 years old. Alvarez completed an application to purchase an LTC policy (Form TL 003039) from INA on March 28, 1992 while he was a resident of Maryland. The group LTC policy was issued in the District of Columbia through the American Chemical Society with coverage commencing on or about April 1, 1992, at a guaranteed renewable premium rate of $1,188.00. The policy was underwritten by CINGA and INA. These terms were set forth in the application form Alvarez completed and in Alvarez's LTC insurance contract that he received from INA weeks after purchasing his LTC policy. See Exhibit A. CIGNA and INA have increased Alvarez's annual premium on his LTC policy by eighty (80) percent, to its present rate of approximately $2,138.00, and have indicated they will seek another premium increase of an additional eighty (80) percent within the next two years. Such an increase would result in a premium of approximately $3,848.00 for Alvarez, an increase of two hundred twenty-three (223) percent.

### *Defendants*

(11)     CIGNA is a publicly traded insurance company headquartered in Philadelphia, Pennsylvania.

-4-

(12)    INA is an insurance company headquartered in Philadelphia, Pennsylvania, and is a subsidiary of CIGNA.

(13)    A division of CIGNA known as CIGNA Group Insurance and/or INA developed, marketed, sold and administered the LTC policy forms TL-003039, TL-001455, and/or TL-004043, that are at issue in this case to Alvarez and the Class.

(14)    The application forms completed by Alvarez and the Class clearly stated that the LTC policies were underwritten by CIGNA and INA.

## JURISDICTION AND VENUE

(15)    The United States District Court, District of Columbia has subject matter jurisdiction over this class action claim under 28 U.S.C. §1332(d)(2) because this case is a class action, Alvarez is a citizen of Florida, CIGNA and INA are citizens of Pennsylvania, and the amount in controversy exceeds $5,000,000.00.

(16)    CIGNA Group Insurance, a division of CIGNA, admitted that the District of Columbia is the situs of the contract between CIGNA and Mr. Alvarez in January 3, 2005 correspondence to the Maryland Insurance Administration.

(17)    The United States District Court, District of Columbia has personal jurisdiction over CIGNA and INA as the District of Columbia is the situs of the LTC insurance contract between CIGNA, INA and Alvarez because the LTC policy was issued in the District of Columbia through the American Chemical Society.

(18)    Venue is proper in the United States District Court, District of Columbia under (a) 28 U.S.C. § 1391(a)(1) and 28 U.S.C. § 1391(c) because CIGNA and INA are subject to personal jurisdiction in this judicial district and therefore they reside in this judicial district, and (b) 28 U.S.C. § 1391(a)(2) because a substantial part of the events and omission giving rise to this claim occurred

in the District of Columbia as the District of Columbia is the is the situs of the LTC insurance contract between CIGNA, INA and Alvarez.

## FACTUAL BACKGROUND

### *Structure and Function of Defendants' LTC Policies*

(19)    Beginning in or about 1988, CIGNA and INA developed, marketed, and sold LTC policies as group insurance to the members of several groups including the American Chemical Society ("ACS").

(20)    In order to market the LTC policies to ACS and other groups, CIGNA and INA entered into a Participating Organization Agreement ("POA") with a given group or with a trustee acting on behalf of the group. The POA set forth the terms under which CIGNA and INA could market the LTC policies to the given group's members.

(21)    CIGNA and INA marketed the Form TL-003039 LTC policies by offering the insurance to members the ACS and their spouses and family members.

(22)    During this same time period, CIGNA and INA had also developed and were marketing Forms TL-001455, and/or TL-004043 (and others) to members of several other participating groups. INA's Form TL-001455, and/or TL-004043 LTC policies are virtually identical in design and form to the Form TL-003039 LTC policy purchased by Alvarez.

(23)    Some time prior to April 1, 1992, CIGNA and INA contracted with Alvarez (a member of ACS) and sold him a Form TL-003039 (Policy No. ADT028-00750), which became effective on or about April 1, 1992, at an annual premium rate of $1,188.00 based upon a uniform policy application form which Alvarez completed and signed. See Exhibit A.

(24)    CIGNA and INA's sale of the Form TL-003039 LTC policy to Alvarez, and defendants' sales of their LTC policies to the Class generally, was based on defendants' uniform application and promotional materials which indicated that the LTC policies that Alvarez and the

Class purchased were guaranteed renewable policies, meaning that as long as the insureds paid the annual premiums, their policies were guaranteed to remain in force each year. This is an important sales device, as LTC insurance is worthless unless the insured can afford to keep it in force for the rest of their lives or until it is needed.

(25)   Insurance, especially long-term care insurance is an essential ingredient in the economic planning of the elderly. They purchase this insurance for the opportunity to pay a fixed amount into an insurance fund knowing the any losses will be covered by insurance. A product is an insurance product only if it shifts the risk of loss from the insured to the insurer. The insurer in turn manages the risk by creating a sufficiently large pool of insureds to spread the risk, by reinsuring all or part of the risk, and/or by investing premiums now to pay claims later.

(26)   The business of insurance is limited to companies which hold themselves out as actuarial experts in evaluating covered risks and appropriately pricing these risks. Insurance companies may not engage in underpricing of LTC insurance products with planned or reasonably foreseeable rate increases.

(27)   Alvarez, and the Class, relied on CIGNA and INA to prepare LTC insurance contracts consistent with their application forms and promotional materials. Alvarez, and the Class, relied on CIGNA's and INA's experience and actuarial expertise to adequately price the LTC policies and to reveal foreseeable future risks inherent in the policy contracts.

(28)   By selling the LTC policies to Alvarez and the Class, CIGNA and INA affirmatively represented that the LTC policies were valuable insurance policies that were developed and priced by expert actuaries and that the LTC policies were priced at levels designed to accumulate sufficient reserves adequate to pay valid claims made by policyholders.

(29)   By selling the LTC policies to Alvarez and the Class as being guaranteed renewable policies, CIGNA and INA effectively represented that the LTC policies would also be affordable for

-7-

life as LTC insurance coverage is worthless unless the insured can afford to keep it in force for the rest of their lives or until it is needed.

(30)    At no time during their sale and renewal of these policies to Alvarez and the Class did CIGNA and INA advise them that their premium rates would increase over the premium rates at which defendants originally sold the LTC policies to plaintiff and the Class.

(31)    Furthermore, nowhere did CIGNA or INA indicate to plaintiff and the Class that premium rate increases were planned prior to defendants' initial sale of the LTC policies and/or prior to the annual renewal of the LTC policies.

### The Defects in Defendants' LTC Policies

(32)    Despite CIGNA and INA's affirmative representations to Alvarez and the Class regarding the LTC policies being guaranteed renewable policies, which Alvarez and the Class could realistically maintain for the rest of their lives, or until needed, at no time during the sale and renewal of the LTC policies did CIGNA or INA represent or advise Alvarez and the Class that the LTC policies were, in fact, defective. They were defective as they were underpriced. CIGNA and INA knew this defective condition would mean that the original premiums for the LTC policies would not be sufficient to support future claims on the LTC policies. Rather than bear the cost of the underpricing the LTC policies themselves, it was CIGNA's and INA's plan to pass the cost of the defective underpricing of the LTC polices back to Alvarez and the Class through premium increases. Such increases subsequently occurred in the form of an eighty (80) percent increase in 2004 and a proposed additional eighty (80) percent increase in the next two years.

(33)    As stated above, the LTC policies CIGNA and INA sold to Alvarez and the Class were defective in that they were underpriced. The policies were underpriced in that the defendants knew that the initial premiums under which they sold the LTC policies to Alvarez and the Class were unreasonably low and would not support future claims. The defendants knew that the initial

premiums were too low, in part, because the lapse rates used to originally price the policies were to high.

(34)    In designing and pricing a LTC policy, lapse rates (the number of policyholders who stop paying premiums and let their policies terminate each year) are used to price the original premium. If it is assumed that a larger group of policyholders will pay premiums and then lapse, thus allowing the insurance company to keep the past premiums paid without carrying the risk of future claims loss, the insurance company can charge a lower premium. This is often called a "lapse supported" premium.

(35)    In addition, the policies were underpriced in that the original pricing did not take into account the risks associated with the way policies were underwritten.[1] The LTC policies were inadequately underwritten in order to sell more policies. The LTC policies in this case were sold through "field underwriting," which does not include obtaining any health verifications from potential policyholders' physicians. This allows high-risk individuals, such as those with serious medical conditions and/or those certain to make claims shortly after the purchase of their policies, to obtain LTC coverage. This underpricing produced a market advantage for the defendants and enabled them to generate a high volume of policy sales.

(36)    Because these LTC policies were defectively underpriced, CIGNA and INA knew that the original premiums would not support future claims. CIGNA and INA willfully and deliberately misrepresented and/or withheld these facts from Alvarez and the Class.

(37)    CIGNA and INA's improper underpricing of the LTC policies, along with other actions by CIGNA and INA such as its commission practices and strategic planning, resulted in the underfunding of reserves for the LTC policies. This resulted in reserves being below levels

---

[1]"Underwriting" is the process of screening risks for insurance and determining in what amounts and on what terms the insurance company will accept the risk.

necessary to generate income sufficient to pay future claims. Rather than bear the cost of the underpricing of the LTC policies themselves, it was CIGNA's and INA's plan to pass the cost of the defective underpricing of the LTC polices back to Alvarez and the Class through premium increases.

(38)    CIGNA and INA wrongfully and fraudulently misrepresented and/or withheld from Alvarez and the Class those facts that would have rendered these defects apparent, thus enabling defendants to continue to sell, renew, and administer these defective LTC policies to Alvarez and the Class.

### Defendants "Close the Block" of their
### LTC Policy Forms TL-003039, TL-001455, and/or TL-004043

(39)    In 1992, CIGNA and INA ceased selling these LTC policies to new customers. This is an act known in the insurance industry as "closing the block" of business. The fact that this block of business had been closed was never disclosed to Alvarez and the Class.

(40)    CIGNA and INA knew that by closing the LTC policy block, the pool of insureds under those policies, including Alvarez and the Class, would be permanently capped. This precludes new insureds from purchasing the insurance policies and decreases the size of the insurance coverage pool as the policyholders' age and claims experience increases.

(41)    Closing the block is particularly significant in LTC insurance situations, where the pool is largely comprised of senior citizens. This is due to the fact that policyholders in the closed block, including Alvarez and the Class, are forced to pay the higher premiums that arise from such block closings or risk losing the coverage of their LTC policies altogether should they cease paying the increased premiums. This is because their age and/or medical history frequently prevents them from obtaining alternative LTC policies elsewhere.

(42)    Moreover, CIGNA and INA knew that by increasing the LTC insurance premiums younger or healthier LTC insureds would drop their LTC policies with defendants and would seek

coverage elsewhere, causing an increase in the number of lapses. This is known in the insurance industry as a "shock lapse." Shock lapse further depletes the insurance pool and inevitably leads insurance companies to seek additional premium increases to cover the insurance claim needs of the remaining elderly and infirm policyholders.

(43)    As the risks and costs associated with the pool are shared by fewer and fewer people, the underfunding of reserves will grow. This provides an insurance company who wishes to pass the cost of the under funding of reserves back onto its policyholders with a reason to seek additional premium increases. Increased premiums force Alvarez and the Class either to pay the higher premiums or to give up their otherwise "guaranteed renewable policies" by letting their LTC policies lapse for premium nonpayment.

(44)    This vicious cycle of higher premiums and a shrinking pool to share the increased costs is known in the insurance industry as a "selection spiral" or "death spiral." A "selection" or "death" spiral results in insurance policy premiums rising so high that insureds are unable to pay the premiums and are forced to relinquish their policies.

### Defendants' Premium Increases

(45)    CIGNA and INA were aware of the defective nature of these policies and the impact closing the book of business would have by at least 1997. During that year, CIGNA was sufficiently concerned about the LTC policies that it conducted a review of the LTC policies to analyze whether premium levels were adequate in light of the experience of the LTC policies. Alvarez and the Class were never told about CIGNA's and INA's concerns about the LTC policies.

(46)    In the years following this study, CIGNA's and INA's knowledge of the defective nature of the LTC policies and the need for future rate increase was reinforced by an experience of growth in claims for benefits by policyholders. This claim experience led CIGNA and INA to commission yet another review of the LTC policies, this time by an outside actuarial consultant.

Alvarez and the Class were never informed of this review or of CIGNA and INA's concerns about the LTC policy.

(47)    In an effort to recoup their underfunded reserves and to mitigate other facets of their fraudulent and wrongful course of conduct, in 2004 CIGNA and INA increased Alvarez's and the Class' LTC policy premiums, thereby passing on the costs of CIGNA's and INA's underpricing of the LTC policies directly onto their policyholders. CIGNA and INA were aware such a course of action would be necessary from the time that they commenced the sale of the LTC policies and at the time of subsequent renewals of the LTC policies.

(48)    In instituting their 2004 LTC premium increases, CIGNA and INA sent form letters to Alvarez and the Class which misrepresented the reasons for the increase, stating that the increase was due to "emerging claim experience" and "the increase in long term care costs." This letter also fraudulently stated that the policy "continues to provide valuable long term care benefits." At no time did defendants advise Alvarez and the Class of the inherent defects in these LTC policies, that the block of business had been closed, and that that the premium increases were CIGNA's and INA's attempt to pass the costs of these defects and decision back to Alvarez and the Class..

(49)    CIGNA and INA did not seek approval for these premium increases from the District of Columbia Department of Insurance, Securities, and Banking and these premium increase have never been approved by the District of Columbia Department of Insurance, Securities, and Banking. Additionally, these requested premium increases were denied by the Connecticut Department of Insurance in November of 2004 and again in February of 2005.

(50)    In 1992, Alvarez's contracted for annual premium payment on his Form 003039 LTC policy was $1,188.00. After the eighty (80) percent premium increase in 2004, his annual premium payment was $2,138.00. After the additional eighty (80) percent premium increase promised by CIGNA and INA in the next two years, his premium will balloon to approximately $3,848,00

(resulting in an aggregate increase of 223 percent). This is an unregulated, unilateral escalation in premium which has effectively deprived Alvarez and the Class of their right to "guaranteed renewable" premium LTC policies.

(51)    Alvarez and others in the Class, unaware of CIGNA's and INA's deceptive and wrongful course of conduct, have continued to make their LTC premium payments to keep their LTC policies in force in order to prevent injury to themselves in the form of having their LTC policies terminated by defendants for premium nonpayment.

(52)    Other Class members were unable to pay CIGNA's and INA's ever-increasing insurance premiums and were forced to drop their LTC policies. When that occurred, defendants obtained windfall profits by retaining all of the prior premium payments on the lapsed policies and avoiding the possibility of future claims on those LTC policies.

(53)    At no time during CIGNA's and INA's sale of the LTC policies to Alvarez and the Class, nor at any time thereafter, did CIGNA and INA inform or advise Alvarez and the Class that: (a) the LTC policies had been initially underpriced; (b) the actuarial assumptions and lapse rates underlying the pricing of the LTC policies were based on limited or incomplete data or ignored data available in the LTC insurance industry; (c) the actuarial assumption underlying the pricing of the LTC policies failed to take into account the way the LTC policies would be underwritten; (d) given these problems, the defendants knew that the original premiums would not be sufficient to support future claims; (e) CIGNA and INA planned on seeking a series of premium increases for the LTC policies; (f) CIGNA and INA would cease selling these LTC policies, "closing the block" of their LTC business and/or the ramifications of such an action; (g) the closed LTC policy block was experiencing or would experience a "selection spiral" or "death spiral;" (h) CIGNA and INA were intentionally raising their premiums to exorbitant rates in order to obtain windfall profits by forcing the insureds to drop the LTC policies and thereby avoid future claims; and/or (i) CIGNA and INA

intended to pass any risk of loss due to the defective underpricing of the LTC policies on to Alvarez and the Class in the form of higher premiums.

(54)    While CIGNA and INA were aware of the above-described problems and engaged in the above-described wrongful course of conduct, Alvarez and the Class, ignorant of CIGNA's and INA's wrongful actions, bought and/or renewed the guaranteed renewable LTC policies and continued to pay ever-escalating premiums on those policies.

(55)    Had CIGNA and INA not made these affirmative misrepresentations and not omitted these material facts, Alvarez and the Class would not have initially purchased the policies nor would they have renewed their policies.

(56)    At all relevant times, CIGNA and INA acted with intent to deceive Alvarez and the Class and effectuated the above-described wrongful course of action that was reasonably calculated to deceive and/or defraud their LTC policyholders, including Alvarez and the Class.

## CLASS ACTION ALLEGATIONS

(57)    Pursuant to Fed.R.Civ.P. 23(b)(3), Alvarez seeks to bring this action on behalf of himself and the Class of similarly situated consumers.

(58)    The Class is defined as:

All individuals who purchased, between 1988 and the present, an Insurance Company of North America Policy Form TL-003039, or TL-001455, or TL-004043 and whose premiums on those policies were increases in calendar year 2004 and/or 2005, but excluding from such class, the defendants, any and all officers, directors, employees, and agents of the defendants, their affiliates, and/or subsidiaries who are or have been employed by defendants.

(59)    Pursuant to Fed.R.Civ.P. 23(a)(1), the Class has, on information and belief, between three thousand (3,000) and five thousand (5,000) members and is so numerous that joinder of all members is impractical. Nevertheless, the identity of each class member is readily ascertainable by CIGNA and INA.

-14-

(60)    Pursuant to Fed.R.Civ.P. 23(a)(2), there are questions of law and fact common to the members of the class, including the following:

(a)    The terms of the uniform written marketing materials, policy forms, and correspondence under which CIGNA and INA sold and renewed the LTC policies to Alvarez and the Class;

(b)    Whether CIGNA and INA fraudulently induced the sale and renewal of the LTC polices by withholding material information from Alvarez and the Class;

(c)    Whether CIGNA and INA affirmatively concealed from Alvarez and the Class the defects inherent in the LTC policies;

(d)    Whether CIGNA and INA wrongfully underpriced their LTC policies;

(e)    Whether CIGNA and INA "closed the block" of LTC policies and failed to inform Alvarez and the Class;

(f)    How much CIGNA and INA profited, or diminished its losses, as a result of its fraudulent sale and renewal of the LTC policies to Alvarez and the Class;

(g)    Construction of D.C. Statute §§ 28-3901 *et. seq.* which prohibits Unlawful Trade Practices;

(h)    Construction of common law claims of Constructive Fraud;

(i)    Construction of common law claims of Actual Fraud;

(j)    Construction of common law claims of Tortious Breach of Implied Covenant of Good Faith and Fair Dealing (Bad Faith)

(k)    Whether Alvarez and the Class have sustained damages and the proper measure of those damages;

(l)    Whether the aforementioned acts of the CIGNA and INA were done intentionally and/or as part of a scheme reasonably calculated to deceive and defraud consumers of its product; and

(m)    Whether the conduct of the CIGNA and INA demonstrates sufficient evil motive, actual malice, deliberate oppression, intent to injure, and willful disregard for the rights of Alvarez and the Class and/or CIGNA's and INA's fraudulent conduct itself was outrageous and grossly fraudulent in order to warrant the imposition of punitive damages.

-15-

(61)    Pursuant to Fed.R.Civ.P. 23(a)(3), the claims of Mr. Alvarez are typical of the claims of all the class members as CIGNA and INA communicated to Mr. Alvarez and the Class via uniform written marketing materials, policy forms, and correspondence and CIGNA and INA enacted uniform rate increases on the LTC policy forms held by Alvarez and the Class.

(62)    Pursuant to Fed.R.Civ.P. 23(a)(4), the representative party will fairly and adequately protect the interests of the Class as:

> (a)    The attorneys for the representative party will adequately represent the interests of the Class, given counsel's collective expertise in complex litigation, class actions, litigation involving claims for fraud and other unfair business practices, and prior litigation involving claims of fraud in connection with the sale and renewal of LTC policies in North Dakota, Florida, Pennsylvania, and California;

> (b)    The representative plaintiff does not have a conflict of interest in the maintenance of the class action, since all claims asserted are virtually identical and the claims of officers, employees, and agents of the defendants have been expressly excluded from the Class definition; and

> (c)    The representative parties can acquire adequate financial resources, to assure that the interests of the Class will be protected.

(63)    Pursuant to Fed.R.Civ.P. 23(b)(3), the common questions of law and fact identified above predominate over any questions affecting only individual class members because the only possible individual question affecting individual members of the class is the precise amount of compensatory damages to which each class member is entitled. Even there, however, most class members paid standardized or ascertainable prices for a standardized or ascertainable level of coverage and therefore damages can be easily computed on a class-wide basis through the application of generally accepted economic calculations.

(64)    Pursuant to Fed.R.Civ.P. 23(b)(3), class action treatment is a superior method for the fair and efficient adjudication of this controversy, because individual class members have little interest

in controlling the prosecution of this matter and the prosecution of this matter as a class action effects no pending litigation. The prosecution of this matter as a class action allows the Class to prosecute their common claims in a single forum simultaneously and without unnecessary duplication. The class action provides an efficient method whereby the enforcement of the rights of the plaintiff, the class members, and the defendants can be fairly managed.

## CLAIMS FOR RELIEF

### CLAIM NO. 1 – Actual Fraud

(65)    For his first claim for relief, Alvarez realleges each and every prior allegation of this Class Action Complaint.

(66)    In connection with Alvarez and the Class's purchase and renewal of their LTC policies, CIGNA and INA made false representations to Alvarez and the Class by suppressing and omitting the fact that:

(a)    the LTC policies had been initially underpriced;

(b)    the actuarial assumptions and lapse rates underlying the pricing of the LTC policies were based on limited or incomplete data or ignored data available in the LTC insurance industry;

(c)    the actuarial assumptions underlying the pricing of the LTC policies failed to take into account the way the LTC policies would be underwritten;

(d)    given these problems, the defendants knew that the original premiums would not be sufficient to support future claims;

(e)    CIGNA and INA planned on seeking a series of premium increases for the LTC policies;

(f)    CIGNA and INA had or would cease selling these LTC policies, "closing the block" of their LTC business and/or the ramifications of such an action;

(g)    the closed LTC policy block was experiencing or would experience a "selection spiral" or "death spiral;"

-17-

(h)     CIGNA and INA were intentionally raising their premiums to exorbitant rates in order to obtain windfall profits by forcing the insureds to drop the policy and thereby avoid future claims; and/or

(i)     CIGNA and INA intended to pass any risk of loss due to the defective underpricing of the LTC policies on to Alvarez and the Class in the form of higher premiums.

(67)    Further, in connection with certain of these rate increases and in conjunction with policy renewal letters, CIGNA made false repressions to Alvarez and the Class when it wrote to each policyholder to mislead them about the reason for the rate increase and to tell him that his policy "continues to provide valuable long term care benefits."

(68)    CIGNA and INA continued to falsely represent, omit, and conceal these material facts from Alvarez and the Class throughout their relationship despite CIGNA's and INA's obligation to make full and complete disclosure of all material facts upon the original sale of the LTC policies and upon the renewal of the LTC policies. Thus, in addition to inducing Alvarez and the Class to originally purchase the LTC policies, CIGNA's and INA's misrepresentations, omissions, and acts of concealment induced and required Alvarez and the Class to pay increased LTC insurance policy premiums in order to keep the LTC policies in force.

(69)    The misrepresentations and omissions by CIGNA and INA were made in reference to facts that are material because a reasonable prospective LTC insurance policyholder would consider them important in deciding whether to purchase the LTC policies from CIGNA and INA and a reasonable existing LTC policyholder would consider them important in deciding whether to pay the increased premium in order to re-new their LTC policies with CIGNA and INA.

(70)    At the times CIGNA and INA made these false representations and omissions as alleged throughout this Class Action Complaint, they knew and/or should have known such representations

were false and/or believed them to be untrue. CIGNA and INA knew and/or should have known that the omitted information was material.

(71)    At the times CIGNA and INA made these misrepresentations and omissions as alleged throughout this Class Action Complaint they did so with the intent to deceive Alvarez and the Class.

(72)    Alvarez and the Class relied upon the defendants' false representations and/or failure to disclose material facts to their detriment. Alvarez and the Class had a right to rely on CIGNA's and INA's representations, and CIGNA and INA made the representations for the purpose of inducing Alvarez and the Class' reliance thereupon.

(73)    Plaintiff and the Class were ignorant of the falsity of CIGNA's and INA's statements, believed them to be true, and reasonably relied on their truth and accuracy. In reasonable reliance on CIGNA's and INA's representations of material facts, and in ignorance of the true facts, Alvarez and the Class were induced to, and did, purchase and/or renew LTC policies from CIGNA and INA and were locked into a situation of paying increasing policy premiums for their LTC insurance coverage; and/or precluded from obtaining alternate LTC insurance coverage because they were too old or infirm to obtain such alternative insurance. Had Alvarez and the Class been fully and truthfully informed, they would not have initially purchased or subsequently renewed the LTC insurance policies.

(74)    Alvarez and the Class suffered damages as a result of the defendants' actions.

### CLAIM NO. 2 – Constructive Fraud

(75)    For his second claim for relief, plaintiff realleges each and every prior allegation of this Class Action Complaint.

(76)    CIGNA and INA had a duty to deal honestly and reasonably with the plaintiff and the Class in negotiating, selling, and renewing the LTC policies because in every insurance policy contract there is an implied obligation of good faith and fair dealing on the part of both parties.

(77)    The defendants breached this duty by failing to inform the plaintiff and the Class that:

(a)    the LTC policies had been initially underpriced;

(b)    the actuarial assumptions and lapse rates underlying the pricing of the LTC policies were based on limited or incomplete data or ignored data available in the LTC insurance industry;

(c)    the actuarial assumptions underlying the pricing of the LTC policies failed to take into account the way the LTC policies would be underwritten;

(d)    given these problems, the defendants knew that the original premiums would not be sufficient to support future claims;

(e)    CIGNA and INA planned on seeking a series of premium increases for the LTC policies;

(f)    CIGNA and INA had or would cease selling these LTC policies, "closing the block" of their LTC business and/or the ramifications of such an action;

(g)    the closed LTC policy block was experiencing or would experience a "selection spiral" or "death spiral;"

(h)    CIGNA and INA were intentionally raising their premiums to exorbitant rates in order to obtain windfall profits by forcing the insureds to drop the policy and thereby avoid future claims; and/or

(i)    CIGNA and INA intended to pass any risk of loss due to the defective underpricing of the LTC policies on to Alvarez and the Class in the form of higher premiums.

(78)    Further, in connection with certain of these rate increases and in conjunction with policy renewal letters, CIGNA made false repressions to Alvarez and the Class when it wrote to each policyholder to mislead them about the reason for the rate increase and to tell him that his policy "continues to provide valuable long term care benefits."

(79)    CIGNA and INA continued to falsely represent, omit, and conceal these material facts from Alvarez and the Class throughout their relationship and despite CIGNA's and INA's obligation to make full and complete disclosure of all material facts upon the original sale of the LTC policies and upon the renewal of the LTC policies. Thus, in addition to inducing Alvarez and the Class to originally

purchase the LTC policies, CIGNA's and INA's misrepresentations, omissions, and acts of concealment induced and required Alvarez and the Class to pay increased LTC insurance policy premiums in order to keep the LTC policies in force.

(80)    The misrepresentations and omissions by CIGNA and INA were made in reference to facts that are material because a reasonable prospective LTC insurance policyholder would consider them important in deciding whether to purchase the LTC policies from CIGNA and INA and a reasonable existing LTC policyholder would consider them important in deciding whether to pay the increased premium in order to re-new their LTC policies with CIGNA and INA.

(81)    At the times CIGNA and INA made these false representations and omissions as alleged throughout this Class Action Complaint, they knew and/or should have known such representations were false and/or believed them to be untrue. CIGNA and INA knew and/or should have known that the omitted information was material.

(82)    At the times CIGNA and INA made these misrepresentations and omissions as alleged throughout this Class Action Complaint they did so with the intent to deceive Alvarez and the Class.

(83)    Alvarez and the Class relied upon the defendants' false representations and/or failure to disclose material facts to their detriment. Alvarez and the Class had a right to rely on CIGNA's and INA's representations, and CIGNA and INA made the representations for the purpose of inducing Alvarez and the Class' reliance thereupon.

(84)    Plaintiff and the Class were ignorant of the falsity of CIGNA's and INA's statements, believed them to be true, and reasonably relied on their truth and accuracy. In reasonable reliance on CIGNA's and INA's representations of material facts, and in ignorance of the true facts, Alvarez and the Class were induced to, and did, purchase and/or renew the LTC policies from CIGNA and INA and were locked into a situation of paying increasing policy premiums for their LTC insurance coverage; and/or precluded from obtaining alternate LTC insurance coverage because they were too old or infirm

-21-

to obtain such alternative insurance. Had Alvarez and the Class been fully and truthfully informed, they would not have initially purchased or subsequently renewed the LTC insurance policies.

(85)    Alvarez and the Class suffered damages as a result of the defendants' actions.

### CLAIM NO. 3 – Unlawful Trade Practices:
### D.C. Code §§ 28-3901 *et. seq.*

(86)    For his third claim for relief, plaintiff realleges each and every prior allegation of this Class Action Complaint.

(87)    CIGNA and INA made misrepresentations as to material facts, as set forth above, in order to sell and/or renew the LTC policies.

(88)    CIGNA and INA failed to state material facts, as set forth above, in order to sell and/or renew the LTC policies and such failure tended to mislead Alvarez and the Class.

(89)    Alvarez and the Class suffered damages as a result of the defendants' actions. Alvarez and the Class are entitled to treble damages and punitive damages as the result of the defendants' actions.

### CLAIM NO. 4 – Tortious Breach of Implied Covenant
### of Good Faith and Fair Dealing (Bad Faith)

(90)    For his fourth claim for relief, plaintiff realleges each and every prior allegation of this Class Action Complaint.

(91)    Contained in the LTC policy contract between CIGNA and INA and Alvarez and the Class there was an implied covenant of good faith and fair dealing which mandated that CIGNA and INA would not undertake any action that would have the effect of destroying or injuring Alvarez's and the Class' right to receive the benefits of the LTC policy contract.

(92)    This implied covenant of good faith and fair dealing governed CIGNA's and INA's actions in negotiating, selling, and renewing the LTC policies to Alvarez and the Class.

(93)    In 2004, CIGNA and INA increased Alvarez's and the Class' LTC policy premiums in an effort to recoup their underfunded reserves and to mitigate other facets of their fraudulent and wrongful course of conduct. In doing so CIGNA and INA passed the costs of the underpricing of the LTC policies directly onto Alvarez and the Class.

(94)    This course of conduct, in which an insurance company shifts the cost of the underpricing of a LTC insurance policy back to a class of policyholders through premium increases, defeats the purpose of insurance. The execution of this type of a scheme by CIGNA and INA constitutes bad faith. It is a violation of the CIGNA's and INA's implied obligation of good faith and fair dealing toward Alvarez and the Class as it destroys or injures their right to receive the benefits of the LTC policy contract.

(95)    Alvarez and the Class suffered damages as a result of the defendants' actions. Alvarez and the Class are entitled to punitive damages as the result of the defendants' actions.

### CLAIM NO. 5 – Punitive Damages

(96)    For his fifth claim for relief, plaintiff realleges each and every prior allegation of this Class Action Complaint.

(97)    CIGNA's and INA's fraudulent conduct as set forth above was undertaken with evil motive, actual malice, deliberate oppression, intent to injure, and willful disregard for the rights of Alvarez and the Class and CIGNA's and INA's fraudulent conduct itself was outrageous and grossly fraudulent.

(98)    Therefore, plaintiff and the Class are entitled to punitive damages under law.

### REQUEST FOR RELIEF

**WHEREFORE**, plaintiff requests the following relief:

(1)   This action be certified as a class action of the proposed plaintiff class and plaintiff be

        designated as the representative of the class;

(2)   Economic and non-economic damages in excess of $5,000,000.00 to be determined by

        the trier of fact;

(3)   Treble damages as allowed by law;

(4)   Punitive damages as allowed by law; and

(4)   Attorneys fees, costs and disbursements, and pre-judgment and post-judgment interest,

        as allowed by law and such other relief as the Court deems just and necessary.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated this 27 day of January, 2006.

JAMES & HOFFMAN
EDGAR N. JAMES
(DC Bar No. 333013)
Amy Fettig, Esq.
(DC Bar No. 484883)
1101 Seventeenth St. N.W., Suite 510
Washington, D.C. 20036
(202) 496-0500


KANNER & WHITELEY
ALLAN KANNER (LA#20580)
CONLEE S. WHITELEY (LA#22678)
701 Camp Street
New Orleans, LA 70130
(504) 524-5777

VOGEL LAW FIRM
TIMOTHY Q. PURDON (ND#05392)
MONTE L. ROGNEBY (ND#05029)
200 North 3rd Street, Suite 201
P. O. Box 2097
Bismarck, ND 58502-2097
(701) 258-7899


PERRY PEARCE BENTON, ESQ.
(Bar No. ASB-2159-N66P)
32516 Sandpiper Dr.
Orange Beach, AL
(251) 980-2640

Attorneys for Plaintiff