## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Robert Alvarez, individually, and on<br>behalf of all others similarly situated, | ) )<br>) | |
| Plaintiff, | ) | Case No. 1:06CV00145 |
| v. | ) )<br>) | THE HONORABLE<br>EMMET G. SULLIVAN |
| CIGNA and The Insurance<br>Company of North America, | ) )<br>) | |
| Defendants. | )<br>) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

James F. Jorden (D.C. Bar No. 37598)
Raul A. Cuervo (D.C. Bar No. 463718)
Stephen H. Goldberg (D.C. Bar No. 465113)
JORDEN BURT LLP
1025 Thomas Jefferson Street, N.W.
Suite 400 East
Washington, DC  20007-5208
Telephone: 202-965-8100
Facsimile:  202-965-8104

Counsel for Defendants CIGNA and The Insurance
Company of North America

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ......................................................................................... 1

II.  SUMMARY OF FACTS AND ALLEGATIONS ........................................... 3

    A.   The Named Plaintiff .............................................................................. 3

    B.   Defendants ............................................................................................. 3

    C.   The LTC Insurance ............................................................................... 4

    D.   The Complaint's Allegations ................................................................ 6

III. ARGUMENT .............................................................................................. 7

    A.   Plaintiff Has Failed To Adequately Establish Many Of The Requisite Elements For His Actual And Constructive Fraud Claims ................... 7

        1.   Plaintiff has failed to adequately establish justifiable reliance on any purported non-disclosures .............................................. 7

        2.   INA had no affirmative duty to disclose the details of its pricing methodology to Plaintiff ................................................ 9

        3.   The Complaint fails to adequately establish fraudulent intent ................ 11

    B.   The District Of Columbia Consumer Procedures And Protection Act ("CPPA") Does Not Reach The Conduct Alleged In This Case ......... 13

    C.   Maryland Law Does Not Recognize A Common Law Claim For A Tortious Breach Of An Implied Covenant Of Good Faith And Fair Dealing ................................................................................................ 15

    D.   There Is No Separately Cognizable Claim For Punitive Damages ...... 17

IV.  CONCLUSION ............................................................................................ 18

## EXHIBITS

Exhibit A, Complaint

Exhibit B, INA Group Long-Term Care Master Policy ("Master Policy")

Exhibit C, Affidavit of Maria A. DaSilva-Neto

Exhibit D, Promotional Material Package

Exhibit E, Participating Organization Agreement ("POA")

Exhibit F, Alvarez's Certificate

# TABLE OF AUTHORITIES

Page

**Chief Cases**

*Huffman v. Town of La Plata*, No. Civ.A DKC 2004-2833, 2005 WL 1038854
(D. Md. May 4, 2005) ........................................................................................................ 8

*Johnson v. Federal Kemper Ins. Co.*, 536 A.2d 1211 (Md. Ct. Spec. App. 1988) ...................... 10

*Maryland Minority Contractor's Ass'n, Inc. v. Maryland Stadium Auth.*, 70 F. Supp. 2d 580
(D. Md. 1998) ................................................................................................................. 13

*Nelson v. Nationwide Mortgage Corp.*, 659 F. Supp. 611 (D.D.C. 1987) .................................. 14

*Sadler v. Loomis Co.*, 776 A.2d 25 (Md. Ct. Spec. App. 2001) ................................................. 10

*Shabazz v. Bob Evans Farms, Inc.*, 881 A.2d 1212 (Md. Ct. Spec. App. 2005). ....................... 17

*State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834 (Ala. 1998) ...................................... 10, 11

*Stephens v. Liberty Mut. Fire Ins. Co.*, 821 F. Supp. 1119 (D. Md. 1993) ................................ 15

**Additional Cases**

*Adams v. NVR Homes, Inc.*, 135 F. Supp. 2d 675 (D. Md. 2001) ................................................ 11

*Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038 (Md. 1995) .................. 11

*Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561 (7th Cir. 1991). 11

*Bass v. Hendrix*, 931 F. Supp. 523 (S.D. Tex. 1996) ................................................................. 15

*Bishop v. GNC Franchising LLC*, 403 F. Supp. 2d 411 (W.D. Pa. 2005) .................................... 17

*Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc.*, 246 F. Supp. 2d 394
(E.D. Pa. 2002) ............................................................................................................. 8, 16

*Brown v. News World Commc'ns, Inc.*, CIV. A. No. 89-1572, 1990 WL 137378 (D.D.C. Sept.
10, 1990) .......................................................................................................................... 16

*Brown v. United States*, 271 F. Supp. 2d 225 (D.D.C. 2003) ...................................................... 6

*Cephas v. MVM, Inc.*, 403 F. Supp. 2d 17 (D.D.C. 2005) ........................................................... 6

*Chalmers v. Toyota Motor Sales, USA, Inc.*, 935 S.W.2d 258 (Ark. 1996) ................................ 15

*Cole v. Equitable Life Assur. Soc'y*, No. 108611, 95-001, 1996 WL 932095
(N.Y. Sup. Ct. June 28, 1996) ........................................................................................... 15

**TABLE OF CONTENTS**
(continued)

Page

*Consumer Prot. Div. v. Outdoor World Corp.*, 603 A.2d 1376 (1992) ........................................ 15

*Cozzi Iron & Metal Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570 (7th Cir. 2001) ....................... 8

*Crystal Prods., Inc. v. Doc Severinsen Orchestras*, No. Civ. A. 90-932, 1994 WL 507546
(D.D.C. Sept. 10, 1992) ........................................................................................................ 16

*Estate of Taylor v. Lilienfield*, 744 A.2d 1032 (D.C. 2000) ......................................................... 18

*Estate of White v. R.J. Reynolds Tobacco Co.*, 109 F. Supp. 424 (D. Md. 2000) .................... 9

*Ex Parte Ford Motor Credit Co.*, 717 So. 2d 781 (Ala. 1997) .................................................... 11

*Flecha de Lima v. International Med. Grp., Inc.*, No. 01CA6866, 2004 WL 2745654
(D.C. Super. Ct. Nov. 29, 2004) ........................................................................................... 16

*Gaines v. Krawczyk*, 354 F. Supp. 2d 573 (W.D. Pa. 2004) ....................................................... 11

*Goshen v. Mutual Life Ins. Co.*, 730 N.Y.S.2d 46 (N.Y. App. Div. 2001) ................................... 15

*Hilbert v. Roth*, 149 A.2d 648 (Pa. 1959) .................................................................................... 17

*Hill v. Brush Engineered Materials, Inc.*, 383 F. Supp. 2d 814 (D. Md. 2005) ........................... 9

*In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828 (N.D. Ill. 2002) ............................ 15

*Jay Freeman Co. v. Glens Falls Ins. Co.*, 486 F. Supp. 140 (N.D. Tex. 1980) ............................ 8

*JHE, Inc. v. Southeast Pa. Transp. Auth.*, No. 1790 NOV. TERM 2001, 2002 WL 1018941
(Pa. Ct. Com. Pl. May 17, 2002) ......................................................................................... 16

*Jiffy Lube Sec. Litig.*, No. Civ. Y-89-1939, 1990 WL 10010982 (D. Md. Oct. 31, 1990) ............. 7

*Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516 (D.C. 1948) ......................................................... 9

*Keene Corp. v. Insurance Co. of N. Am.*, 597 F. Supp. 934 (D.D.C. 1984) .................................. 7

*Klapp v. United Ins. Grp. Agency*, 674 N.W.2d 736 (Mich. Ct. App. 2003) ................................. 8

*Learning Works, Inc. v. Learning Annex, Inc.*, 830 F.2d 541 (4th Cir. 1987) .............................. 7

*Maxwell v. Gallagher*, 709 A.2d 100 (D.C. 1998) ...................................................................... 18

*Mikeron, Inc. v. Exxon Co., U.S.A.*, 264 F. Supp. 2d 268 (D. Md. 2003) .................................... 16

*Norwest Mortgage, Inc. v. Superior Ct.*, 85 Cal. Rptr. 2d 18 (Cal. Ct. App. 1999) .................... 15

# TABLE OF CONTENTS
(continued)

Page

*Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618 (D. Md. 2003) .............. 11, 12

*Parrino v. FHP, Inc.*, 146 F.3d 699 (9th Cir. 1998) ....................................................... 6

*Phillip Morris Inc. v. Angeletti*, 752 A.2d 200 (Md. 2000) ........................................... 18

*R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm'n*, 913 F. Supp. 1031
(N.D. Ohio 1996) ...................................................................................................... 9

*Rafferty v. NYNEX Corp.*, 60 F.3d 844 (D.C. Cir. 1995).............................................. 7

*Richter v. Aetna Life Ins. & Annuity Co.*, No. BC221760, 2003 WL 1930341
(Cal. Ct. App. Apr. 23, 2003) ............................................................................... 16, 17

*Scheve v. McPherson*, 408 A.2d 1071 (Md. Ct. Spec. App. 1979).............................. 11

*Schiff v. American Ass'n of Retired Persons*, 697 A.2d 1193 (D.C. Cir. 1997) ........... 11

*Seiss v. Sherman*, 49 Pa. D. & C. 4th 367 (Pa. Ct. Com. Pl. 2000) ............................ 10

*USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433 (3d Cir. 1993).................................. 16

*Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.*,
878 A.2d 1226 (D.C. Cir. 2005) ............................................................................... 7

*Williams v. Central Money Co.*, 974 F. Supp. 22 (D.D.C. 1997) ................................ 15

*Wootton Enters., Inc. v. Subaru of Am., Inc.*, 134 F. Supp. 2d 698 (D. Md. 2001) ...................... 16

*Youndt v. First Nat.l Bank of Port Allegany*, 868 A.2d 539 (Pa. Super. Ct. 2005) ........................ 9

**Statutes**

D.C. Code §§ 28-3901 et seq ................................................................................... 13

**Other Authorities**

Amy Friedman, *New Wrinkles On A Young Product*, Fin. Servs. Wk., Apr. 29, 1991. ................. 4

Korbin Liu, et al., *Morbidity, Disability and Long Term Care of the Elderly: Implications for
Insurance Financing*, Milbank Q., September 22, 1990................................................ 4

Maryland Ins. Admin., *Glossary of Ins. Terms*.............................................................. 3

## I.     **INTRODUCTION**

In his Class Action Complaint (the "Complaint"),[1] Plaintiff purports to represent a nationwide class, raising claims predicated on conclusory allegations that the Defendant, Insurance Company of North America ("INA" or "Defendant"),[2] intentionally underpriced the long-term care ("LTC") insurance sold to Plaintiff in 1992 with the undisclosed plan to increase premiums **twelve** years later. [3]  Such conduct is alleged to give rise to claims for (i) actual fraud, (ii) constructive fraud, (iii) violation of the District of Columbia Consumer Procedures and Protection Act ("CPPA"), (iv) tortious breach of an implied covenant of good faith and fair dealing, and (v) punitive damages.

This allegedly unlawful scheme of intentionally concealing planned future premium increases is belied by the terms of the group insurance policy through which Plaintiff purchased his LTC coverage (the "Master Policy").  Thus, the Master Policy explicitly provides on its face page that "**[we] may change the premium rates on any Premium Due Date after the first anniversary of the policy.**"  INA Group Long-Term Care Master Policy ("Master Policy"), attached hereto as Exhibit B, at 1 (emphasis added).[4]  Likewise, the "uniform application and promotional materials"[5] upon which the Complaint alleges that Plaintiff relied in purchasing his

---

[1]    A copy of the Complaint is attached hereto as Exhibit A.

[2]    A separate motion pursuant to Fed. R. Civ. P. 12(b)(2) and (5) has been filed concurrently with this motion to seek the dismissal of the Defendant "CIGNA" inasmuch as no such entity exists.  In the event that such motion is not granted, the Court should regard this motion as applying to both INA and CIGNA.

[3]    The Complaint is devoid of any allegations of explicit misrepresentations that premiums would never be increased.

[4]    Notwithstanding the express contractual reservation of the right to change rates, the premium rate on Plaintiff's LTC coverage (and the coverage of other insureds in the same class as Plaintiff) remained unchanged until such rate was increased in 2004, twelve years after Plaintiff purchased such coverage and after the block of business which included his coverage was closed to new sales.

[5]    For the type of coverage Plaintiff purchased, the "uniform application and promotion materials" upon which Plaintiff relied (Complaint at ¶ 24), were sent as a single package (the "Promotional Material Package").  *See* Affidavit of Maria A. DaSilva-Neto (the "DaSilva-Neto Affidavit"), attached hereto as Exhibit C, at ¶¶ 3-4.

LTC coverage states that premiums can be increased.  *See* Promotional Material Package at

Premium Schedules A-E; *id.* at Guaranteed Renewable Eligibility; DaSilva-Neto Aff. at ¶¶ 4-5.

As demonstrated below, all of Plaintiff's claims should be dismissed for the following

reasons:

- Plaintiff has failed to plead any facts, which if assumed to be true, would establish that Plaintiff justifiably relied on INA not doing what it had a contractual right to do − *i.e.*, increase premiums;

- In any event, INA had no duty as a matter of law to make any affirmative disclosures to Plaintiff concerning the pricing of the product;

- Plaintiff has failed to adequately plead facts which would establish INA's purported fraudulent intent to conceal that it would increase premiums;

- None of the jurisdictions whose laws are potentially applicable recognize a cause of action for tortious breach of a covenant of good faith with regard to a contract.  In any event, in jurisdictions which recognize such a cause of action, a breach cannot, as is the case here, be predicated on conduct which is explicitly authorized by the terms of the contract;

- The District of Columbia CPPA has no applicability where, as is recognized in the Complaint, neither Plaintiff nor Defendants are citizens of the District of Columbia and the purportedly fraudulent or deceptive conduct did not occur there; and

- Applicable law does not recognize a separate cause of action for punitive damages.

---

References to the DaSilva-Neto Affidavit shall be "DaSilva-Neto Aff. at ___."  A copy of the Promotional Material Package is attached hereto as Exhibit D.

## II.    SUMMARY OF FACTS AND ALLEGATIONS

### A.    The Named Plaintiff

The named Plaintiff, Robert Alvarez ("Plaintiff"), is currently a resident of Florida, but was a resident of Maryland when he applied for and purchased LTC coverage in 1992. Complaint at ¶ 10. Plaintiff was 71 when he purchased this coverage and is currently 84 years old. *Id.* Plaintiff's coverage, for which he paid an annual premium of $1,188.00, became effective on or about April 1, 1992. *Id.* The Complaint avers that such rate was a "guaranteed renewable premium rate." *Id.* However, the Complaint does not – and cannot – point to any document or other information where the term "guaranteed renewable premium" is used. In fact, the documents attached to the Complaint, or referred to therein, use the term "guaranteed renewable," a distinct term having a very different meaning.[6]   Moreover, as discussed previously, the Master Policy through which Plaintiff purchased coverage, and which governed the terms of such coverage, in fact, provided that Defendant "may change the premium rates on any Premium Due Date after the first anniversary of the policy." Master Policy at 1.

### B.    Defendants

INA is an insurance company headquartered in Philadelphia, Pennsylvania. Complaint at ¶ 12. INA is the insurer under the Master Policy issued to the National Group Benefits Insurance Trust (the "Trust") through which LTC coverage was made available to Plaintiff and other

---

[6]    The Complaint attempts to equate "guaranteed renewable" with a promise on the part of the insurer that premiums will not be increased. To the contrary, however, it is uniformly recognized that a guaranteed renewable policy, while precluding *unilateral changes to policy terms* or premium increases *on an individual insured basis*, allows the insurer to increase rates for an entire insured class, as occurred under the LTC policy at issue. For example, the Maryland Insurance Administration, in its published "Glossary of Insurance Terms," defines "guaranteed renewable policy" as follows:

> a policy which the insured has the right to continue in force by the timely payment of premiums to a specified age, (usually age 50) during which period the insurer has no right to make unilaterally any change in any provision of the policy while the policy is in force *but may make changes in premium rates for the entire policyholder classification.*

Maryland Insurance Administration, *Glossary of Ins. Terms, available at* http://www.mdinsurance.state.md.us/jsp/glossary/Glossary.jsp10 (emphasis added).

persons associated with the American Chemical Society ("ACS"). *See* Master Policy at 1; Participating Organization Agreement between INA and ACS ("POA"), attached hereto as Exhibit E; Alvarez's Certificate for Group Long-Term Care Insurance ("Certificate"), attached hereto as Exhibit F.

Defendant, CIGNA,[7] is alleged to be a publicly traded insurance company headquartered in Philadelphia, Pennsylvania. Complaint at ¶ 11. It is further alleged that "[a] division of CIGNA, known as CIGNA Group Insurance and/or INA developed, marketed, sold and administered" the LTC coverage sold to Plaintiff and other members of the purported class. *Id.* at ¶ 13.

### C.     The LTC Insurance

LTC insurance was first introduced into the insurance market in the late 1980s. *See* Amy Friedman, *New Wrinkles On A Young Product*, Fin. Servs. Wk., Apr. 29, 1991, at 25; Korbin Liu, et al., *Morbidity, Disability and Long Term Care of the Elderly: Implications for Insurance Financing*, Milbank Q., September 22, 1990, at 445. INA is alleged in the Complaint to have begun selling such insurance in 1988. Complaint at ¶ 19. It ceased selling the type of LTC coverage which it sold to Plaintiff in 1992. *Id.* at ¶ 39. This type of insurance is intended to provide benefits for certain types of long-term medical, rehabilitative, therapeutic, maintenance and personal care expenses arising out of conditions specified in the insurance policy (*i.e.*, physical and mental impairments that cause the loss of the ability to perform certain activities of daily living) and which are incurred in a setting other than a hospital (*i.e.*, a nursing home and/or personal home). *See* Master Policy at 7-13 (describing coverage); Certificate at 6, 9 (same).

---

[7]     As set forth in the Fed. R. Civ. P. 12(b)(2) and (5) motion, filed concurrently herewith, no such named entity exists.

Under the coverage at issue in this case, the minimum age to purchase such coverage is 50 and the maximum age is 79. *See* Master Policy at 3 (discussing eligibility).[8]

Plaintiff was able to purchase LTC coverage from INA through the Master Policy, which was a group policy issued to the Trust, and pursuant to which individual coverage was made available to certain persons associated with the ACS. Complaint at ¶10; Master Policy at Schedule of Participating Organizations; POA. When Plaintiff decided to purchase LTC coverage through the Master Policy, he received the Certificate from INA which summarized the terms of his coverage. *See* Certificate. The Certificate made it clear, however, that the Master Policy, the application of the Master Policyholder (*i.e.*, the Trust), the subscription agreement of the ACS, and, if required, the certificateholder's application constituted the entire contact between the parties. *Id.* at 7.

The Complaint alleges that the sale of Plaintiff's LTC coverage "was based on INA's uniform application and promotional materials . . . ." Complaint at ¶24. The Complaint further alleges the Plaintiff relied on INA "to prepare LTC insurance contracts consistent with their application forms and promotional materials." *Id.* at ¶27. Plaintiff attaches to the Complaint at Exhibit A what is purported to be a copy of the "uniform policy application form." Plaintiff's Exhibit A, however, omits several pages of "uniform promotional materials" that were attached to the "uniform policy application form" and sent as a single package for the type of coverage which Plaintiff purchased. *See* Promotional Material Package. Such pages set forth the applicable premium schedules by age, individual or family, and option. At the bottom of each page of the premium schedule is the following language:

---

[8]    A rider to the Master Policy lowered to 40 the minimum age for "Class 2" eligible insureds (comprising the spouses of ACS members and the parents, parents-in-law, and siblings of ACS members and their spouses) under the ACS program.

> Your age at the time of application determines your premium and
> it will **not** increase unless the Company changes premiums on a
> class basis.  If you received an incorrect premium sheet, the
> Company will bill you in accordance with the Master Contract.[9]

*Id.* at Premium Schedules A-E (emphasis in original). *See also* DaSilva-Neto Aff. at ¶ 4.[10]

### D.    The Complaint's Allegations

The gravamen of the Complaint is that INA intentionally underpriced the LTC coverage

sold to Plaintiff and other members of the purported class with the undisclosed "plan to pass the

cost of the defective underpricing of the LTC policies back to Alvarez and the class through

premium increases."  Complaint at ¶ 4.  The Complaint further alleges that INA ceased selling

LTC coverage in 1992 (known as "closing the block" of business) without disclosing such fact to

policyholders.  *Id.* at ¶ 8.  The Complaint avers that "[w]hen an insurance company fails to

properly price a LTC policy and fails to properly establish reserves for a block of LTC insurance

business, closing the block can lead to a 'death spiral' that will guarantee that the premium rates

on the LTC policies will increase at an even greater rate."  *Id.*

---

[9]    Likewise, the Promotional Material Package, when discussing the "guaranteed renewability" of Plaintiff's coverage states as follows:

> Your premiums are based on your age at the time of purchase and will not be
> adjusted unless the Company increases rates for the class or group.

*Id.* at Guaranteed Renewable Eligibility.

[10]    "'[D]ocuments attached as exhibits or incorporated by reference' may be used in determination of a 12(b)(6) motion to dismiss." *Cephas v. MVM, Inc.*, 403 F. Supp. 2d 17, 20 (D.D.C. 2005), *quoting Brown v. United States*, 271 F. Supp. 2d 225, 228 (D.D.C. 2003).  Plaintiff's Complaint expressly refers to the "uniform application and promotional materials" and alleges that he relied on those materials in purchasing his LTC coverage.  Complaint at ¶ 24.  Plaintiff attaches the application form but omits the promotional material attached to it.  Just as Plaintiff should not be permitted to "surviv[e] a Rule 12(b)(6) motion by deliberately omitting references to documents upon which [his] claims are based," he should not be permitted to survive a Rule 12(b)(6) motion by omitting essential pages of a document upon which his claims are based.  *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998).  Therefore, the Court may properly consider the entire Promotional Material Package attached hereto as Exhibit D, because it is referred to in the Complaint, and is so central to Plaintiff's claims that he attached a partial copy to the Complaint.

## III.   ARGUMENT[11]

### A.   Plaintiff Has Failed To Adequately Establish Many Of The Requisite Elements For His Actual And Constructive Fraud Claims.

#### 1.   Plaintiff has failed to adequately establish justifiable reliance on any purported non-disclosures.

Under Maryland law, an essential element of a fraud or fraudulent concealment claim is that plaintiff must have taken action in **justifiable reliance** on the information misrepresented or concealed. *Jiffy Lube Sec. Litig.*, No. Civ. Y-89-1939, 1990 WL 10010982, *10 (D. Md. Oct. 31, 1990) (applying Maryland law) ("[P]laintiffs must allege and prove direct reliance to satisfy the cause of action for common law fraud."). *See also Learning Works, Inc. v. Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987) (applying Maryland law) (fraud claims require factual allegations that reliance was reasonable).[12] The Complaint, however, fails to offer any plausible

---

[11]    The Court will apply the District of Columbia's choice of law principles since this is a diversity action. *Rafferty v. NYNEX Corp.*, 60 F.3d 844, 849-50 (D.C. Cir. 1995) ("To determine the applicable law, we must follow the choice of law rules of the forum state."). The Court, however, is not "bound to decide all issues under the local law of a single State." *Keene Corp. v. Insurance Co. of N. Am.*, 597 F. Supp. 934, 941 (D.D.C. 1984). Rather, each issue must be given "separate consideration because of the varying interests involved." *Id.*

Under this forum's choice of law principles, Defendant submits that each of Plaintiff's claims, all of which are fraud-based, should be decided pursuant to the laws of the State of Maryland where (i) Plaintiff resided when he purchased his LTC coverage, (ii) he applied for such coverage, and (iii) he would have received and acted upon any of the purported non-disclosures and misrepresentations. *See id.* at 944 (to determine which jurisdiction has the most significant relationship regarding the Plaintiff's fraud claims, the Court will look at the following factors set forth in § 148 of the Restatement (Second) of Conflict of Laws: (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the misrepresentations, (c) the place where the defendant made the representations, (d) the domicile, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant). However, even though the Defendant's place of business is in Pennsylvania and the Defendant made the alleged misrepresentations from Pennsylvania, the case law favors applying the law of the jurisdiction where the fraudulent representations were received and relied upon. *Id.* ("Defendant's principal place of business is irrelevant to the consideration of the consequences of its alleged misconduct.") (quotations omitted).

As demonstrated herein, however, the laws of the other two potentially relevant jurisdictions (Pennsylvania, the domiciliary state and headquarters of INA, and the District of Columbia, the jurisdiction in which the Master Policy was issued to the Trust) are similar to the relevant laws of Maryland in all material respects.

[12]    District of Columbia and Pennsylvania law are in accord with Maryland law. *See Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1237 (D.C. Cir. 2005) (fraud claims require clear and convincing evidence of substantial reliance); *Blue Mountain Mushroom Co., Inc. v.*

explanation as to how Plaintiff could justifiably rely on the assumption that, **for twelve years,** INA would not do what it had the explicit contractual authority to do – *i.e.*, increase premium rates.[13] Nor can one be reasonably inferred from the facts alleged in the Complaint. That there could be no justifiable basis for any such reliance is further supported by the fact that there are no allegations in the Complaint which describe any specific and explicit affirmative misrepresentations by INA to Plaintiff that it could not or would not increase premiums.[14]

"Although the court is to construe all factual allegations in the complaint in the light most favorable to Plaintiff, the court need not accept unsupported legal allegations, legal conclusions couched as factual allegations, or conclusory factual allegations devoid of any reference to actual events." *Huffman v. Town of La Plata*, No. Civ.A DKC 2004-2833, 2005 WL 1038854, *9 (D. Md. May 4, 2005) (citations omitted). "Although reliance is normally a question of fact, it can be determined as a matter of law when no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn." *Cozzi Iron & Metal Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (affirming dismissal of fraud claim where reliance was unjustified because alleged representations were contradicted by written

---

*Monterey Mushroom, Inc.*, 246 F. Supp. 2d 394, 406 (E.D. Pa. 2002) (applying Pennsylvania law) (justifiable reliance is one of the elements that plaintiff must establish to sustain a prima facie case for fraud).

[13]    The Complaint merely alleges that "Alvarez, and the Class, relied on CIGNA and INA to prepare LTC insurance contracts consistent with their application forms and promotional materials." Complaint at ¶ 27. Yet, the Complaint does not refer to any specific promotional materials or to any specific statements contained therein or in the application forms which would warrant such justifiable reliance on the notion that premiums would never be increased. To the contrary, the promotional materials make it clear that premiums can, in fact, be increased. Promotional Material Package, at Premium Schedules A-E ("Your age at the time of application determines your premium and it will **not** increase unless the Company changes premiums on a class basis.") (emphasis in original); *see also* DaSilva-Neto Aff. at ¶¶ 4-5.

[14]    Plaintiff argues that the **sale** of the LTC coverage constituted implied representations that such coverage was adequately priced and would be affordable. Complaint at ¶¶ 27-29. Insurance contracts, however, are not covered by the Uniform Commercial Code ("UCC"). *See, e.g., Klapp v. United Ins. Grp. Agency*, 674 N.W.2d 736, 738 (Mich. Ct. App. 2003) ("all jurisdictions that have construed the UCC definition have held that insurance contracts are not goods"). Nor is there any other authority for the proposition that the mere issuance of an insurance contract creates any implied warranty of the type claimed by Plaintiff. *See Jay Freeman Co. v. Glens Falls Ins. Co.*, 486 F. Supp. 140, 143 (N.D. Tex. 1980) (applying Texas law) ("the terms of [an insurance policy] themselves define its benefits and obligations, and no implied warranty can extend those terms").

contract). *See also R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm'n*, 913 F. Supp. 1031, 1040-41 (N.D. Ohio 1996) (dismissing fraud claim where contract language "operates as a disclaimer" making reliance unjustified). Because the language of the Master Policy and the Promotional Material Package clearly provide that INA has the right to increase premiums, as a matter of law, Plaintiff cannot allege justifiable reliance on the purported non-disclosure of what the documents cited in the Complaint explicitly provide that INA has a right to do – *i.e.*, increase premiums.

> **2.     INA had no affirmative duty to disclose the details of its pricing methodology to Plaintiff.**

As demonstrated previously, the fraud claims in the Complaint are predicated solely on purported non-disclosures rather than affirmative misrepresentations. The Complaint, however, fails to allege any relationship or circumstances sufficient as a matter of law to establish a duty on INA's part to make any affirmative disclosures to Plaintiff of the information concerning the Defendant's methodology for pricing the Plaintiff's coverage or the assumptions underlying same which the Complaint alleges to have been fraudulently concealed. Under Maryland law, an affirmative duty to disclose can only arise (i) "when one party is in a fiduciary or confidential relationship with the other," or (ii) "when one party makes a partial and fragmentary statement of fact." *Hill v. Brush Engineered Materials, Inc.*, 383 F. Supp. 2d 814, 820 (D. Md. 2005) (applying Maryland law); *Estate of White v. R.J. Reynolds Tobacco Co.,* 109 F. Supp. 2d 424, 431 (D. Md. 2000) (applying Maryland law).[15]

There are no allegations in the Complaint that INA and Plaintiff had a "fiduciary" or "confidential" relationship nor are there any allegations of facts which would give rise to such a

---

[15]     Again, the law of the District of Columbia and Pennsylvania is in accord with Maryland law. *See Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 518 (D.C. 1948) (finding that the absence of any partial disclosure or a confidential relationship between the parties negates an affirmative duty to disclose); *accord Youndt v. First Nat.l Bank of Port Allegany,* 868 A.2d 539, 550 (Pa. Super. Ct. 2005).

relationship under Maryland law. Indeed, the type of "special relationship" which would give rise to an affirmative duty to make disclosures about the suitability or cost of insurance "requires more than the ordinary insurer-insured relationship." *Sadler v. Loomis Co.*, 776 A.2d 25, 35 (Md. Ct. Spec. App. 2001); *Johnson v. Federal Kemper Ins. Co.*, 536 A.2d 1211, 1213 (Md. Ct. Spec. App. 1988) ("Because it involves a claim by the insured against an insurer, rather than a claim by a third party against both the insurer and insured, there is no conflict of interest situation requiring the law to impose any fiduciary duties on the insurer. Instead, the situation is a traditional dispute between the parties to a contract."). [16]

Moreover, other courts have specifically rejected allegations, like Plaintiff's, that insurers were obligated to disclose details of their pricing methodology. In *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834 (Ala. 1998), the insured plaintiff brought an action for fraudulent suppression against a property insurer on the ground that the insurer had a duty to disclose to plaintiff that the stated contractual premium paid to the insurer for a personal articles protection policy covering plaintiff's diamond ring was based on the "appraisal value" of the ring, while the policy entitled her to receive no more than the "replacement cost" of the ring if it were lost, a lower amount than appraisal value. *Id.* at 836. The Alabama Supreme Court, reversing the decision of the lower court, held as a matter of law that there was no duty to disclose how the premium rate for plaintiff's policy was determined. *Id.* at 843.

Among other things, the Alabama Supreme Court considered the practical ramifications of imposing a duty on an insurer to disclose its pricing and other internal procedures –

> To uphold [plaintiff's] claim we would have to rule that it is the responsibility of every insurer at the point of sale to explain fully

---

[16] *See also Seiss v. Sherman*, 49 Pa. D. & C. 4th 367, 373-374 (Pa. Ct. Com. Pl. 2000) (citing Pennsylvania cases holding that insurers do not have fiduciary responsibilities to the insured either prior to the formation of an insurance agreement, or when there is an existing relationship between the insurer and the insured. Instead, the relationship is more akin to that of buyer and seller).

> to potential customers the insurer's internal procedures, its ratemaking process and its business practices. To impose that responsibility strikes us as highly impractical, and it is a responsibility we have not imposed in the past. *Ex Parte Ford Motor Credit Company*, 717 So. 2d 781 (Ala. 1997) . . . .

*Id.*[17] The same reasoning is equally applicable to Plaintiff's allegations that INA should have disclosed its actuarial assumptions underlying the pricing of the LTC coverage, including the effect of "closing the block" of business.

### 3.     The Complaint fails to adequately establish fraudulent intent.

Under Maryland law, another necessary element of a claim of actual fraud[18] is establishing that a defendant **intended** to defraud or deceive a plaintiff. *See Adams v. NVR Homes, Inc.,* 135 F. Supp. 2d 675, 692 (D. Md. 2001) (applying Maryland law) (facts indicating intent to deceive required for fraudulent concealment claims). *See also Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 629 (D. Md. 2003) (applying Maryland law) ("unsupported inferences" are insufficient to prove intent element in a fraudulent concealment claim).[19]

---

[17]     *See also Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 569 (7th Cir. 1991) (holding that life insurer had no duty to disclose one particular factor used in determining what interest rates it would offer to credit under an annuity contract, notwithstanding that it was alleged that such factor resulted in a lower interest rate than would have been credited in its absence).

[18]     Fraudulent intent is not a required element of a claim of "constructive fraud" under Maryland law. However, as demonstrated above, such claim should be dismissed because of the Complaint's failure to adequately establish (i) justifiable reliance, and (ii) any duty to disclose the information purportedly concealed. *See Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1049 n.6 (Md. 1995) (action for constructive fraud may arise where plaintiff is justified in relying upon defendant to act in plaintiff's interest by virtue of a confidential or fiduciary relationship); *Scheve v. McPherson*, 408 A.2d 1071, 1076 (Md. Ct. Spec. App. 1979) ("key element" in definition of constructive fraud is "the breach of a legal or equitable duty" to disclose information).

[19]     *See also Gaines v. Krawczyk*, 354 F. Supp. 2d 573, 586-87 (W.D. Pa. 2004) (applying Pennsylvania law) (granting defendants' motion to dismiss fraudulent concealment claims because plaintiffs' attempt to predicate a claim of fraud was "specious" absent proof of misrepresentation and **intentional** withholding of information); *Schiff v. American Ass'n of Retired Persons*, 697 A.2d 1193, 1198 (D.C. Cir. 1997) (Plaintiff's fraud claim fails because "he has not alleged sufficient facts to establish the first element of a claim of fraud, *i.e.*, that [defendant] made a false representation of or **willfully omitted** a material fact.").

The Complaint in this case is bereft of any facts to substantiate its conclusory allegations that INA knew in 1992 and intentionally concealed that Plaintiff's initial premium was underpriced and would have to be subsequently increased. To the contrary, the closest that the Complaint comes to furnishing any facts in this regard is an allegation that "CIGNA and INA were aware of the defective nature of these policies and the impact closing the book of business would have **by at least 1997**." Complaint at ¶45 (emphasis added). According to the Complaint, in 1997 – five years *after* Plaintiff purchased the LTC coverage at issue – "CIGNA was sufficiently concerned about the LTC policies that it conducted a review of the LTC policies to analyze whether premium levels were adequate in light of the experience of the LTC policies." *Id.*

Far from substantiating the oft-repeated allegation that INA knew its premiums and reserves were inadequate in 1992 when Plaintiff purchased his coverage, the fact that a study was undertaken in 1997 raises the logical question of why such a study was necessary if, as alleged, INA already knew it was underreserved and was already planning a series of premium increases to address that matter. Moreover, the Complaint offers no explanation as to why premiums were not increased in 1997 if the study reflected material underreserving.

To the contrary, as alleged in the Complaint, the block of business at issue was closed in 1992. With a closed block, there would be no plausible reason for INA to wait 16 years to increase premiums which it allegedly knew to be insufficient from the beginning. Indeed, the passage of such a considerable amount of time would only reduce the effect of any such premium increase and benefit to the insurer because, by the time the increase was implemented, a sizeable percentage of insureds would have lapsed their coverage, died, or been paid substantial

benefits. Such an approach, therefore, would leave the insurer with the prospect of a diminished population of insureds on which to impose a rate increase to recoup losses.

The implausibility of this scheme is further demonstrated by the explicit language in the Master Policy and Application explicitly disclosing that premiums could be increased and the absence of any allegations of INA affirmatively misrepresenting that it would not increase premiums.

Where intent is a required element of the claim, "the complaint must give rise to an inference of such motivation in order to survive a motion for dismissal under Rule 12(b)(6)." *Maryland Minority Contractor's Ass'n, Inc. v. Maryland Stadium Auth.*, 70 F. Supp. 2d 580, 593 (D. Md. 1998) (dismissing plaintiff's equal protection claim for failure to allege requisite discriminatory intent where plaintiff alleged prequalification requirements were discriminatory). Where it would require "sheer speculation" to infer the requisite intent, the claim must be dismissed. *See id.* (dismissing racial discrimination claims pursuant to Rule 12(b)(6) on the grounds that it would require "***sheer speculation***" to conclude that company "whose largest project and bonding capacity are less than 20% of the contract price was denied an opportunity to bid because of discrimination.") (emphasis added). Because it would require "sheer speculation" to conclude that INA had a clandestine intention of raising premium rates from the inception of the block of business, Plaintiff's actual fraud claim also should be dismissed for failure to adequately allege fraudulent intent on the part of INA.

**B.**    **The District Of Columbia Consumer Procedures And Protection Act ("CPPA") Does Not Reach The Conduct Alleged In This Case.**

In Claim No. 3 of the Complaint, Plaintiff asserts that the misrepresentations allegedly made in order to sell and renew Plaintiff's LTC Coverage constitute violations of the CPPA, D.C. Code §§ 28-3901, *et seq.* The Complaint, however, fails to allege that any of such alleged

misrepresentations occurred in the District of Columbia.    Moreover, neither Plaintiff nor Defendant is a resident of the District.  Complaint at ¶¶ 10-12.  Finally, Plaintiff applied for his LTC coverage in the State of Maryland, and his insurance certificate was delivered in that state. Complaint at Exhibit A, at 18-19 ("Plaintiff's Application"); Certificate at 1.    Under such circumstances the CPPA should not apply to the purported misrepresentations alleged in Claim No. 3, and any application of the CPPA under the circumstances herein would violate the Due Process and Commerce Clauses of the U.S. Constitution.

In *Nelson v. Nationwide Mortgage Corp.*, 659 F. Supp. 611, 616 (D.D.C. 1987), this Court found the CPPA not to apply under circumstances where the connection to the District was even less attenuated than the connection (or lack thereof) in this case.  In *Nelson*, the plaintiff, a resident of the District of Columbia, asserted that two Virginia corporations misrepresented the terms and nature of two loans issued to her by such corporations in meetings occurring in their Virginia offices in violation of the CPPA.  *Id.* at 616.    This Court granted summary judgment to the defendants, stating as follows:

> It is undisputed that both Nationwide and Family Federal are Virginia corporations, and that the relevant transactions occurred in Virginia.  Consequently, the District of Columbia statute would have to be given broad extraterritorial effect if it were to apply here.  Nothing in the statute or interpretative case law indicates such a legislative intent, and absent such affirmative evidence the Court will not presume that the statute was intended to apply to every commercial transaction involving a District of Columbia resident, wherever and with whomever the transaction occurs.

*Id.* at 616-17.

14

In this case, like *Nelson*, the Defendant is not a District of Columbia corporation and the misrepresentations upon which the Plaintiff's CPPA claims are based did not occur in the District. Moreover, unlike *Nelson*, the Plaintiff is not a resident of the District.[20]

The holding in *Nelson* is consistent with numerous decisions in other jurisdictions finding that a state's consumer protection statutes do not apply to conduct that transpired outside the boundaries of the state, particularly where, as in this case, neither the Plaintiff nor Defendant is a resident of the state.[21]

### C.    Maryland Law Does Not Recognize A Common Law Claim For A Tortious Breach Of An Implied Covenant Of Good Faith And Fair Dealing.

Plaintiff's claim for tortious breach of an implied covenant of good faith and fair dealing (Claim No. 4) must be dismissed because Maryland law does not recognize an independent common law cause of action in tort for such a purported breach. *Stephens v. Liberty Mut. Fire Ins. Co.*, 821 F. Supp. 1119, 1122 (D. Md. 1993) ("The implied covenant of good faith and fair

---

[20]    That Plaintiff is not a resident of the District of Columbia distinguishes the instant case from *Williams v. Central Money Co.*, 974 F. Supp. 22, 27 (D.D.C. 1997) where Judge Robertson took issue with *Nelson* and found that the CPPA could apply to fraud committed outside the District *where the victim was a District of Columbia. resident* on the grounds that the District of Columbia has a "substantial interest in protecting its citizens from predatory and fraudulent business practices . . . ." Such a rationale obviously is inapplicable to this case where Plaintiff resided in Maryland at the time he purchased coverage and currently resides in Florida.

[21]    *See Norwest Mortgage, Inc. v. Superior Ct.*, 85 Cal. Rptr. 2d 18, 23 (Cal. Ct. App. 1999) (California's consumer protection statute did not encompass claims by non-residents arising out of conduct outside of California); *In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828, 849 (N.D. Ill. 2002) (despite amendment to NCUTPA that removed the phrase "within this state," thus leaving text without geographic limitations, court held that plaintiffs who did not allege that they experienced any harm within North Carolina could not state a claim under NCUTPA); *Goshen v. Mutual Life Ins. Co.*, 730 N.Y.S.2d 46, 47 (N.Y. App. Div. 2001) (to maintain private right of action under New York's General Business Laws, plaintiff must allege deceptive acts or practices which took place in New York); *Cole v. Equitable Life Assur. Soc'y*, No. 108611, 95-001, 1996 WL 932095, *9 (N.Y. Sup. Ct. June 28, 1996) (plaintiffs' theory of a fraudulent scheme emanating from New York was not sufficient to turn the sale of insurance to plaintiffs in Florida into a deceptive practice occurring in New York for purposes of New York's consumer protection act when policy was provided by insurer's Colorado office); *Chalmers v. Toyota Motor Sales, USA, Inc.*, 935 S.W.2d 258, 264 (Ark. 1996) (Arkansas Unfair Practices Act has no extraterritorial application); *Bass v. Hendrix*, 931 F. Supp. 523, 536 (S.D. Tex. 1996) (refusing to apply the Texas consumer protection statute to misrepresentations that occurred outside Texas that could not have an anticipated effect on a Texas resident); *Consumer Prot. Div. v. Outdoor World Corp.*, 603 A.2d 1376, 1383 (1992) (Maryland consumer protection statute did not apply to claims arising solely from extraterritorial conduct).

dealing, which Maryland recognizes in certain contracts, does not create any duties outside the realm of contract.").[22]

Moreover, Plaintiff predicates this claim on INA's decision to increase Plaintiff's premium in 2004. Complaint at ¶¶ 93-95. It is well recognized, however, that a breach of an implied covenant of good faith and fair dealing cannot lie where such alleged breach is based on conduct that is explicitly permitted under a contract. *See Mikeron, Inc. v. Exxon Co., U.S.A.*, 264 F. Supp. 2d 268, 273 (D. Md. 2003) (applying Maryland law) (explaining that the plaintiff, in a breach of contract claim, cannot use the obligation of good faith and fair dealing to penalize the defendant for acts that are expressly allowed in the contract's terms). *See also Wootton Enters., Inc. v. Subaru of Am., Inc.*, 134 F. Supp. 2d 698, 704 n.5 (D. Md. 2001) (applying Maryland law) (stating that the implied duty cannot override or modify specific contractual terms) (citations omitted).[23] As demonstrated herein, the Master Policy, indeed, explicitly permits Defendant to increase premiums on Plaintiff's LTC coverage as it did in this case, and the Complaint does not include any breach of contract claim. Master Policy at 1, 16.

Thus, in virtually the same circumstances as those in the present case, in *Richter v. Aetna Life Ins. & Annuity Co.*, No. BC221760, 2003 WL 1930341 (Cal. Ct. App. Apr. 23, 2003),

---

[22]     Similarly, neither the District of Columbia nor Pennsylvania recognizes an independent cause of action for breach of an implied covenant of good faith and fair dealing. *See Brown v. News World Commc'ns, Inc.*, CIV. A. No. 89-1572, 1990 WL 137378, *5 (D.D.C. Sept. 10, 1990) (applying District of Columbia law) ("with respect to the claim for tortious breach of an implied covenant of good faith and fair dealing, the Court does not find any support for a cause of action in the District of Columbia"); *Blue Mountain Mushroom Co.*, 246 F. Supp. 2d at 400-01, *citing JHE, Inc. v. Southeast Pa. Transp. Auth.*, No. 1790 NOV. TERM 2001, 2002 WL 1018941, * 6 (Pa. Ct. Com. Pl. May 17, 2002), ("A breach of such covenant [of implied good faith and fair dealing] is a breach of contract action, not an independent action for breach of a duty of good faith and fair dealing.").

[23]     *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 439 (3d Cir. 1993) (applying Pennsylvania law) ("there can be no implied covenant as to any matter specifically covered by the written contract between the parties"); *Flecha de Lima v. International Med. Grp., Inc.*, No. 01CA6866, 2004 WL 2745654, *6 (D.C. Super. Ct. Nov. 29, 2004) (defendant-insurers' refusal to reimburse plaintiffs for costs of gastric bypass surgery falls clearly within the exclusions present in the policy, and thus defendants did not breach any duty of good faith and fair dealing). *See also Crystal Prods., Inc. v. Doc Severinsen Orchestras*, No. Civ. A. 90-932, 1994 WL 507546, *4 (D.D.C. Sept. 10, 1992) (applying D.C. law) (The implied covenant is not "an undertaking that can be breached apart from [the contract's] explicit terms.").

plaintiff alleged that the defendant group health insurers engaged in fraud, breach of an implied covenant of good faith and other violations when they raised the premiums payable by plaintiff for health coverage under such policy. Among other things, plaintiff alleged that the defendants knew that the closure of the group policy to new sales would cause the experience of the pool of insureds to deteriorate, and, that by increasing plaintiff's premium in accordance with the terms of her contract, they took advantage of the actuarial deficiency in violation of a covenant of good faith and fair dealing. Relying on the general rule that an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract, the court rejected the plaintiff's claim for breach of such a covenant, stating as follows:

> In this case, Richter's policy permitted Aetna and later Mutual to increase premiums based on the claims experience of the entire group. We may not conclude that the implied covenant of good faith and fair dealing required the insurers to refrain from increasing premiums based on the group's experience in contradiction of the express terms of the policy.

*Richter*, 2003 WL 1930341 at *22. The same reasoning is applicable here.

### D.    There Is No Separately Cognizable Claim For Punitive Damages.

Plaintiff's Claim No. 5,[24] asserting a cause of action for punitive damages, must be dismissed for failure to state a cause of action upon which relief may be granted. "It is a well settled proposition in Maryland law that a cause of action does not exist for punitive damages alone."[25] *Shabazz v. Bob Evans Farms, Inc.*, 881 A.2d 1212, 1233 (Md. Ct. Spec. App. 2005). "[A] necessary condition for the recovery of punitive damages is an underlying award of compensatory damages."[26] *Id.* at 1233-34, *citing Phillip Morris Inc. v. Angeletti*, 752 A.2d 200,

---

[24]    Complaint at ¶¶ 96-98.

[25]    Similarly, under Pennsylvania law, "[p]unitive damages . . . do not constitute an independent cause of action." *Bishop v. GNC Franchising LLC*, 403 F. Supp. 2d 411, 425 (W.D. Pa. 2005).

[26]    An award of compensatory damages is a prerequisite to any award of punitive damages under the law of Pennsylvania as well as the District of Columbia. *See Hilbert v. Roth*, 149 A.2d 648, 652 (Pa. 1959) ("It is well

246 (Md. 2000). This is because "one of the purposes of punitive damages is to punish the wrongs of the defendant. The requirement of a compensatory damages foundation protects defendants from being punished for acts that the trial court determines the defendant did not commit." *Angeletti*, 752 A.2d at 246. Because the award of compensatory damages is a prerequisite to any award of punitive damages, punitive damages are not an independent cause of action for which relief can be granted. Consequently, Claim No. 5 must be dismissed with prejudice.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be granted.

Dated: March 22, 2006                    Respectfully submitted,


/s/ James F. Jorden
James F. Jorden (D.C. Bar No. 37598)
Raul A. Cuervo (D.C. Bar No. 463718)
Stephen H. Goldberg (D.C. Bar No. 465113)
JORDEN BURT LLP
1025 Thomas Jefferson Street, N.W.
Suite 400 East
Washington, DC  20007-5208
Telephone: 202-965-8100
Facsimile:  202-965-8104

Counsel for Defendants CIGNA and The Insurance Company of North America

---

recognized that no award for punitive damages may be made where actual damage has not been suffered."); *Estate of Taylor v. Lilienfield*, 744 A.2d 1032, 1036 (D.C. 2000) ("It is now established in the District of Columbia that when there is no basis for compensatory or 'actual' damages, there can be no consideration of punitive damages."); *Maxwell v. Gallagher*, 709 A.2d 100, 104 (D.C. 1998) (rule that compensatory damages are a precondition to punitive damages "accords with the law of our sister jurisdiction, Maryland").

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing Motion To Dismiss, Memorandum In Support Of Motion To Dismiss and Proposed Order were served via electronic filing on this 22nd day of March, 2006, upon the following:

Edgar N. James, Esq.
JAMES & HOFFMAN, P.C.
1101 Seventeenth St., N.W., Suite 510
Washington, D.C. 20036

and by first class mail, postage paid, on the following:

Allan Kanner, Esq.
Conlee S. Whiteley, Esq.
KANNER & WHITELEY
701 Camp Street
New Orleans, LA 70130

Timothy Q. Purdon, Esq.
Monte L. Rogneby, Esq.
VOGEL LAW FIRM
200 North 3rd Street, Suite 201
P.O. Box 2097
Bismarck, ND 58502-2097

Perry Pearce Benton, Esq.
32516 Sandpiper Drive
Orange Beach, AL 36561-5728

/s/ James F. Jorden
James F. Jorden

#153911v7