UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Robert Alvarez, | ) | |
| 1419 Southeast 43rd Terrace, | ) | |
| Ocala, FL 34471, | ) | |
| individually, and on | ) | Civil Case No. 1:06CV00145 |
| behalf of all others similarly | ) | |
| situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | The Honorable |
| v. | ) | Emmet G. Sullivan |
| | ) | |
| CIGNA and | ) | |
| The Insurance Company of | ) | |
| North America, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF ROBERT ALVAREZ'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO DEFENDANT, THE INSURANCE
COMPANY OF NORTH AMERICA'S MOTION TO DISMISS**

JAMES & HOFFMAN
EDGAR N. JAMES
(D.C. Bar No. 333013)
Amy Fettig, Esq.
(D.C. Bar No. 484883)
1101 Seventeenth St. N.W., Suite 510
Washington, DC 20036

KANNER & WHITELEY
ALLAN KANNER (LA#20580)
CONLEE S. WHITELEY (LA#22678)
701 Camp Street
New Orleans, LA 70130

VOGEL LAW FIRM
TIMOTHY Q. PURDON (ND#05392)
MONTE L. ROGNEBY (ND#05029)
200 North 3rd Street, Suite 201
P.O. Box 2097
Bismarck, ND 58502-2097
(701) 258-7899

PERRY PEARCE BENTON, ESQ.
(Bar No. ASB-2159-N66P)
32330 Sandpiper Dr.
Orange Beach, AL 36561
(251) 980-2640

Attorneys for Plaintiff

## TABLE OF CONTENTS

                                                                            **Page**

I.     INTRODUCTION ............................................................................ 1

     A.    Robert Alvarez's and the class' long-term care insurance. ........................ 1

     B.    Problems in long-term care insurance. ....................................................... 4

     C.    Judicial response to the problems in long-term care insurance. ............... 9

II.    LAW AND ARGUMENT ............................................................... 12

     A.    Rule 12(b) Standard of Review. .................................................................. 12

     B.    Conversion of CIGNA Group Insurance's and INA's Rule 12(b) Motion into a Motion for Summary Judgment under Rule 56. ............... 15

     C.    The law of the District of Columbia is applicable to Alvarez's claims against CIGNA Group Insurance and INA. ............................................ 16

          1.    D.C. conflict of law analysis. ...................................................... 16

          2.    D.C law applies to Alvarez's Actual Fraud and Constructive Fraud claims. ...................................................................... 20

          3.    D.C. Law applies to Alvarez's claim the INA violated D.C.'s Unlawful Trade Practices Act, D.C. Code §§ 28-3901 et. seq. ... 21

          4.    D.C. Law applies to Alvarez's claim of Tortious Breach of Implied Covenant of Good Faith and Fair Dealing. ................... 23

          5.    D.C. law applies to Alvarez's claim for punitive damages. ......... 27

     D.    Actual and Constructive Fraud. ............................................................. 27

          1.    Actual Fraud and Constructive Fraud: Alvarez relied on the fraudulent misrepresentations and omissions by CIGNA Group insurance and INA. ................................................................. 28

          2.    Constructive Fraud: CIGNA Group Insurance and INA had a duty to disclose all material facts relating to Alvarez's LTC policy to Alvarez. ........................................................... 33

          3.    Actual Fraud: CIGNA Group Insurance and INA acted with the intent to deceive Alvarez. ....................................................... 37

III.   CONCLUSION .............................................................................. 39

## TABLE OF AUTHORITIES

**Page**

**Chief Cases**

Ackerman v. Price Waterhouse, 252 A.D.2d 179, 683 N.Y.S.2d 179, 198
    (N.Y.App.Div.1998) ............................................................... 32

American Nat. Red Cross v. Travelers Indem. Co. of Rhode Island, 924
    F.Supp. 304, 307 n.5 (D.D.C. 1996) ....................................... 23, 24, 26

American Registry of Pathology v. Ohio Cas. Ins. Co., 401 F.Supp.2d 75
    (D.D.C. 2005) ...............................................................

Atraqchi v. GUMC Unified Billing Services, 788 A.2d 559 (D.C. 2002) ................. 32, 38

Bennett v. Kiggins, 377 A.2d 57, 59-60 (D.C.1977) ................................. 32, 37

Berry v. Federal Kemper Life Assur. Co., 99 P.3d 1166, 1168 (N.M. App. 2004) ......... 33

Braesch v. v. Union Ins. Co., 464 N.W.2d 769 (Neb. 1991). ......................... 24

Brown v. Dorsey & Whitney, LLP., 267 F.Supp.2d 61 (D.D.C.,2003) .... 16, 18, 20, 21, 22

Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002) ................................. 12, 13, 29

Burlington Ins. Co. v. Okie Dokie, Inc., 329 F.Supp.2d 45, 47 (D.D.C. 2004) .............. 12

Cambridge Holdings Group, Inc. v. Federal Ins. Co., 357 F.Supp. 2d 89, 95
    (D.D.C. 2004) ................................................................. 23

Cameron v. USAA Property and Cas. Ins. Co., 733 A.2d 965, 968
    (D.C. 1999) .................................................................. 36

Central Armature Works v. Am. Motorists Ins. Co., 520 F.Supp. 283, 292
    (D.D.C.1980) ................................................................. 26

Chase v. State Farm Fire and Cas. Co., 780 A.2d 1123 (D.C. 2001) .............. 36

City Solutions Inc. v. Clear Channel Communications, Inc. 365 F.3d
    835, 840 (9th Cir. 2004) ...................................................... 30

Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ...................... 12, 13

D'Ambrosio v. Colonnade Council of Unit Owners, 717 A.2d 356, 360
(D.C. 1998) .................................................................................. 13, 14, 29

Delaney, 819 A.2d at 989 ................................................................... 27

Diamond Service Co., Inc. v. Utica Mut. Ins. Co., 476 A.2d 648, 655 (D.C. 1984) . 23, 35

District Cablevision Ltd. Partnership v. Bassin, 828 A.2d 714 (D.C. 2003) ................... 22

Fresh Start Industries, Inc. v. ATX Telecommunications Services, 295
F.Supp.2d 521 (E.D.Pa. 2003) ........................................................ 22

Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994) ................................................ 21

Hanson, et al. v. Acceleration Life Insurance Company, et al., Not Reported in
F.Supp.2d, 1999 W.L. 33283345 (D.N.D.) ...................................... 9, 10, 32, 34

Hanson, et al. v. Acceleration Life Insurance Company, et al., Not Reported in
F.Supp.2d, 2000 W.L. 33340298 (D.N.D.) ...................................... 11

Hercules & Co., Ltd. v. Shama Restaurant Corp., 613 A.2d 916, 923 (D.C. 1992) ........ 20

Hoffman v. Hill, 777 F.Supp. 1003, 1005 (D.D.C. 1991) ......................................... 23, 33

Holt v. George Washington Life Ins. Co., 123 A.2d 619, 625 (D.C.1956) ..................... 36

Howard v. Riggs Nat'l Bank, 432 A.2d 701, 706 (D.C.1981) ......................................... 28

In re Estate of Delaney, 819 A.2d 968, 988 (D.C. 2003) ......................................... 17, 27

Kitt v. Pathmakers, Inc., 672 A.2d 76, 79 (D.C. 1996) ..................................... 15

Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020,
85 L.Ed. 1477 (1941) ........................................................................ 16

Kowal v. MCI Communications Corp., 305 U.S.App.D.C. 60, 67, 16 F.3d 1271,
1278 (1994) ........................................................................ 13

Lane, etc. et al. v. American Travelers Life Insurance Co., etc., et al, Cane
No. GIC 745641, Superior Court, San Diego County, California,
filed March 24, 2000 ........................................................................ 11

Malacca Corp. v. Travelers Indemnity Co., 2006 WL 740142, *2 (D.D.C. 2006);
924 F.Supp. At 308 ................................................................. 23, 24, 26

iii

Mathis v. Hargrove, 888 A.2d 377 (Md.App. 2005) ........................................ 21

Messina v. Nationwide Mutual Insurance Co., 998 F.2d 2, 4
    (D.C.Cir.1993) ................................................................. 23, 24, 33

Milkman v. American Travelers Life Ins. Co., 2002 WL 778272 (Pa.Com.Pl. 2002) .... 12

Nichols v. State Farm Mutual Auto. Ins. Co., 279 S.C. 336, 306 S.E.2d 616
    (1983) ........................................................................ 24, 25

Osbourne v. Capital City Mortgage Corp., 727 A.2d 322, 325 (D.C.1999) ................... 22

Remeikis v. Boss & Phelps, Inc., 419 A.2d 986 (D.C. 1980) ........................ 28, 29

Rose v. United Equitable Ins. Co., Cass County, East Central Judicial District,
    CV-00-2248 .......................................................................... 11

Rose v. United Equitable Ins. Co., 2001 ND 154, 632 N.W.2d 429 ......................... 11

Rose v. United Equitable Insurance Co., 2002 ND 148, 651 N.W.2d 683 ...................... 11

Rymer v. Pool, 574 A.2d 283 D.C.,1990 ........................................................ 18

Schiff v. American Ass'n of Retired Persons, 697 A.2d 1193, 1198 (D.C.App.
    1997) ...................................................................... 20, 28

Spark v. MBNA Corp., 178 F.R.D. 431, 435- 36 (D.Del.1998) ........................ 33

Turner v. National Hospitalization, Inc. ..................................................... 34

Virginia Academy of Clinical Psychologists v. Group Hospitalization and
    Medical services, 878 A.2d 1226 (D.C. Ct. App. 2005) ....................... 29

Washington v. GEICO, 769 F.Supp. 383 (D.D.C. 1991) ........................... 23, 24

Washington v. Group Hospitalization Inc., 585 F.Supp. 517 (D.D.C. 1984) ................ 24

Zimmerman v. Harleysville Mut. Ins. Co., 860 A.2d 167 (Pa.Super. 2004) ................... 24

**Other Authorities**

26 D.C. ADC § 2600 ........................................................................ 35

Consumer Protection and Long-Term Care Insurance: Predictability
    of Premiums 2 (Georgetown University Long-Term Care Financing
    Project, March 2004) ........................................................................................ 7

D.C. Code Ann. § 31-3606 ..................................................... 35

D.C. Code § 31-3601 ................................................................ 25

D.C. Code § 35-712(f) (1940) ...................................................... 34, 35

D.C.'s Unlawful Trade Practices Act ("CPPA"), D.C. Code §§ 28-3901 ................. 21, 27

Fed.R.Civ.P. 12(b)(6) ........................................... 12, 13, 15, 28, 29, 39

Fed. R.Civ.P. 12(b) .................................................... 12, 15, 16

Long-Term Care Insurance: Protecting Consumers From Hidden Rate Hikes,
    Hearing Before the Special Committee on Aging, United States Senate,
    106th Cong., Testimony of Charles N. Kahn III 222 (September 13, 2000) ........... 5

Maryland Consumer Protection Act, MD Code Ann., Com. Law, § 13-101 .................. 21

N.D.C.C. § 26.1-29-16 ................................................... 34

Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPL),
    Pa. St. Ann. Title. 73 § 201-1 .............................................. 21

Regulation of Private Long-Term Care Insurance: Implementation Experience
    in Key Issues (Kaiser Family Foundation 2003) ................................. 4, 5

Restatement (Second) of Conflicts, § 145 (1971) ...................................... 18, 19

Restatement (Second) of Conflict of Laws § 188 (1971) ................................ 18

Restatement (Second) of Torts § 529 (1977) ......................................... 29

Rule 56 ................................................................... 15, 16

**PLAINTIFF ROBERT ALVAREZ'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO DEFENDANT, THE INSURANCE
COMPANY OF NORTH AMERICA'S MOTION TO DISMISS**

## I.     INTRODUCTION

Robert Alvarez, and the class he represents, have a unitary complaint about the
Long Term Care ("LTC") policy at issue here: the seller of the policy withheld material
information from the buyers that the seller intended to pass the risks of the insurance onto
the policyholders by raising premiums in the future. Had the seller made these
disclosures, the policyholders, most of who are on fixed incomes, would not have
purchased the LTC insurance.

As a result, Mr. Alvarez' premium has been increased by eighty percent from
$1,188.00 to its present rate of $2,138.00. Additionally, Cigna has indicated it will raise
the premium again to $3,848.00: a total increase of 223%. These unexpected increases
have caused some policyholders who cannot afford to pay the premiums to drop coverage
and lose the benefit of past premiums paid while others continue to pay an ever
increasing premium[1] to avoid a loss of investment and coverage because they are unable
at this time in their life to qualify for a new policy.

### A.     Robert Alvarez and the Class' Long Term Care Insurance.

Robert Alvarez ("Alvarez") is a resident of Ocala, Florida. Alvarez was born in
1921 and is currently 85 years old. Alvarez completed an application to purchase an LTC
insurance policy from the Insurance Company of North America ("INA") on March 28,

---

[1] It is more likely than not that the premiums are accelerating more rapidly due to the
lapses caused by the past increases.

1

1992 while he was a resident of Maryland.[2]  The terms of Alvarez's insurance were set

forth in the Master policy, the application form Alvarez completed, and in the Certificate

of LTC insurance Alvarez received from INA weeks after purchasing his LTC policy.[3]

Complaint, Para. 10.

CIGNA and INA sold and renewed the LTC policies, which were meant to

provide long term nursing and related care to policyholders when the need arose, to

Alvarez and the Class with the representation that those policies were guaranteed

renewable policies, advising policyholders that:

> Your coverage will automatically be renewed provided the
> required premium is paid and benefits have not been
> exhausted.

See Alvarez's LTC Certificate Form 003039, attached as Def's Exhibit F.  CIGNA and

INA represented the LTC policies would remain in force provided Alvarez and the Class

continued to make their annual premium payments to defendants. This is an important

sales device as LTC insurance is worthless unless the insureds can afford to keep it in

force for the rest of their life or until it is needed.  Complaint, Para. 3.

---

[2] Defendant INA is an insurance company headquartered in Philadelphia, Pennsylvania.
INA is a subsidiary of CIGNA Corporation d/b/a CIGNA Group Insurance (hereinafter
"CIGNA").  CIGNA Corporation is a publicly traded company headquartered in
Philadelphia, Pennsylvania. "CIGNA Group Insurance" is a registered trademark
licensed for the use of insurance company subsidiaries of CIGNA Corporation. CIGNA
Corporation's Group Insurance Division participated in the development, marketing,
selling, administering and renewal of LTC insurance sold to Alvarez and the Class
through the American Chemical Society ("ACS") in the District of Columbia.
Complaint, Para. 11-14.
[3] The group LTC "Master Policy" that insured Alvarez was issued by INA in the District
of Columbia to the Bank of Washington D.C. which was acting as the Trustee of the
National Group Benefits Trust.  Alvarez was eligible for insurance under this Master
Policy through his membership in the ACS.  Complaint, Para. 10.  Plaintiffs believe that
the ACS would not have agreed to promote the INA policy to its membership but for the
same fraudulent omissions complained of herein.

2

Despite CIGNA's and INA's affirmative representations to Alvarez and the Class regarding the LTC policies being guaranteed renewable policies that Alvarez and the Class could maintain for the remainder of their lives, the LTC policies were, in fact, defective from the outset. The policies were underpriced, a condition which meant that the original premiums for the LTC policies would not be sufficient to support future claims on the LTC policies. However, for the LTC policies to remain in force as Defendants originally represented to Alvarez and the Class, CIGNA's and INA's planned to pass the cost of the defective underpricing of the LTC polices back to Alvarez and the Class through premium increases. Complaint, Para. 4.

Alvarez's coverage commenced on or about April 1, 1992, at a "guaranteed renewable" premium rate of $1,188.00. CIGNA and INA have increased Alvarez's annual premium on his LTC policy by eighty (80) percent to its present rate of approximately $2,138.00 and have indicated they will seek another premium increase of an additional eighty (80) percent within the next two years. Such an increase would result in a premium of approximately $3,848.00 for Alvarez, an increase of two hundred twenty-three (223) percent. Complaint, Para. 10. Moreover, given that Alvarez is now older and less healthy, he has lost the chance to lock into an alternative policy.

Not only did CIGNA and INA fail to disclose the anticipated premium increases, but in 1992 CIGNA and INA ceased selling the LTC policies, an act known as "closing the block" of business in the insurance industry. This decision to close the block of business carried with it serious negative ramifications that were never disclosed to the policyholders. By "closing the block," the defendants capped its pool of insureds under these policies and barred new insureds from purchasing these LTC policies. When an

3

insurance company fails to properly price a LTC policy and fails to properly establish reserves for a block of LTC insurance business, closing the block can lead to a "death spiral" that will guarantee the premium rates on the LTC policies will increase at an even greater rate.  This is alleged to have happened here.  Closing the block is particularly significant in LTC insurance situations, where the pool is largely comprised of senior citizens.  Policyholders in the closed block are forced to pay the higher premiums that arise from such block closings or risk losing their LTC coverage altogether should they cease paying the increased premiums.  This is because their age and/or medical history prevents them from obtaining alternative LTC insurance elsewhere once the premiums begin to increase.  Complaint, Para. 8.

As a direct and proximate result of CIGNA's and INA's wrongful course of conduct, Alvarez and the Class were damaged in that they were required to pay exorbitant premium increases to keep their LTC policies in force or give up their coverage, thereby leaving Alvarez and the Class without the insurance coverage they contracted for with defendants, despite their years of paid-up premiums.  Complaint, Para. 9.

Alvarez brings this case individually and on behalf of a class of similarly situated LTC insurance policyholders seeking redress for the fraudulent conduct of INA and CIGNA in connection with the purchase and subsequent renewals of his LTC policy.

### B.    Problems in Long Term Care Insurance.

LTC insurance is designed to pay an insured's necessary long term care services, such as nursing home care or home care.  Stephanie Lewis, John Wilken and Mark Merlis, Regulation of Private Long-Term Care Insurance: Implementation Experience in

4

Key Issues (Kaiser Family Foundation 2003)(hereinafter "Kaiser Report). _Id_. The

subject policy is consistent with this. In addition to the peace of mind of knowing that

there will be sufficient resources to pay for long term care if needed, the purpose of a

properly designed LTC policy is to provide significant improvements in quality of life.

Long-Term Care Insurance: Protecting Consumers From Hidden Rate Hikes, Hearing

Before the Special Committee on Aging, United States Senate, 106th Cong., Testimony of

Charles N. Kahn III 222 (September 13, 2000)(hereinafter "Senate Report"). Recent

studies of policy holders, claimants, and informal care givers show that the presence of

long term care insurance can: (1) delay or prevent institutionalization; (2) afford a greater

choice of long term care services and providers; (3) enable easier access to home care

and/or assisted living; (4) ease the financial, physical, and emotional burdens on families

providing care in the home; and (5) preserve assets for heirs. _Id_. In short, LTC insurance

can be an important product, which means that fraudulent sales hurt consumers, hurt

honest competitors and hurt the public interest.

    Although LTC insurance resembles health insurance, its premiums are more akin

to life insurance. The premiums paid for a health insurance policy during a year cover

average expected claim costs for the pool of purchasers during that same year. Kaiser

Report, supra at iv. In contrast, premiums for LTC insurance policies are set with the

assumption that most buyers will pay premiums for some years before requiring services.

_Id_.

    Plaintiffs allege that when consumers purchase an LTC policy, their premiums are

determined by their age at the time of purchase. Younger purchasers pay smaller

premiums than older purchasers; the incentive being that younger purchasers as a group

will pay less than similarly situated youth who only decide to address LTC needs at a more advanced age. Pricing is structured in this way because younger policyholders will pay premiums for a longer period of time before receiving benefits under the policy. Generally, because claims will be less during the early years of a policy, reserves can build up over time to prevent premium increases over time. For example, a fifty-year-old who buys LTC insurance may not need care until she is eighty years old -- or never. The rates are set on the assumption that she will go on paying premiums throughout the intervening years, thus building up a pot of money that will be available as the need for long term care becomes more likely. Id. LTC insurance is, thus, similar to life insurance, as it relies on the long-range accumulation in investment of premiums to meet a distant future cost. Id.

Most people are encouraged to buy, and do buy long term care insurance many years before they are likely to require services. Because prices are much lower for younger purchasers, buying coverage earlier in life and paying the premiums for a longer period can be a sensible investment --if the premiums stay at the same level over time. Id. at vii (emphasis in original). The premium for LTC insurance is expected to be fixed or level for the life of the policy. Id. at viii.

Rate increases are not always understood by, or acceptable to, consumers. Plaintiffs allege that insurers must disclose to consumers whether they set their initial premium rates at levels sufficient to cover their ultimate projected cost. Here, the premium was set low to attract buyers, and at some point, INA had full knowledge that substantial premium increases would be implemented.

6

The vast majority of companies currently offering LTC insurance have not increased premiums on policies that they have developed. Senate Report, supra, at 5-6. Although LTC insurance has been marketed for over twenty years[4], some insurers argue that LTC insurance is still a difficult product to price initially and thus rate increases to avoid losses by the insurance company are necessary. See Kaiser Report, supra at viii. If so, the experimental or risky nature of their LTC insurance offer must be disclosed to consumers.

Instead, while responsible insurance companies have initially priced their products conservatively, some less scrupulous insurers, such as Defendants, have deliberately "low-balled" i.e., offered unrealistically low initial premiums to gain market share, then closed enrollment in the policy, knowing that they can raise rates later on. Id. at 24. See also Mila Kofman and Lee Thompson, Consumer Protection and Long-Term Care Insurance: Predictability of Premiums 2 (Georgetown University Long-Term Care Financing Project, March 2004)(hereinafter "Georgetown Report"). These insurers set premiums for short-term gain rather than long term price stability.[5] Id. Other insurers have made a business of acquiring under-priced policies from other companies and then raising rates. Kaiser Report, supra at 24-25. Still other insurers have set initial prices that were apparently more reasonable but have failed to screen out high-risk applicants. Id. The use of "loose" underwriting rules i.e., selling to less-healthy people along with others and then setting rates that are too low to cover the long term risk, is another example of

---

[4] INA has been selling the LTC policy in question in this case for over fourteen years.
[5] Underpricing of LTC insurance is caused by a number of factors, including price competition among insurers. State regulators lack the ability to determine whether underpricing is occurring.

7

short-term gains at the expense of long term stability. Id. See also Georgetown Report at 2. Such machinations make a mockery of the insurance contract which is premised on the insurer using its expertise to manage a risk or set of risks for a consumer.

Rate increases threaten purchasers' ability to continue paying for coverage, especially for seniors on fixed incomes. Insurers are obligated to appropriately price their products to protect consumers from paying too little or too much for a policy. Underpricing is especially harmful to senior consumers if the insurer attempts to compensate for its mistake in setting an inadequate initial price with rate increases. These rate increases may cause consumers to drop policies in which they have invested substantial resources, often at a time when they will need the coverage the most and have the least ability to absorb an increase in premiums.

LTC insurance providers' bad acts and omissions, such as Defendants', which lead to rate increases have severe detrimental consequences for all LTC insurance policy holders, whether rich or poor. If increases are large enough, many policy holders, especially those living on fixed retirement incomes, allow their policies to lapse because they can no longer afford coverage. Kaiser Report, supra at 24. See also Georgetown Report, supra at 2. These individuals lose everything their insurer has accumulated with the premiums over the years. Id. Those who go on paying the higher premiums will with the passage of time become those at the greatest risk of needing services. Id. As a result, a further rate increase may be needed. If this cycle continues, the block of business may enter a "death spiral," covering a dwindling number of high risks at very high prices. Id. Policyholders who are forced out of the block of insurance because of large rate increases lose the single most important aspect of LTC insurance -- the guarantee of renewability.

8

Given Defendants' knowledge at the time they sold the policy or shortly thereafter, the so-called "guarantee" was misleading from the start since Defendants knew of its falsity.

Consumers have found little protection, if any, from rate increases foisted on them by LTC insurers, such as Defendants. LTC insurance, like most insurance products, is regulated by individual state insurance commissioners. However, this regulation is sparse and most States have no power to prevent premium increases if the loss ratio has been exceed or if the company's experience indicates that future loss ratios may exceed original projected loss ratios. See Hanson, et al. v. Acceleration Life Insurance Company, et al., Not Reported in F.Supp.2d, 1999 W.L. 33283345, *4 (D.N.D.) ("[T]here is a lack of statutory language requiring approval of [LTC premium] rate increases. . . . Further, the statutory scheme provides no mechanism for meaningful review of rates filed with the [North Dakota] Insurance Commissioner or for public input in a rate determination, hearings or otherwise.. . . . Simply put, the North Dakota Insurance Commissioner does not have the authority to establish long term care insurance policy rates."). Plaintiff's Exhibit A. This absence of meaningful regulatory power has been recognized and regulators have become so concerned about instability in the pricing and underwriting of LTC insurance that in August 2000 the National Association of Insurance Commissioners ("NAIC") adopted new model rules intended to improve the accuracy of initial rate proposals and to set standards for approval of requests for rate increases. Kaiser Report, supra at 25.

C.    **Judicial Response to the Problems in Long Term Care Insurance.**

The claims in this case are similar to the plaintiffs' successful claims in Hanson, supra. The Hanson case was a class action brought on behalf of a class of LTC insurance

9

policyholders against their insurers.  In Hanson, plaintiffs claimed that the insurance

company defendants had fraudulently misled their policyholders, through

misrepresentations and omissions of material facts, concerning the policyholders' LTC

policies.  The Hanson plaintiffs claimed the insurance company defendants knew their

LTC policies were defectively underpriced and improperly underwritten and, as a result,

that they would seek a series of exorbitant premium rate increases.  The Hanson plaintiffs

alleged the insurance company defendants withheld this information from them.[6]  The

Court denied the insurance company defendants' claim that the plaintiff could not

establish the fraud element of reliance:

> [R]eliance, and inducement, may be inferred from the facts and
> circumstances surrounding a transaction.

Hanson, supra at *5.  The Hanson Court also rejected the insurance company defendants'

claim that the facts did not support a claim or fraud:

> Here, if all of the alleged suppressed facts are accepted by a jury, (e.g.,
> that the policies were experimental, that the policies were initially
> underpriced to gain market advantages, that the underwriting was faulty,
> that it was known that the rates would need to be drastically increased, that
> the block of business would be closed), it could be fairly concluded that
> the plaintiffs would not have purchased or renewed the long term care
> policies at issue from the defendants. It could reasonably be concluded
> that since pertinent and material facts were withheld, plaintiffs were
> victims of fraud.

Hanson, supra at *5.  Finally, the Hanson Court denied the insurance company

defendants' claim that the defendants had no duty to disclose the material information

concerning planned rate increases to their policyholders.  Hanson, supra at *6.  The case

eventually settled on the eve of trial, and the Federal Court approved the national class

---

[6] The United States District Court, District of North Dakota, certified the Hanson case as
a class action. Id

10

action settlement.   Hanson, et al. v. Acceleration Life Insurance Company, et al., Not Reported in F.Supp.2d, 2000 W.L. 33340298 (D.N.D.).

A second North Dakota case, Rose v. United Equitable Ins. Co., Cass County, East Central Judicial District, CV-00-2248, also upheld a plaintiff's cause of action against his LTC insurer under circumstances similar to those found in this case.  In Rose, the Supreme Court of North Dakota affirmed a policyholder's fraud-based causes of action against an LTC insurer, Rose v. United Equitable Ins. Co., 2001 ND 154, 632 N.W.2d 429, and affirmed the certification of a litigation class as well, Rose v. United Equitable Insurance Co., 2002 ND 148, 651 N.W.2d 683.  The Rose case also eventually settled and the State Court approved the class action settlement.

Finally, in Lane v. American Travelers Life Ins. Co., Cane No. GIC 745641, Superior Court, San Diego County, California, filed December 11, 2000, (a LTC case with facts nearly identical to those herein) Judge Judith McConnell overruled defendants' demurrers similar to the Motion to Dismiss at issue here finding:

> Plaintiffs' complaint adequately pleads facts sufficient to state causes of action as pled . . . the complaint clearly asserts defendants failed to disclose material facts that would have effected the decision of someone, presumably on a fixed income, when deciding to buy long term care or home health care insurance.  Plaintiffs do not make any allegations regarding the amount of the increases of the propriety of the increases.  Only that defendants misled plaintiffs when making the sales and renewals without disclosing the premiums were planned to increase and the policies were defective in the first place. . . .

> Similarly, plaintiffs do not rely on parole evidence in making their claims, instead plaintiffs assert active concealment of material facts in the inducement of the contract.  Plaintiffs point out through the statements in the advertising material and the policy terms, that material information allegedly known to defendants was required to be disclosed.

11

> Finally, all the causes of action in the nature of fraud are adequately pled with the requisite specificity and with sufficient facts to demonstrate plaintiffs' justifiably relied upon the implications of the representations.

Plaintiff's Exhibit B. This case was eventually settled on a class basis. The court

certified a national class action and approved the settlement under Pennsylvania law.

Milkman v. American Travelers Life Ins. Co., 2002 WL 778272 (Pa.Com.Pl. 2002).

Defendants CIGNA Corporation and INA argue that Robert Alvarez's Class

Action Complaint fails to state a claim and should be dismissed under Fed.R.Civ.P.

12(b)(6). However, this argument is contradicted by the court decisions cited above

which specifically recognize a policyholder's claim against his LTC insurer under the

factual scenario present in this case.

## II.     LAW AND ARGUMENT

### A.     Rule 12(b) Standard of Review.

CIGNA Group Insurance and INA seek dismissal of Alvarez's claims pursuant to

Fed. R.Civ.P. 12(b). The Defendants face a high burden in their motion as Rule 12(b)

motions to dismiss tests only the legal sufficiency of a complaint. Burlington Ins. Co. v.

Okie Dokie, Inc., 329 F.Supp.2d 45, 47 (D.D.C. 2004) (citing Browning v. Clinton, 292

F.3d 235, 242 (D.C.Cir. 2002)). The complaint need only set forth a short and plain

statement of the claim, giving the defendant fair notice of the claim and the grounds upon

which it rests. Id. (citing Kingman Park Civic Ass'n v. Williams, 348 F.3d 1033, 1040

(D.C.Cir.2003) (citing Fed R. Civ. P. 8(a)(2) and Conley v. Gibson, 355 U.S. 41, 47, 78

S.Ct. 99, 2 L.Ed.2d 80 (1957)). "Such simplified notice pleading is made possible by the

liberal opportunity for discovery and the other pre-trial procedures established by the

Rules to disclose more precisely the basis of both claim and defense to define more

narrowly the disputed facts and issues." Id. (quoting Conley, 355 U.S. at 47-48, 78 S.Ct. 99 (internal quotation marks omitted)).  It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint or "plead law or match facts to every element of a legal theory." Id. (internal citations omitted).

Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  Id. (citing Warren v. District of Columbia, 353 F.3d 36, 37 (D.C.Cir.2004)).  Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations-including mixed questions of law and fact as true and draw all reasonable inferences therefrom in the plaintiff's favor.  Id. (citing Macharia v. United States, 334 F.3d 61, 64, 67 (D.C.Cir.2003);  Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 165 (D.C.Cir.2003); Browning, 292 F.3d at 242).

When the claim is for fraud, however, the court must also consider whether the complaint is pled with particularity.  D'Ambrosio v. Colonnade Council of Unit Owners, 717 A.2d 356, 360 (D.C. 1998).  The pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud.  Id. at 361 (applying D.C. court rules but noting that the D.C. rules and federal rules are identical and citing Kowal v. MCI Communications Corp., 305 U.S.App.D.C. 60, 67, 16 F.3d 1271, 1278 (1994) (quoting United States v. Cannon, 206 U.S.App.D.C. 405, 417, 642 F.2d 1373, 1385 (1981), cert. denied, 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 865 (1982)).

13

Reviewing Alvarez's complaint under these standards, it is evident that the facts are well pleaded, with particularity. Unlike in D'Ambrosio, where the plaintiff only pled fraud "in extremely 'short and plain' terms", Alvarez has explained the fraudulent scheme in detail in his twenty-five page complaint. Alvarez has alleged the following specific facts to support his fraud allegations:

**Time and Place**

- Alvarez completed the purchase of his Form TL-003039 (policy no. ADT023-00750) policy on March 28, 1992; ¶ 10, 23.
- The policy was issued in the District of Columbia; ¶ 10.
- As to the Class, the complaint alleges that CIGNA and INA developed, marketed, and sold the LTC polices beginning in 1988 and that the block was closed in 1992; ¶ 19, 39.

**Content of False Representations and Facts Misrepresented**

- CIGNA and INA misrepresented that the LTC policies were "guaranteed renewable" in its uniform promotional materials; ¶ 3, 24, 28, 29, 32, 65-74.

- CIGNA and INA misrepresented the LTC policies continued "to provide valuable long-term profits" in connection with the renewals of the policies; ¶ 67, 78.

- CIGNA and INA failed to disclose that

  - the LTC policies had been initially underpriced; ¶ 53
  - the actuarial assumptions and lapse rates underlying the pricing of the LTC policies were based on limited or incomplete data or that the actuarial assumptions ignored data available in the LTC insurance industry; ¶ 53
  - the actuarial assumption underlying the pricing of the LTC policies failed to take into account the way the LTC policies would be underwritten; ¶ 53
  - given these problems, the defendants knew that the original premiums would not be sufficient to support future claims; ¶5, 53
  - CIGNA and INA planned on seeking a series of premium increases for the LTC policies; ¶ 5, 53
  - CIGNA and INA would cease selling these LTC policies, "closing

14

the block" of their LTC business and/or the ramifications of such an action; ¶ 8, 39-44, 53

- the closed LTC policy block was experiencing or would experience a "selection spiral" or "death spiral; ¶ 53
- CIGNA and INA were intentionally raising their premiums to exorbitant rates to obtain windfall profits by forcing the insureds to drop the LTC policies and thereby avoid future claims; ¶ 53
- CIGNA and INA intended to pass any risk of loss due to the defective underpricing of the LTC policies on to Alvarez and the Class in the form of higher premiums. ¶ 53.

**Damages**

- CIGNA and INA shifted their risk under the policy to Alvarez and the Class through rate increases;
- Alvarez paid an annual premium of $1,188.00 from 1994 to 2003; ¶ 10, 50.
- In 2004, after investing nine years into this policy and at the age of eighty-three (83) Alvarez paid an eighty percent (80%) increase on his annual premium in the amount of $2,138.00; ¶ 50.
- CIGNA and INA planned to raise the premiums an additional eighty percent (80%) in 2005 and 2006; ¶ 50.
- Alvarez and others in the class have continued to pay the premiums to keep their LTC policies; ¶ 51.
- Other class members were unable to pay the ever-increasing insurance premiums and were forced to drop their policies. Thereby, Defendants avoided future liability on these claims obtaining either windfall profits or avoiding the losses associated with those claims. ¶ 52.

These allegations clearly establish the time, place and content of the false misrepresentations, the facts misrepresented and what was retained or given up as a consequence of the fraud.

**B.    Conversion of CIGNA Group Insurance's and INA's Rule 12(b) Motion Into a Motion for Summary Judgment Under Rule 56.**

When ruling on a Rule 12(b)(6) motion, the court may not rely on any facts that do not appear on the face of the complaint itself. Kitt v. Pathmakers, Inc., 672 A.2d 76, 79 (D.C. 1996). If any matters outside the complaint are presented to the court, then the rule requires that the motion be treated as one for summary judgment and disposed of as

15

provided in Rule 56. In this case, CIGNA Group Insurance and INA have presented to the Court several exhibits in support of their Rule 12(b) motion including the Master Policy, various promotional materials and an Affidavit which purport to establish CIGNA Group Insurance's and INA's right to raise premium rates on Alvarez's LTC policy. This effectively converts this Motion into a Motion for Summary Judgment. Alvarez has had no chance to undertake discovery so as to be able to fairly respond to such a motion. Therefore, INA's Motion for Summary Judgment is premature and should be denied for this reason alone.

C.      **The Law of the District of Columbia is Applicable to Alvarez's Claims Against CIGNA Group Insurance and INA.**

The United States Supreme Court in Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), relying upon Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), determined that, in a diversity action in federal district court, the court is to apply the conflicts law of the forum state. Therefore, in determining what law will apply to Alvarez's claims, this Court must look to the conflicts law of the District of Columbia ("D.C.").

1.      **D.C. conflict of law analysis.**

The first issue for a court to consider in making a conflicts of law decision is whether there is a conflict between D.C. law and Maryland or Pennsylvania law on each of the causes of action. "The absence of a true conflict compels the application of District of Columbia law by default." Brown v. Dorsey & Whitney, LLP., 267 F.Supp.2d 61 (D.D.C.,2003)(citing Greaves v. State Farm Ins. Co., 984 F.Supp. 12, 15 (D.D.C.1997)).

16

If the Court determines there is, in fact, a conflict, the Court's first step is to determine which area of law is presented by the underlying issue (torts, property, contracts, etc.).    In re Estate of Delaney, 819 A.2d 968, 988 (D.C. 2003).  This case involves allegations of (1) actual fraud, (2) constructive fraud, (3) unlawful trade practices, (4) breach of implied covenant of good faith and fair dealing, and (5) a request for punitive damages.

In determining which jurisdiction's law will apply to substantive issues, D.C. courts use a government interest analysis which requires a court evaluation of the governmental policies underlying the applicable conflicting laws and then a determination as to which jurisdiction's policy would be most advanced by having its law applied to the facts of the case.  Delaney, 819 A.2d at 988 (citing Felch v. Air Florida, Inc., 275 U.S.App. D.C. 403, 866 F.2d 1521, 1523 (1989); Stutsman v. Kaiser Found. Health Plan of Mid-Atlantic States, Inc., 546 A.2d 367, 372 (D.C.1988);  Rong Yao Zhou v. Jennifer Mall Rest., Inc., 534 A.2d 1268, 1270-71 (D.C.1987);  Gaither v. Myers, 131 U.S.App. D.C. 216, 404 F.2d 216, 222-24 (1968)).  "When the policy of one state would be advanced by application of its law, and that of another state would not be advanced by application of its law, a false conflict appears and the law of the interested state prevails. Where each state would have an interest in the application of its own law to the facts, a true conflict exists and the law of the jurisdiction with the stronger interest will apply." Id.  (citing Biscoe v. Arlington County, 238 U.S.App. D.C. 206, 738 F.2d 1352, 1360 (1984) (footnote omitted), cert. denied, 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985)).  Using this analysis, "this Court applies another state's law when (1) [the other state's] interest in the litigation is substantial, and (2) `application of District of Columbia

17

law would frustrate the clearly articulated public policy of that state."' *Id.* (citations omitted).

In making the choice-of-law decision, the trial court should also consider the four factors set forth in the Restatement (Second) of Conflicts § 145. <u>Rymer v. Pool</u>, 574 A.2d 283 D.C.,1990 (citing <u>Estrada v. Potomoc Elec. Power Co.</u>, 488 A.2d 1359, 1361, n. 2 (D.C.1985)). Those factors are:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship between the parties is centered.

Restatement (Second) of Conflicts, § 145 (1971). In sum, the trial court should look at the determinative factors for choice-of-law questions in the District of Columbia: "which jurisdiction has the most substantial interest in having its law applied." <u>Id</u>.

D.C. has a substantial interest in the application of its laws to Alvarez's claims. In arguing that Maryland or Pennsylvania law applies to Alvarez's claims, INA focuses on the domicile of Alvarez at the time he purchased his insurance (Maryland) and INA's domicile (Pennsylvania) and ignores the fact that the LTC policy under which Alvarez is insured is the "Master Policy," which was delivered and is sitused in D.C.[7] <u>See</u> Def's Exhibit B. The Master Policy refers to the "state of delivery" as D.C. and states that the

---

[7] In cases involving contract disputes, the courts in this circuit apply the "significant relationship test," which is derived from the Restatement (Second) of Conflict of Laws § 188 (1971). <u>Brown</u>, 267 F.Supp.2d at 71 (citations omitted) Pursuant to the Restatement (Second), in the absence of an "effective choice of law by the parties . . . the contacts to be taken into account" include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties. *Id.* (citing Restatement (Second) of Conflict of Laws § 188).

18

provision in the Master Policy are to conform with the laws of D.C.  Id.  Alvarez's
insurance contract specifically includes the terms of the Master Policy.  See Def's Exhibit
F, Alvarez's Cert, p. 8.  The Master Policy, under which Alvarez's certificate was issued
and under which he is insured is a contract between INA and the Trustee of the National
Group Benefits Trust.  The Trustee of the National Group Benefits Trust is the National
Bank of Washington, D.C. and the terms of the Trust itself state that the "Trust is
accepted by the Trustee in the District of Columbia and all questions pertaining to its
validity, construction, effect and administration shall be determined and governed in
accordance with the applicable laws of that jurisdiction" and that the Insurance Fund
created under the Trust "shall maintain its place of business at such a place in the District
of Columbia as the Trustee may determine...."  Plaintiff's Exhibit C.

Additionally, CIGNA has previously admitted that Alvarez's insurance policy is
sitused in D.C. and is subject to D.C. law.   In a November 18, 2004 letter to Alvarez,
CIGNA admitted that Alvarez's LTC policy was issued in D.C.  Plaintiff's Exhibit D.
CIGNA also admitted in a January 3, 2005 letter to the Maryland Department of
Insurance that Alvarez's LTC policy was sitused in D.C. and therefore, that the Maryland
Department of Insurance did not have jurisdiction over the policy.[8]  Plaintiff's Exhibit E.
In a January 11, 2005 letter to Alvarez, the Maryland Department of Insurance agreed
with CIGNA's argument that Maryland law did not apply to the policy.  Plaintiff's
Exhibit F.

---

[8] If, as the Defendants now argue, Maryland law does apply, then the Defendants
statements to the Maryland Insurance Department denying Maryland jurisdiction may be
fraudulent.  This conclusion may give rise to additional causes of action for Alvarez.

Although Plaintiff was domiciled in Maryland when he received his certificate of insurance under the Master Policy, this, and other plaintiffs' domicile are is irrelevant to the choice of law issue. However, in <u>Brown v. Dorsey & Whitney, LLP.</u>,267 F.Supp.2d 61 (D.D.C.,2003) the court found that the choice of law factor regarding the domiciles of the parties neither supports nor weighs against the application of District of Columbia law. In <u>Brown</u>, plaintiff resided in Maryland and defendant's principal office was in Minnesota. However, the court found there was no allegation that events of significance pertaining to the formation of the contract occurred in Maryland or Minnesota. Thus, the court held that the domicile factor was of minimal importance to the choice of law analysis. The same analysis is appropriate here as the events of significance pertaining to the formation of the insurance contract between INA and the National Group benefits Trust occurred in D.C.

## 2. D.C law applies to Alvarez's Actual Fraud and Constructive Fraud claims.

There is no substantive difference in the fraud laws of D.C., Maryland and Pennsylvania.[9] "The absence of a true conflict compels the application of District of

---

[9] <u>District of Columbia</u>: Common law fraud is never presumed, and a plaintiff alleging it must do so with particularity and must prove it by clear and convincing evidence. <u>Hercules & Co., Ltd. v. Shama Restaurant Corp.</u>, 613 A.2d 916, 923 (D.C. 1992)(citations omitted). To be entitled to a trial on the merits of a fraud claim, a plaintiff must allege "such facts as will reveal the existence of all the requisite elements of fraud. Allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient." <u>Id</u>. At common law, the requisite elements of fraud were (1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation, and (6) in cases involving commercial contracts negotiated at arm's length, that the defrauded party's reliance be reasonable. <u>Id</u>. <u>See also</u> <u>Schiff v. American Ass'n of Retired Persons</u>, 697 A.2d 1193, 1198 (D.C.App. 1997) (citing <u>Howard v. Riggs Nat'l Bank</u>, 432 A.2d 701, 706 (D.C.1981)) (stating elements of

20

Columbia law by default." <u>Brown</u>, 267 F.Supp.2d at __.  Therefore, the Court should

apply D.C. law to Alvarez's claims of Actual Fraud and Constructive Fraud.

        **3.**      **D.C. Law applies to Alvarez's claim the INA violated D.C.'s Unlawful Trade Practices Act, D.C. Code §§ 28-3901 et. seq.**

        Maryland law should not apply because Maryland consumer protection statute

does not apply to insurers.  <u>See</u> Maryland Consumer Protection Act, MD Code Ann.,

Com. Law, § 13-101, et seq.  D.C.'s Unlawful Trade Practices Act ("CPPA"), D.C. Code

§§ 28-3901 <u>et. seq</u> should be applied instead of the Pennsylvania Unfair Trade Practices

and Consumer Protection Law ("UTPL"), Pa. St. Ann. Title. 73 § 201-1 because there is

no true conflict between the statutes, particularly regarding (1) available remedies, (2)

---

fraud: 1) that defendant made a false representation of or willfully omitted a material fact; 2) that defendant had knowledge of the misrepresentation or willful omission; 3) that defendant intended to induce plaintiff to rely on the misrepresentation or willful omission; 4) that plaintiff acted in reliance on that misrepresentation or willful omission; and 5) that plaintiff suffered damages as a result of his reliance).

<u>Pennsylvania</u>: The cause of action of intentional misrepresentation or fraud contains the following elements: "(1) a representation, (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." <u>Gibbs v. Ernst</u>, 647 A.2d 882, 889 (Pa. 1994).  "The tort of intentional non-disclosure has the same elements as the tort of intentional misrepresentation except that in a case of intentional non-disclosure the party intentionally conceals a material fact rather than making an affirmative misrepresentation." <u>Id</u>. at 889 n.12.  Such fraud arises where there is an intentional concealment calculated to deceive. <u>Id</u>. (citations omitted).

<u>Maryland</u>:  A person claiming fraud must establish: 1) that the defendant made a false representation to the plaintiff, 2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, 3) that the misrepresentation was made for the purpose of defrauding the plaintiff, 4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and 5) that the plaintiff suffered compensable injury resulting from the misrepresentation. <u>Mathis v. Hargrove</u>, 888 A.2d 377 (Md.App. 2005).

21

class of persons protected, and (3) elements to be proven.  Where there is no conflict, the law of the forum state must be applied.  Brown v. Dorsey & Whitney, LLP., 267 F.Supp.2d 61 (D.D.C. 2003).

First, in both D.C. and Pennsylvania, attorneys fees and treble damages are available and discretionary.  See Fresh Start Industries, Inc. v. ATX Telecommunications Services, 295 F.Supp.2d 521 (E.D.Pa. 2003); District Cablevision Ltd. Partnership v. Bassin, 828 A.2d 714 (D.C. 2003). Second, both the CPPA and the UTPL protect the same class of persons-- individual consumers, as opposed to a broader class including commercial entities.  See Fresh Start, 295 F.Supp.2d at 527 (finding that New Jersey's consumer protection laws protected a broad class of persons, including commercial entities, constituted a conflict and indicated New Jersey's greater interest in apply its law).  Third, both the CPPA and the UTPL require proving the elements of common law fraud, including reliance.  Osbourne v. Capital City Mortgage Corp., 727 A.2d 322, 325 (D.C.1999); Fresh Start, 295 F.Supp.2d at 527 (finding that New Jersey's exclusion of reliance element constituted a greater interest in applying its law).

As set forth above, D.C. has a substantial interest in the application of D.C. consumer protections statutes to this case.  The insurance contract at issue was delivered and is sitused in D.C.  The National Group Benefits Trust is located in D.C.  The parties to the Master Policy and the language of the National Group Benefits Trust itself contemplate the application of D.C. law.  Additionally, the government of the State of Maryland has indicated it has little interest in the application of its laws to this matter. The Maryland Insurance Department specifically found that it had no jurisdiction over the matter because the insurance contract was "sitused" in D.C.

22

4.    **D.C. Law applies to Alvarez's claim of Tortious Breach of Implied Covenant of Good Faith and Fair Dealing.**

The District of Columbia has consistently recognized a duty of good faith and fair dealing. Malacca Corp. v. Travelers Indemnity Co., 2006 WL 740142, *2 (D.D.C. 2006); Paul v. Howard Univ., 754 A.2d 297, 310 (D.C.2000); American Nat. Red Cross v. Travelers Indem. Co. of Rhode Island, 924 F.Supp. 304, 307 n.5 (D.D.C. 1996)(citing GEICO, supra). Under District of Columbia law, "all contracts contain an implied duty of good faith and fair dealing, which means that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Cambridge Holdings Group, Inc. v. Federal Ins. Co., 357 F.Supp. 2d 89, 95 (D.D.C. 2004)(quoting Paul v. Howard University, 754 A.2d 297, 310-11 (D.C.2000); Hais v. Smith, 547 A.2d 986, 987 (D.C.1988); Messina v. Nationwide Mutual Insurance Co., 998 F.2d 2, 4 (D.C.Cir.1993)). See also Hoffman v. Hill, 777 F.Supp. 1003, 1005 (D.D.C. 1991). "This duty prevents a party from evading the spirit of the contract, willfully rendering imperfect performance or interfering with the other party's performance." Hoffman, 777 F.Supp. at 1005 (quoting Hais, 547 A.2d at 987-88). While the insured's duty to disclose accurate information on his or her application is often emphasized, "[t]he relationship of insured and insurer presumes good faith on both sides." Diamond Service Co., Inc. v. Utica Mut. Ins. Co., 476 A.2d 648, 655 (D.C. 1984).

The covenant of good faith and fair dealing that is implicit in all contracts, supplemented by the idea that insurance contracts have a special characteristic, warrants heightened liability for the breach of that covenant." Messina, 998 F.2d at 5 (emphasis

23

added)(citing <u>Braesch v. Union Ins. Co.</u>, 237 Neb. 44, 464 N.W.2d 769, 774-75 (Neb. 1991); <u>Kranzush v. Badger State Mut. Casualty Co.</u>, 103 Wis.2d 56, 307 N.W.2d 256, 261 (1981)).[10]  In <u>Braesch</u>, on which the <u>Messina</u> court relied, the court explained the special characteristics of the insurance contract:

> The public interest in insurance contracts, the nature of insurance contracts, and the inequity of the bargaining power between the insurer and the policyholder all serve to distinguish insurance contracts from other types of contracts.  Each of these three factors will be discussed in order.

237 N.W.2d at 51. The noncommercial aspect of insurance distinguishes it from other types of contracts for which a breach does not sound in tort.  <u>Id</u>. at 53 (citing <u>Travelers Ins. Co. v. Savio</u>, 706 P.2d 1258 (Colo.1985) (an insured seeks to obtain some measure of financial security and protection against calamity, rather than to secure a commercial advantage);  <u>Nichols v. State Farm Mutual Auto. Ins. Co.</u>, 279 S.C. 336, 306 S.E.2d 616 (1983) (an insured does not contract to obtain any kind of commercial advantage but only to protect himself against the specter of loss)).  The court astutely observed that:

> Tort actions for breach of covenants implied in certain types of contractual
> relationships are most often recognized where the type of contract

---

[10] Many courts have extended the duties of the covenant of good faith to create a tort of bad faith denial of an insurance claim, <u>Zimmerman v. Harleysville Mut. Ins. Co.</u>, 860 A.2d 167 (Pa.Super. 2004), and a tort of bad faith refusal to settle, <u>Braesch v. Union Ins. Co.</u>, 464 N.W.2d 769 (Neb. 1991).  However, the District of Columbia courts continue to dispute whether a bad faith tort for refusal to pay a claim exists.  <u>Compare Messina v. Nationwide Mutual Insurance Co.</u>, 998 F.2d 2, 4 (D.C.Cir.1993) and <u>Washington v. Group Hospitalization Inc.</u>, 585 F.Supp. 517 (D.D.C. 1984) <u>with American Registry of Pathology v. Ohio Cas. Ins. Co.</u>, 401 F.Supp.2d 75 (D.D.C. 2005) <u>and American Nat'l Red Cross v. Travelers Indem. Co.</u>, 924 F.Supp. 304 (D.D.C. 1996)(punitive damages available where breach of contract merges with tort) <u>and Washington v. GEICO</u>, 769 F.Supp. 383 (D.D.C. 1991).  Nevertheless, the District of Columbia has recognized that an insurer has a duty to act in good faith in fair dealing separate and distinct from a bad faith failure to pay, which may reach the level of a tort.  <u>Malacca Corp. v. Travelers Indemnity Co.</u>, 2006 WL 740142, *2 (D.D.C. 2006); 924 F.Supp. At 308.

involved is one in which the plaintiff seeks something more than commercial advantage or profit from the defendant. When dealing with an innkeeper, a common carrier, a lawyer, a doctor or an insurer, the client/customer seeks service, security, peace of mind, protection or some other intangible. These types of contracts create special, partly noncommercial relationships, and when the provider of the service fails to provide the very item which was the implicit objective of the making of the contract, then contract damages are seldom adequate, and the cases have generally permitted the plaintiff to maintain an action in tort as well as in contract.

Id. at 52 (citing Rawlings v. Apodaca, 151 Ariz. 149, 159, 726 P.2d 565, 575 (1986)("one of the benefits that flow from the insurance contract is the insured's expectation that his insurance company will not wrongfully deprive him of the very security for which he bargained or expose him to the catastrophe from which he sought protection. Conduct by the insurer which does destroy the security or impair the protection purchased breaches the implied covenant of good faith and fair dealing implied in the contract")). The inequity in the bargaining power of the insurer and insured differentiates the instant insurance contract from the run-of-the-mill contract. Id. (citing Rawlings, supra; Dolan v. Aid Ins. Co., 431 N.W.2d 790 (Iowa 1988); Nichols, supra; Arnold v. Nat. County Mut. Fire Ins. Co., 725 S.W.2d 165 (Tex.1987); McCullough v. Golden Rule Ins. Co., 789 P.2d 855 (Wyo.1990)).

The aforementioned public policy is why the insurance industry is regulated. As such, the District of Columbia has recently passed legislation specifically related to Long Term Care insurance. D.C. Code § 31-3601, et seq. However, these regulations did not exist at the time Alvarez and the class purchased their policies because LTC insurance is a relatively new product, which only came on the market in the late 1980s. Regardless, by the time Defendants made their decisions to close the block and raise premiums and

25

subsequently failed to disclose the affect thereon, the industry had fourteen years of actuarial experience yet, Defendants were somehow unable to accurately predict premiums to avoid 80% increases two years in a row?

It is the nature of insurance and the industry's purported actuarial experience that induced Alvarez and the class to rely on Defendants' assurances of a "guaranteed renewable" policy for security and peace of mind. Similarly, Alvarez and the class had a reasonable expectation that Defendants, as a purportedly experienced and regulated insurance company, would disclose material facts such as the premium will definitely increase as opposed to the premium "may change on a class basis."

Just as courts have recognized that the covenant of good faith and fair dealing creates a duty beyond mere contractual specific performance, the District of Columbia has recognized that a breach of contract can "assumes the character of a wilful [sic] tort." American Nat. Red Cross, 924 F.Supp. 304, 307 n.5, 308 (D.D.C. 1996)(internal citations omitted). See also Central Armature Works v. Am. Motorists Ins. Co., 520 F.Supp. 283, 292 (D.D.C.1980). In 2006, the District Court for the District of Columbia recognized that an insurer has a duty to act in good faith in fair dealing, which is separate and distinct from a bad faith failure to pay. Malacca Corp. v. Travelers Indemnity Co., 2006 WL 740142, *2 (D.D.C. 2006). The court also stated that punitive damages may be assessed under these circumstances. Id. If there were ever a breach of the covenant of good faith, it is here where thousands of senior citizens are facing unaffordable insurance after years of investment on the very time when they may need the coverage most.

As set forth above, D.C. recognizes a cause of action for tortious breach of implied covenant of good faith and fair dealing while Pennsylvania and Maryland do not.

26

Therefore, D.C. has a strong interest in preventing "fraud and injustice." Delaney, 819 A.2d at 989 (citation omitted). By recognizing an independent tort for breach of implied covenant of good faith and fair dealing, D.C. has articulated a public policy interest in preventing breaches of implied covenant of good faith and fair dealing that go beyond mere contract. Pursuant to this public policy, in this case, D.C. has an interest in protecting the beneficiaries of the National Group Benefits Trust, (which is sitused in D.C. and under which the LTC insurance in this case was sold) from breaches of D.C. law. In contrast, Maryland and Pennsylvania have no interest or a much lower interest in conduct affecting a D.C. Trust that rises to a level of tortious breach of implied covenant of good faith and fair dealing since they do not recognize such a cause of action. Therefore, in addition to D.C.'s interest in this matter stemming from the contacts with D.C., D.C. has a stronger interest based on D.C.'s articulated public policy interest in preventing breaches of implied covenant of good faith and fair dealing, D.C. law should apply. Id.

### 5. D.C. law applies to Alvarez's claim for punitive damages.

If the court determines that D.C. law apples to Alvarez's claims for actual fraud, constructive fraud, Unlawful Trade Practices Act, D.C. Code §§ 28-3901 et. seq., and tortious breach of implied covenant of good faith and fair dealing, it should follow that D.C. punitive damages law should apply to any punitive damages awarded as a result of these predicate tortious acts.

### D. Actual and Constructive Fraud.

Defendants CIGNA Group Insurance and INA argue that Alvarez's claims of actual and constructive fraud fail under Maryland law. As set forth above, all of these

arguments are irrelevant as the law of the District of Columbia applies in this case. Under D.C. law, these arguments of lack of evidence of reliance, lack of duty, and lack of evidence of intent are without merit.

      1.     **Actual Fraud and Constructive Fraud: Alvarez relied on the fraudulent misrepresentations and omissions by CIGNA Group insurance and INA.**

When the facts in the Class Action Complaint are taken as true, as they must be for purposes of this Rule 12 (b)(6) Motion, the Defendants' argument that Alvarez cannot establish that he relied on the Defendants' material misrepresentations and omissions in deciding to initially purchase the LTC policy and in connection with his decision to annually renew the policy must fail.

This is primarily a fraud by omission of material fact case. Howard v. Riggs Nat'l Bank, 432 A.2d 701, 706 (D.C.1981)) sets forth the elements in a fraud by omission case: (1) that defendant made a false representation of or willfully omitted a material fact; (2) that defendant had knowledge of the misrepresentation or willful omission; (3) that defendant intended to induce plaintiff to rely on the misrepresentation or willful omission; (4) that plaintiff acted in reliance on that misrepresentation or willful omission; and (5) that plaintiff suffered damages as a result of his reliance. See also Schiff v. American Ass'n of Retired Persons, 697 A.2d 1193, 1198 (D.C. App. 1997).

When a person positively states that something is to be done or is to occur, when he knows the contrary to be true, the statement will support an action in fraud. A statement literally true is actionable if made to create a false impression. Remeikis v. Boss & Phelps, Inc., 419 A.2d 986 (D.C. 1980) (citing Tucker v. Beazley, 57 A.2d 191, 193 (D.C.Mun. App. 1948) (seller of rooming house correctly told buyer the present

rentals, but neglected to state that these rentals were higher than those allowed by law); Restatement (Second) of Torts § 529 (1977) (misleading half truths can be fraudulent misrepresentations).

In Remeikis, the court found that "even silence about the material fact of termite damage can amount to a false representation in circumstances where Boss & Phelps and Western would be expected to speak, as here, having undertaken an examination of the premises for appellants' protection." Id. (inferring reckless false representation) (citing Borzillo v. Thompson, 57 A.2d 195 (D.C.Mun.App. 1948) (when seller volunteers information, but is silent as to relevant unfavorable material, his statement constitutes a fraudulent representation); Ehrlich v. Real Estate Commission, D.C.Mun.App., 118 A.2d 801 (1955) (brokers fraudulently failed to reveal zoning restrictions)).  Nondisclosure or silence, as well as active misrepresentation, may constitute fraud.   D'Ambrosio v. Colonnade Council of Unit Owners, 717 A.2d 356 (D.C. 1998)(finding fraudulent nondisclosure).

The Defendants concede that determination of the fraud element of reliance is a question of fact. See INA's Memo. In Support of Mot. To Dismiss, p.8 citing Cozzi Iron & Metal v. U.S. Office Equip. Inc. 250 F.3d 570, 574 (7th Cir. 2001).  Nevertheless, INA seeks dismissal of the fraud claim in this case on an allegation of failure of proof as to the element of reliance.  Questions of fact are ill suited for disputation by Rule 12(b)(6) Motion. Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).

In Virginia Academy of Clinical Psychologists v. Group Hospitalization and Medical Services, 878 A.2d 1226 (D.C. Ct. App. 2005), the D.C. Court of Appeals found that "[i]t is not ... necessary that [a plaintiff's] reliance upon the truth of the fraudulent

29

misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct ... It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." Citing City Solutions Inc. v. Clear Channel Communications, Inc. 365 F.3d 835, 840 (9th Cir. 2004).

In this case, Alvarez has alleged that he was unaware of the Defendants' plan to pass the risk of loss for the LTC policy back on to him and the Class through rate increase and of the effect of INA's decision to close the block of business. Class Action Complaint Para 53, 66. He has also alleged that if he had known these material facts he would have acted in a different way. Class Action Complaint Para 55, 72, 73. When these allegations are taken as true, they are sufficient to establish that the Defendants' material misrepresentations and omissions were a substantial factor in Alvarez's decision to purchase and renewed this LTC policy from CIGNA Group Insurance and INA.

However, the Defendants claim that the Master Policy states that they may raise premiums[11] and that therefore Alvarez cannot prove reliance based upon their failure to disclose known, planned rate increases. This argument fails because it misconstrues

---

[11] To prove that Alvarez and the Class were given notice of the Defendants' right to raise premiums, the Defendants point to language in the Master Policy (which was never provided to Mr. Alvarez prior to this lawsuit) and from various marketing materials that allows for the increase of premium rates:

> Master Policy: "We may change the premium rates on any Premium Due after the first anniversary of the policy. We will give you at least 60 days written notice."

> Promotional Materials: "Your age at the time of application determines your premium and it will not increase unless the Company changes premiums on a class basis." (Emphasis in original).

See Def.'s Exhibit B.

30

Alvarez's claims. Alvarez is not claiming that CIGNA Group Insurance and INA failed to disclose that they "could" raise premium rates. Alvarez's claim is that the Defendants failed to disclose (1) that they already planned to raise premiums; (2) that at some point (before Alvarez's initial purchase of the LTC policy) CIGNA Group Insurance and INA knew that the initial assumptions they had used to price the policy had been erroneous and that, as a result, premiums collected would not support payment of expected claims; (3) that, armed with this knowledge, the Defendants made a decision to pass the cost of their plan to underprice the policy or their mistakes in pricing the policy back on to Alvarez and the class through a series of premium increases. The Defendants' "right" to raise premium conflicts with the Defendants' duty to ensure that the LTC policy remains "guaranteed renewable." A duty which is at odds with the Defendants' claim that rate increases are per se allowable. Just as an insurer has a duty to adjust a claim fairly, even though payment of the claims comes out of their reserves and profits, an insurer has a duty to structure a policy in favor of consumers' reasonable expectations.

The Guaranteed Renewability term in the Certificate of Insurance provided to Alvarez gives rise to a duty on the part of the Defendants to disclose all material facts concerning the pricing defects of the LTC policy to Alvarez at the time of the initial purchase and the time of subsequent renewal. The Guaranteed Renewability term in the Certificate of Insurance issued to Alvarez in 1992 provides:

> GUARANTEED RENEWABILITY: Your coverage will automatically be renewed provided the required premium is paid and benefits have not been exhausted.

Def's Exhibit F. The Guaranteed Renewability term is a promise by CIGNA Group Insurance and INA that they will act reasonably in connection with the premiums charged

31

and a warranty that the premiums will remain affordable such that they can be renewed and Alvarez was entitled to rely upon this promise.

The documents in this case, then, create (1) a duty on the part of the Defendants, enshrined in the Certificate of Insurance sent to the insureds and upon which Alvarez relied, to insure that the LTC insurance would remain renewable, and (2) a right by the Defendants to raise premiums on a class basis. This "right" which was located in the Master Policy (which was not routinely forwarded to policyholders) and in marketing materials. Alvarez does not claim that the Defendants did not disclose that they may change the premiums. It is that they did not disclose that they intended to raise premiums for an unreasonable purpose (to push the risk of loss created by the original underpricing of the LTC policies back to the policyholder) and the effect of this decision: the breach of the Defendants' duty to ensure renewability.

The North Dakota Federal Court in Hanson recognized that in a fraud by omission of material fact case involving LTC insurance, reliance may be inferred. See Hanson, supra. D.C. law similarly allows the inference of the elements of fraud when the facts have been sufficiently pled. See Atraqchi v. GUMC Unified Billing Services, 788 A.2d 559 (D.C. 2002); Bennett v. Kiggins, 377 A.2d 57, 59-60 (D.C.1977)(citations omitted), cert. denied, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). In fraud by omission cases it is necessary and proper for the Court to inference reliance:

> Like proving a negative, it is obviously difficult to prove that one relied on the fact that something was not disclosed. Or, put another way, it would be an unrealistic burden on a plaintiff to prove how he would have acted if the omitted material information had been disclosed. This concept underlies those cases which impose a presumption of reliance "where a defendant makes materially misleading omissions." Ackerman v. Price Waterhouse, 252 A.D.2d 179, 683 N.Y.S.2d 179, 198

32

(N.Y.App.Div.1998). A court may presume reliance where it is logical to believe that a reasonable person--or insured--would attach importance to the omitted fact in his choice of action on the transaction in question. Spark v. MBNA Corp., 178 F.R.D. 431, 435- 36 (D.Del.1998) (certifying a class of credit card holders against card issuer and applying a presumption of reliance on material contained in advertised offer).

Berry v. Federal Kemper Life Assur. Co., 99 P.3d 1166, 1168 (N.M. App. 2004).

When the facts in the Class Action Complaint are taken as true, the Defendants' argument that Alvarez cannot establish that he relied on the Defendants' material misrepresentations and omissions in this case must fail.

> **2.    Constructive Fraud: CIGNA Group Insurance and INA had a duty to disclose to Alvarez all material facts relating to Alvarez's LTC policy.**

The Defendants seek dismissal of Alvarez's claim of constructive fraud by claiming that CIGNA Group Insurance and INA did not have a "fiduciary" or "confidential" relationship with Alvarez that would support a constructive fraud claim. As set forth above, the D.C. courts have long recognized a special relationship between insurance companies and their insured's analogous to a confidential or fiduciary relationship. Messina v. Nationwide Mutual Insurance Co., 998 F.2d (D.C.Cir. 1993)("The bad faith tort is grounded on the covenant of good faith and fair dealing that is implicit in all contracts, supplemented by the idea that insurance contracts have a special characteristic that warrants heightened liability for the breach of that covenant." 998 F.2d at 5 (emphasis added). See also Hoffman v. Hill, 777 F.Supp. 1003, 1005 (D.D.C. 1991)("This duty prevents a party from evading the spirit of the contract, willfully rendering imperfect performance or interfering with the other party's performance." 777 F.Supp. at 1005 (internal quotation omitted).

In Hanson, the Court recognized a duty on the part of an LTC insurance company to disclose all material facts surrounding the LTC insurance to its insureds. Hanson, *supra*. The Hanson Court held that a provision of North Dakota statute requiring full mutual disclosure of all material facts by the parties to an insurance contract created a duty on the part of the LTC insurer to disclose such facts. The D.C. statutes in effect at the time Alvarez purchased his LTC policy from INA (April 1, 1992) create a duty to disclose similar to that created by the North Dakota statute identified by the Hanson Court. The North Dakota statue in question in Hanson, N.D.C.C. § 26.1-29-16, required both parties to an insurance contract to communicate in good faith and to disclose material facts. D.C.'s statute is similar. It provides:

> The falsity of any statement in the application for any policy covered by this section shall not bar the right to recovery there under unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the company.

(D.C. Code § 35-712(f) (1940).

Although on its face the statute applies to "false statements", D.C. Courts have interpreted this statute as applying to material omissions as well as material misstatements.

Courts have long imposed this burden on parties to insurance contracts in D.C. In Turner v. National Hospitalization, Inc., the Municipal Court of Appeal for the District of Columbia ruled that an insured was properly denied coverage under a hospitalization policy where the insured had not disclosed the material fact of prior medical treatment to the insurance company at the time she purchased the policy. The Turner Court held that

34

the statutory law of D.C. at the time (D.C. Code § 35-712(f) (1940)) the same statute that was in effect when Alvarez purchased his policy, applied to bar the plaintiff's claim.

The D.C. Court's have recognized that the statute creates a duty requiring the disclosure of all material facts, which impact on the "acceptance of risk or the hazard assumed by the insurance company." The insurance company is subject to the same duty to disclose material facts pertaining to its decision to pass the risk of loss on the insurance back to the policyholders through rate increases as these facts also affect "acceptance of risk or the hazard assumed by the insurance company." See Diamond Service Co., Inc. v. Utica Mut. Ins. Co., 476 A.2d 648, 655 (D.C. 1984).(While the insured's duty to disclose accurate information on his or her application is often emphasized, "[t]he relationship of insured and insurer presumes good faith on both sides.") In fact, an insurance company should be held to this duty to disclose for another reason as well. In regard to matters of pricing and actuarial science, the insurance company is holding itself out as the expert in this area and the policyholder is relying on the insurance company for its expertise in this area.

Additionally, D.C. statutes and administrative regulations in effect at the time Alvarez renewed his LTC policy require disclosure by the Defendants of material facts surrounding the LTC contract. See D.C. Code Ann. § 31-3606 (Disclosures required in connection with group LTC insurance sold in D.C.)(Effective date May 23, 2000); 26 D.C. ADC § 2600 et seq. (Administrative rules setting forth requirements for LTC insurance sold in D.C.)(Effective date December 15, 2005). First, these requirements for disclosure of material information surrounding Alvarez's LTC policy are applicable to

35

Alvarez's LTC policy when he renewed his coverage.[12]    Second, the D.C. legislative body's adoption of its version of the National Association of Insurance Commissioners Model Act regarding LTC pricing and disclosure recognizes the statutory gap that existed prior to 2000 and evidences a public policy of requiring disclosure of material facts by LTC insurance companies.

Finally, D.C. case law imposes upon the insurance company a duty to disclose all material facts to its insured.  An insurer has a duty "to spell out in plainest terms-terms understandable to the man in the street-any exclusionary or delimiting policy provisions." Chase v. State Farm Fire and Cas. Co., 780 A.2d 1123 (D.C. 2001).  "Failing such unambiguous language, doubt should be resolved in favor of the insured."  Holt v. George Washington Life Ins. Co., 123 A.2d 619, 625 (D.C.1956) (citation omitted). "The rule that a real ambiguity in an insurance policy is to be construed against the company is not a rule of convenience or a mere technicality of legalists."  Cameron v. USAA Property and Cas. Ins. Co., 733 A.2d 965, 968 (D.C. 1999)(citing Hayes v. Home Life Ins. Co., 83 U.S.App.D.C. 110, 112, 168 F.2d 152, 154 (1948) (Prettyman, J.). On the contrary, this rule is based on sound public policy, for the contracts in question are written by the insurers. Id.  In recognition of these realities, ambiguities in an insurance policy are construed against the insurer and in favor of "the reasonable expectations of the purchaser of the policy." Chase, 780 A.2d at 1127 (citation omitted).  The policy behind these cases recognizes a "special" relationship between an insured and his or her insurance company sufficient to create a duty on the part of the insurance company to

---

[12] In other words, Alvarez entered into a new prospective contract with INA for coverage in which he exchanged premium payments for a future period of coverage AFTER these disclosure requirements became effective.

36

disclose material facts.   Under D.C. law, INA and CIGNA Group Insurance had a "special" relationship with Alvarez sufficient to support a claim for Constructive Fraud.

### 3.    Actual Fraud: CIGNA Group Insurance and INA acted with the intent to deceive Alvarez

To establish a claim for fraud, D.C. law requires that Alvarez prove that INA acted with the intent to deceive.   Bennett v. Kiggins, 377 A.2d 57, 59-60 (D.C.1977)(citations omitted), cert. denied, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978)(identifying elements of fraud claim under D.C. law).   Alvarez' Class Action Complaint establishes that INA knew material facts concerning Alvarez's LTC policy and did not disclose these facts to Alvarez.   Intent to deceive is proven by these facts.

INA's argument on the issue of intent focus on the allegation that INA knew in 1992, when Alvarez initially purchased his policy, that the LTC policies were underpriced.   This is a fact question which cannot be answered without discovery. Regardless, however, this argument ignores the fact, whether INA knew that its policies were under priced in 1992, INA became aware of this material fact as some point and failed to disclose it to Alvarez as he made his annual decision to renew his coverage.   At some point in time, INA had knowledge that the LTC policies were under priced and that INA planned to rectify this situation by passing the risk of loss on the policies back to Alvarez and the Class through a series of premium increases.   Even when they did disclose there would be a premium increase, INA omitted material facts as to why.   The fraud element of intent can be inferred from this failure to disclose material facts. Bennett v. Kiggins, 377 A.2d 57, 59-60 (D.C.1977)(citations omitted), cert. denied, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782(1978)(stating nondisclosure or silence, as well

as active misrepresentation, may constitute fraud and that the court can draw an inference of fraud from the facts alleged). See also Atraqchi v. GUMC Unified Billing Services, 788 A.2d 559, 563 (D.C. 2002)(citing Bennett v. Kiggins, 377 A.2d 57, 59-60 (D.C.1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978)).

All actions by INA and CIGNA Group Insurance of which plaintiffs complain in this case amount to an evasion of the spirit of the contract, willful imperfect performance and interference with plaintiffs' performance. The purpose of properly designed LTC insurance is to bring significant improvements to quality of life by assuring there will be sufficient resources to pay for long term care if and when needed. The Defendants interfered with the spirit of this benefit by underpricing this insurance, by closing the block, and by increasing premiums. The Defendants never disclosed how their decisions would affect Alvarez and the Class, nor how these decisions would adversely affect the renewability of this block of business. Defendants deprived Alvarez and the class of the very security for which they bargained. Such conduct by the insurer, which destroys the security or impairs the protection purchased by the policyholder is contrary to the special relationship between an insurer and an insured and is a breach of the insurer's responsibility to their insureds. Defendants' failure to honor its special relationship exposed Alvarez and the Class to the catastrophe from which they sought protection and thereby interfered with and destroyed plaintiffs' right to receive the fruits of the contract by necessarily forcing them to lapse or to pay unreasonable premiums to maintain their investment.

## III.    CONCLUSION

For the reasons set forth above, INA's and CIGNA Group Insurance's  Rule

12(b)(6) Motion to Dismiss should be denied.

Dated this ___ day of May, 2006.

JAMES & HOFFMAN
EDGAR N. JAMES
(D.C. Bar No. 333013)
Amy Fettig, Esq.
(D.C. Bar No. 484883)
1101 Seventeenth St. N.W., Suite 510
Washington, D.C. 20036
(202) 496-0500

KANNER & WHITELEY
ALLAN KANNER (LA#20580)
CONLEE S. WHITELEY (LA#22678)
AYLIN R. AÇIKALIN MAKLANSKY
(LA#30195)
701 Camp Street
New Orleans, LA 70130
(504) 524-5777

VOGEL LAW FIRM
TIMOTHY Q. PURDON (ND#05392)
MONTE L. ROGNEBY (ND#05029)
200 North 3rd Street, Suite 201
P.O. Box 2097
Bismarck, ND 58502-2097
(701) 258-7899

PERRY PEARCE BENTON, ESQ.
(Bar No. ASB-2159-N66P)
32330 Sandpiper Dr.
Orange Beach, AL 36561
(251) 980-2640

**Attorneys for Plaintiff**

39

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of May 2006, a copy of the foregoing

was forwarded via first-class mail, postage prepaid to:

James F. Jorden
Raul A. Cuervo
Stephen H. Goldberg
Jorden Burt LLP
1025 Thomas Jefferson Street, N.W.
Suite 400 East
Washington D.C. 20007-5208

James & Hoffman
Edward N. James
Amy Fettig
1101 Seventeenth St. N.W. Suite 510
Washington D.C. 20036

40