UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Robert Alvarez,<br>1419 Southeast 43rd Terrace,<br>Ocala, FL 34471,<br>individually, and on<br>behalf of all others similarly<br>situated,<br><br>Plaintiff,<br><br>v.<br><br>CIGNA and<br>The Insurance Company of<br>North America,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Case No. 1:06CV00145<br><br><br>The Honorable<br>Emmet G. Sullivan |

### AFFIDAVIT OF CONLEE S. WHITELEY

| | |
|---|---|
| STATE OF LOUISIANA | ) |
| | ) ss |
| PARISH OF ORLEANS | ) |

I, Conlee S. Whiteley, state:

1.    I am one of the attorneys for Robert Alvarez in the above-entitled action.

2.    Attached as Exhibit A and B hereto find true and correct copies of <u>Hanson, et al.</u>
<u>v. Acceleration Life Insurance Company, et al.</u>, Not Reported in F.Supp.2d, 1999
W.L. 33283345 (D.N.D.) (Exhibit A) and an Order, <u>Lane v. American Travelers</u>
<u>Life Insurance Co.</u>, Case No. GIC 745641, Superior Court, San Diego County,
California, filed December 11, 2000.

3.    Attached as Exhibit C hereto find a true and correct copy of  the National Group
Benefit Trust received from ACS Member Insurance Program, 1200 East Glen
Ave., Peoria Heights, IL 61616.

4.    Attached as Exhibit D, E, and F hereto find true and correct copies of the

following documents that were provided by Robert Alvarez to his attorneys in this

matter:

Exhibit D:    Letter from Peter Brown of November 18, 2004
Exhibit E:    Letter from CIGNA Group Insurance dated January 3, 2005
Exhibit F:    Letter from Maryland Insurance Administration of January 11,
              2005.

FURTHER AFFIANT SAYETH NOT.

Dated this 2nd day of May, 2006.

_____
Conlee S. Whiteley (#22678)
Kanner & Whiteley, LLC
701 Camp Street
New Orleans, LA 70130
(504) 524-5777


Subscribed and sworn to before me this 3rd day of May, 2006.

_____
Notary Public
Elizabeth Cowen
My commission expires
at death
#23697 Louisiana

2

PLAINTIFF'S EXHIBIT A


PLAINTIFF ROBERT ALVAREZ'S
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT, INA'S MOTION TO DISMISS

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

▷

Only the Westlaw citation is currently available.
United States District Court, D. North Dakota, Southeastern Division.
Harold HANSON, Nellie McIlroy, and Estate of Gladys Schimke, and the class of similarly
situated North Dakota purchasers of Nursing Home Benefit Policies, Plaintiffs,
v.
ACCELERATION LIFE INSURANCE COMPANY, Interstate Service Insurance Agency, Inc.,
Benefit Plans II, and Commonwealth Life Insurance Company, Defendants.
No. CIV A3-97-152.

March 16, 1999.

*MEMORANDUM AND ORDER*

WEBB.

**\*1** Before the Court are various motions dealing with the issues of fraud, the filed rate doctrine, class certification and the pleading of exemplary damages. The matters have been fully briefed and oral argument was heard on February 26, 1999. For the reasons set out below, the Court rules as follows:

1. Motion by Defendants for Summary Judgment on All Claims (Fraud), (doc. # 94), is hereby DENIED except with respect to plaintiffs' Claim No. 6, for breach of implied warranty, which is hereby DISMISSED;

2. Motion by Plaintiffs for Leave to Amend Complaint, (doc. # 77), to the extent not already ruled upon by the Honorable Karen K. Klein, Magistrate Judge, i.e., to add a claim for exemplary damages, is hereby GRANTED, the plaintiffs are DIRECTED to forward the Amended Complaint to the Clerk of Court, and the amended complaint is hereby authorized and ORDERED FILED;

3. Motion by Plaintiffs for Partial Summary Judgment on the Filed Rate Doctrine,(doc. # 82), is hereby GRANTED;

4. Motion by Defendants for Summary Judgment on the Filed Rate Doctrine, (doc. # 83), is hereby DENIED;

5. Motion by ACLI for Leave to File an Amicus Curiae Brief on the Filed Rate Doctrine, (doc. # 102), is hereby GRANTED and the lodged brief ORDERED FILED, however ACLI is DIRECTED to make no further filings in this case;

6. Motion by Defendants to Strike the Class Allegations in the Complaint, (doc. # 13), is hereby DENIED; and

7. Motion by Plaintiffs to Certify Class Action, (doc. # 36), is hereby GRANTED, and plaintiffs are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT

A

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

hereby DIRECTED to present within ten days of receipt of this Order a revised class definition.

In light of the Court's rulings, and given the Court's concerns regarding the ability of the parties to be adequately prepared for the scheduled May 3, 1999, trial date, the parties are hereby DIRECTED to confer and present to the Court a case management plan within ten days following receipt of this Order.

## I. BACKGROUND

Harold Hanson, Nellie McIlroy and Gladys Schimke were senior citizens when they first purchased nursing home insurance policies [FN1] from defendant Acceleration Life Insurance Company (Acceleration) in 1987. Said policies were apparently developed, marketed and administered by Interstate Service Insurance Agency, Inc., (Interstate). These policies were "guaranteed renewable for life" upon payment of the premiums, and were allegedly sold as "level premium policies."

> FN1. The "policies" referred to throughout this memorandum are Acceleration Life Insurance Company-Nursing Care Benefit Policies forms 520, 521 and 522. They are also referred to as "long term care" policies as denominated by the applicable North Dakota statutes.

Commonwealth Life Insurance Company (Commonwealth) assumed all obligations and duties connected to Acceleration's nursing home policies. This was approved in North Dakota in 1990. Plaintiffs were notified that this was "good news" because of Commonwealth's "financial strength." Later, Commonwealth ceased selling these nursing home policies in North Dakota. Acceleration and Commonwealth eventually assumed all assets and liabilities of Interstate. Benefit Plans, a unit of Commonwealth, took over the administration of these policies.

*2 Although these policies were allegedly sold as "level premium policies," the premiums increased each year from 1989 to 1996. Plaintiffs allege that the increases were exorbitant and that policyholders were forced to pay or drop their coverage. Plaintiffs assert that defendants had a plan to defraud consumers and that it was the regular policy and practice of defendants to conceal certain material facts, e.g., the policies were initially underpriced for marketing advantages, the policies were poorly underwritten, the block was closed thus making large premium increases inevitable. It is further asserted that the defendants structured the increases to foster lapses. Plaintiffs allege actual and constructive fraud, consumer fraud, false advertising, misrepresentation and breach of implied warranty on behalf of the class of similarly situated North Dakota purchasers of Nursing Home Benefit Policies.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs initiated this action in state court and the cause was removed to federal court based on diversity jurisdiction. Defendants move for summary judgment asserting that plaintiffs' claims are precluded by the filed rate doctrine. Defendants also raise various defenses with respect to the merits of plaintiffs' claims. Plaintiffs move for class certification. Plaintiffs also move to amend the complaint to assert a claim for punitive damages.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is "material" if it might affect the outcome of a case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Churchill Bus. Credit, Inc. v. Pacific Mut. Door Co.*, 49 F.3d 1334, 1336 (8th Cir.1995).

The "basic inquiry" for purposes of summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376 (8th Cir.1996) (citing *Anderson*, 477 U.S. at 251-52). In making this inquiry, however, this Court will not "weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Id.* (citing *Anderson*, 477 U.S. at 249). Rather, this Court's function is to determine only whether a dispute is genuine, and "[i]f reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate. *Id.* at 1377 (citing *Anderson*, 477 U.S. at 250). This determination is made by reading the record in the light most favorable to the non-moving party and drawing all "justifiable inferences" in the non-movant's favor. *Id.* (citing *Anderson*, 477 U.S. at 255); *Churchill*, 49 F.3d at 1336 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

**\*3** The moving party has the initial burden of demonstrating to the Court that there is no genuine issue as to any material fact. *Webb v. Lawrence County*, 144 F.3d 1131, 1134 (8th Cir.1998)(citing *Celotex Corp.*, 477 U.S. at 323). Once the moving party has met this burden, however, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings; rather, the non-movant must set forth specific facts showing that there is a general issue for trial. *Id.* (citing Fed.R.Civ.P. 56(e)).

## III. DISCUSSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 4
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

## A. FILED RATE DOCTRINE

Preliminarily, the Court acknowledges receipt of an amicus curiae brief lodged by the American Council of Life Insurance, (ACLI), and has read and considered the same. Although the Court is not convinced that it is obligated to allow the filing, no harm is done to plaintiffs by doing so. The motion by ACLI for leave to file an amicus curiae brief on the filed rate doctrine is hereby GRANTED, and the lodged brief ORDERED FILED. However, ACLI is DIRECTED to make no further filings in this case as the parties are capable of fully presenting the issues and ACLI participation is not necessary.

Defendants assert that plaintiffs' claims are precluded under the filed rate doctrine and that they are entitled to judgment as a matter of law. The Court does not agree. The Court concludes that the filed rate doctrine does not apply to the facts of this case and rejects the defense as a matter of law.

The question of whether the filed rate doctrine acts as an absolute bar to fraud based claims against insurers involving discussion of rate increases in the context of long term care insurance policies has not been previously determined under North Dakota law. "It is this court's duty in a diversity case not to formulate the legal mind of the state, but merely to ascertain and apply it." *Simundson v. United Coastal Ins. Co.,* 951 F.Supp. 165, 167 (D.N.D. 1997) (citations omitted). "Where neither the legislature nor the highest court in a state has addressed an issue, this court must determine what the highest state court would probably hold were it called upon to decide the issue." *Id.* (citations omitted). In making this determination, the Court "may consider relevant state precedent, analogous decisions, considered dicta, scholarly works and any other reliable data." *Anderson v. Nissan Motor Co., Ltd.,* 139 F.3d 599, 601-02 (8th Cir. 1998) (citation omitted).

"Federal courts have applied the filed rate doctrine in a variety of contexts to bar recovery by those who claim injury by virtue of having paid a filed rate." *Taffet v. Southern Co.,* 967 F.2d 1483, 1488 (11th Cir. 1992)(en banc) (citing *Keogh v. Chicago & Northwestern Ry.,* 260 U.S. 156 (1922)). In *Taffet,* utility customers brought a RICO action against the providers alleging that approval of rates was gained by fraud. 967 F.2d at 1486-87. The Eleventh Circuit *en banc* found that there was no legally cognizable injury by having paid a supposedly higher than reasonable rate. *Id.* at 1488. "[T]he filed rate doctrine recognizes that where a legislature has established a scheme for utility rate-making, the rights of the rate-payer in regard to the rate he pays are defined by that scheme." *Id.* at 1490 (discussing Supreme Court precedent). Upon examining the comprehensiveness of the rate setting schemes at issue, the court in *Taffet* concluded that the rate-payer had no right to pay other than the agency set rate, notwithstanding any allegations of fraud.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

*4 The Eighth Circuit is in accord. In *H.J. Inc. v. Northwestern Bell Tel. Co.,* the court emphasized that "the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations," not on underlying conduct such as fraud. 954 F.2d 485, 489 (8th Cir.1992)(discussing *Montana-Dakota Util. Co. v. Northwestern Pub. Servs. Co.,* 341 U.S. 246, 248-52 (1951); *Square D Co. v. Niagra Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 415-23 (1986); *Keogh,* 260 U.S. at 159-65). The court distinguished cases involving situations where a plaintiff could show they had been fraudulently induced to enter contracts. *H.J. Inc.,* 954 F.2d at 490 (discussing *Gulf States Utils. Co. v. Alabama Power Co.,* 824 F.2d 1465, 1471-72 (5th Cir.1987)(noting that setting aside contracts because of fraud in the inducement would not interfere with agency rate-making authority), and *Nordlicht v. New York Tele. Co.,* 617 F.Supp. 220, 227-28 (S.D.N.Y.1985)(noting that the filed rate doctrine "is of no help to a defendant which fraudulently induces a plaintiff to pay a filed rate ... by fraud")).

To determine whether the plaintiffs here have alleged cognizable claims, or whether defendants have an absolute defense to plaintiffs' claims, this Court must "examine the rate-making *scheme.*" *Taffet,* 967 F.2d at 1490 (emphasis added). The court in *Taffet* discussed several important factors including the elaborateness of the legislatively established administrative scheme, public participation in the rate making process, and the ability of the agency to provide a remedy. *Id.* at 1490-94. Unlike the regulatory schemes discussed in *Taffet,* North Dakota's regulation of long term care insurance is not comprehensive.

In North Dakota, there is no statutory language indicating that application of the filed rate doctrine is required; but there is statutory language inconsistent with its application, e.g., an insurer may make changes in premium rates in accordance with policy provisions. N.D. Cent.Code § 26.1-45-05.2 (1995). Further, there is a lack of statutory language requiring approval of rate increases. *See generally id.* Ch. 26.1-45. Further, the statutory scheme provides no mechanism for meaningful review of rates filed with the Insurance Commissioner or for public input in a rate determination, hearings or otherwise. *Id.* Simply put, the North Dakota Insurance Commissioner does not have the authority to establish long term care insurance policy rates. Defendants themselves have recognized this. *See* Letter from Dickinson to Foley of 8/28/97. The Court does not reach the conclusion as a matter of judicial estoppel, rather as one of good logic.

Further, the North Dakota Supreme Court has never applied the filed rate doctrine as a bar to a claim, although it has recognized the existence of the doctrine in the common carrier context. *See E.W. Wylie Corp. v. Menard, Inc.,* 523 N.W.2d 395, 398-99, 403 (N.D .1994)(discussing statutory filed rate doctrine and finding it inapplicable in contract carriage case). Defendants' arguments that the North Dakota Supreme Court would apply the filed rate doctrine in the present context of long term care insurance contracts are unpersuasive. This Court concludes that the North Dakota Supreme

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                  Page 6
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

Court would not preclude the presentation of this case based on the filed rate doctrine defense.

*5 For the above discussed reasons, plaintiffs' motion for partial summary judgment on the filed rate doctrine is hereby GRANTED, and defendants' motion for summary judgment on the filed rate doctrine is hereby DENIED.

## B. ALL CLAIMS-FRAUD

Preliminarily, the Court finds that the plaintiffs' fraud based claims are not time-barred. Section 28-01-16 of the North Dakota Century Code provides that a fraud based claim "must be commenced within six years after the claim for relief has accrued," and the claim for relief in a fraud case is "not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." *See also Phoenix Assurance Co. v. Runck,* 366 N.W.2d 788, 791 (1985)("A fraud action is not barred by the passage of time until six years after discovery of the facts constituting the fraud."). Plaintiffs commenced the original state action against the defendants on or about October 27, 1997. *See* Notice of Removal (defense counsel states it was served on October 27, 1997), *compare* Original State Complaint (signed by plaintiffs' counsel October 21, 1997). If plaintiffs discovered the facts constituting the fraud before October 27, 1991, the cause of action would be barred by the statute of limitations. Plaintiffs have sufficiently alleged that facts constituting the fraud could not have been discovered by October 1991. For example, Mr. Hanson was not notified that the block of business was closed until February, 1996. Whether plaintiffs had sufficient knowledge under the discovery rule to trigger the limitation period is "ordinarily a fact question which is inappropriate for summary judgment." The Court is reluctant to dismiss these claims based on a statute of limitations defense, especially given the nature of the case, i.e., this is an omissions or failure to disclose case.

### 1. Actual Fraud

Defendants assert that plaintiffs cannot satisfy the elements of actual fraud and emphasize a lack of reliance. Plaintiffs disagree, highlight several examples of fraudulent representations and nondisclosures, and argue that reliance can be inferred from the circumstances.

In North Dakota, actual fraud is defined by statute, N.D. Cent. Code § 9-03-08, with which the parties are well familiar. "Fraud is never presumed, but must be proved by evidence that is clear and convincing." *Albrecht v. Walter,* 572 N.W.2d 809, 813 (N.D.1997)(citing *Karv v. Prudential Ins. Co.,* 541 N.W.2d 703, 705 (N.D.1996)). A key element of establishing fraud is reliance upon the false or misleading representations. *Karv,* 541 N.W.2d at 706. However, reliance, and inducement,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

may be inferred from the facts and circumstances surrounding a transaction. *Adams v. Little Missouri Minerals Ass'n,* 143 N.W.2d 659, 684 (N.D.1966). In *Adams,* the North Dakota Supreme Court noted that facts inferred from circumstances surrounding a transaction are often stronger and more satisfactory evidence of fraudulent inducement and reliance than direct testimony to the same effect. *Id.* at 683.

*6 In *Adams,* landowners contributed mineral rights to a corporation in exchange for stock not knowing that they would never have any opportunity to control the corporation. *Id.* Inferring inducement and reliance, the court concluded that since the landowners would not have exchanged their minerals for stock had the suppressed facts been given to them, the landowners were victims of fraud. *Id.* at 684. Here, if all of the alleged suppressed facts are accepted by a jury, (e.g., that the policies were experimental, that the policies were initially underpriced to gain market advantages, that the underwriting was faulty, that it was known that the rates would need to be drastically increased, that the block of business would be closed), it could be fairly concluded that the plaintiffs would not have purchased or renewed the long term care policies at issue from the defendants. It could reasonably be concluded that since pertinent and material facts were withheld, plaintiffs were victims of fraud.

Actual fraud is always a question of fact. *First State Bank of Buxton v. Thykeson,* 361 N.W.2d 613, 616 (N.D.1985)(quoting N.D. Cent.Code § 9-03-10). Whether or not there have been fraudulent representations or omission depends upon the facts of the case. *Gershman v. Engelstad,* 160 N.W.2d 80, 83 (N.D.1968). "Summary judgment cannot be granted merely because the court believes that the movant [may] prevail if the action is tried on the merits." *Thykeson,* 361 N.W.2d at 616 (citing Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2728). Reading the record in the light most favorable to the non-moving party and drawing all justifiable inferences in plaintiffs' favor, the Court finds a sufficient disagreement on genuine issues of material fact to require submission to a jury; it certainly is not so one sided that defendants must prevail as a matter of law. *See Quick,* 90 F.3d at 1376 (citations omitted). Thus, summary judgment is inappropriate on the actual fraud claim.

### 2. Constructive Fraud

Constructive fraud is defined by statute as any breach of duty which, without an actual fraudulent intent, gains an advantage to the person in fault by misleading another to his prejudice. N.D. Cent.Code 9-03-09. *See also Asleson v. West Branch Land Co.,* 311 N.W.2d 533 (N.D.1981)(discussing contours of constructive fraud claim). "Constructive fraud is based on a relationship between the parties which gives rise to a duty of disclosure." *Holcomb v. Zinke,* 365

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 8
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

N.W.2d 507, 511 (N.D.1985). Defendants assert that plaintiffs' constructive fraud claim fails because no fiduciary or confidential relationship existed between defendants and plaintiffs. While the duty of disclosure may arise from a fiduciary or other confidential relationship, which is not conspicuous in the present case, a duty of disclosure may also "arise from *other* circumstances." *Id.* (emphasis added)(imposing duty to disclose on seller of real estate as to condition of property being sold based on seller's superior position).

*7 Section 26.1-29-16 of the North Dakota Century Code imposes special duties upon parties to insurance contracts to communicate in good faith and to disclose facts material to the contract. This duty to disclose is obviously sufficient to create liability under the constructive fraud statute, and the Court so holds as a matter of law. *See Holcomb,* 365 N.W.2d at 511 ("whether or not a duty exists is a question of law"). As sufficient disagreement on genuine issues of material fact surround the constructive fraud claim, submission to a jury is required; summary judgment on the constructive fraud claim is inappropriate.

### 3. Consumer Fraud & False Advertising

The North Dakota Supreme Court has held that one injured by a violation of North Dakota's false advertising statutes (chapter 51-12, N.D. Cent.Code) may bring an action to recover damages. *Fargo Women's Health Org. v. FM Women's Help and Caring Connection,* 444 N.W.2d 683, 685 (N.D.1989). A private right of action is also apparent under North Dakota's consumer fraud statutes. N.D. Cent.Code § 51-15-09 (allowing private claims for relief for violations of the consumer fraud statutes); *see also State ex rel. Spaeth v. Eddy Furniture Co.,* 386 N.W.2d 901, 903 (N.D.1986)(noting that consumer protection statutes must be liberally construed). Furthermore, these claims are distinguishable from the claims of actual or constructive fraud, discussed above, because the alleged fraudulent conduct need only be proven by a preponderance of the evidence, as opposed to the clear and convincing standard otherwise required. *Eddy Furniture Co.,* 386 N.W.2d at 903 (adopting concept that consumer fraud is a cause of action separate and distinct from common law fraud). The Court concludes that the plaintiffs have sufficiently established that genuine issues of material fact exist precluding summary judgment on these fraud based claims, thus summary judgment is inappropriate.

### 4. Misrepresentation

The parties agree that negligent misrepresentation is a cognizable claim in North Dakota law under the provisions of section 9-03-08(2) of the North Dakota Century Code, the actual fraud statute.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

*Bourgois v. Montana-Dakota Util. Co.*, 466 N.W.2d 813, 817-18 (N.D.1991); *see also Cooperative Power Ass'n v. Westinghouse Elec. Corp.*, 60 F.3d 1336, 1342-43 (8th Cir.1995)(discussing negligent misrepresentation claim under North Dakota law). Further, the misrepresentation claim is distinguishable from a claim of actual or constructive fraud because intent to deceive is not a necessary element. *See Westinghouse*, 60 F.3d at 1342. The Court here notes that the negligent misrepresentation claim does have an "inducement to contract" requirement, *see id.*, and that it has been sufficiently pled by the plaintiffs. In light of the Court's conclusion that a sufficient genuine issue of material fact exists precluding summary judgment on the other fraud based claims, it follows that summary judgment is inappropriate on this claim as well.

### 5. Breach of Implied Warranty

*8 The implied warranty theory upon which plaintiffs rely in Claim No. 6 of the Amended Complaint applies to the sale of goods. The Uniform Commercial Code "does not apply to insurance contracts because insurance contracts are not for the sale of goods." *Nielsen v. United Servs. Auto. Ass'n*, 612 N.E.2d 526, 531 (Ill.App.Ct.1993)(agreeing that no implied warranty existed in context of sale of insurance)(citing *Elrad v. United Life and Accident Ins. Co.*, 624 F.Supp. 742, 744 (N.D.Ill.1985)(sale of life insurance is not the sale of goods under UCC)). *See also Bartley v. National Union Fire Ins. Co.*, 824 F.Supp. 624, 637 (N.D.Tex.1992) (declining to recognize novel implied warranty claim under UCC because insurance contracts do not easily fit within definition of goods); *Mills v. Agrichemical Aviation, Inc.*, 250 N.W.2d 663, 672 (N.D.1977)(noting similarity between insurance and sale of services). Furthermore, if the UCC did apply in this context, any implied warranty claim here would be time-barred. *See N.D. Cent .Code § 41-02-104 (1983 & Supp.1998)*(providing for four year limitation period accruing when breach occurs regardless of complainant's lack of knowledge of breach). Thus, summary judgment in favor of the defendants is appropriate on plaintiffs' implied warranty claim.

### 6. Exemplary Damages

The Court concludes that plaintiffs have followed the proper procedure for the pleading of exemplary damages as required under North Dakota law. The plaintiffs' motion for leave to amend the complaint, to the extent not already ruled upon by the Honorable Karen K. Klein, Magistrate Judge, i.e., to add a claim for exemplary damages, is hereby GRANTED. The plaintiffs are directed to forward the amended complaint to the Clerk of Court, and the Amended Complaint is hereby ORDERED FILED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

## C. CLASS CERTIFICATION

### 1. Standards

The Court may only certify a class action if it satisfied, after a "rigorous analysis," that the prerequisites of Rule 23 are satisfied. *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161 (1982); *Bishop v. Committee on Professional Ethics,* 686 F.2d 1278, 1287 (8th Cir.1982). Nonetheless, the trial court does have broad discretion in determining whether a class action may be maintained. *Bishop,* 686 F.2d at 1287.

Federal Rule of Civil Procedure 23(a) sets out the following prerequisites to a class action: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." In addition, plaintiffs must show that the action is maintainable under Rule 23(b)(1), (2), or (3). *Amchem Products, Inc. v. Windsor,* 117 S.Ct. 2231, 2245 (1997). Rule 23(b)(3) "encompasses cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness." Fed.R.Civ.P. 23, Advisory Committee's Notes. The intent of Rule 23(b)(3) is the "vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.' " *Amchem,* 117 S.Ct. at 2246 (citation omitted). Further, class members may opt out under Rule 23(b)(3). *See* Fed.R.Civ.P. 23(c); *In re Federal Skywalk Cases,* 680 F.2d 1175, 1178 (8th Cir .1982).

*9 Certification under Rule 23(b)(3), which plaintiffs here seek, requires that the Court find "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23. Factors relevant to the inquiry include: "the interest of members of the class in individually controlling the prosecution ... of separate actions;" "the extent and nature of any litigation concerning the controversy already commenced by ... members of the class;" "the desirability or undesirability of concentrating the litigation of the clams in a particular forum;" and "the difficulties likely to be encountered in the management of a class action." *Id.*

### 2. Numerosity/Impracticality

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                  Page 11
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

The numerosity requirement of Rule 23(a)(1) requires an inquiry into whether the class is "so numerous that joinder of all members is impracticable." *Paxton v. Union National Bank*, 688 F.2d 552, 559 (8th Cir.1982). There is no arbitrary rule regarding the necessary size of class. *Id.* (citing *Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 54 (8th Cir.1977)). Relevant factors include the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the practicability of joining all the proposed class members. *Id.* at 559-60 (citing Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 1762). The Court should determine whether impracticability exists based upon all the circumstances surrounding a case. *Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 55 (8th Cir.1977). Impracticable does not mean that joinder must be impossible, but it does require a showing that it would be extremely difficult or inconvenient to join all members of the proposed class. *Morgan v. United Parcel Service*, 169 F.R.D. 349, 355 (E.D.Mo.1996).

Here, the named plaintiffs have demonstrated that the class may include up to approximately 2,000 members. The plaintiffs are not required to specify an exact number or prove the identity of each class member, but must only show a reasonable estimate of the number of class members. *See id.* Given the group's advanced age, with naturally increased health and other mental or physical concerns, the finite size of the individual claims, and the inconvenience of trying individual suits (not only to individual plaintiffs, but to the defendants and judicial system as well), the Court finds that joinder here is impracticable.

### 3. Commonality and Predominance of Common Questions

It is here noted that Rule 23(a)(2)'s commonality requirement is subsumed under the more stringent predominance requirement of Rule 23(b)(3). *Amchem*, 117 S.Ct. at 2243. The commonality requirement is satisfied when the common questions of law or fact "linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortgage Co.*, 1171, 1174 (8th Cir.1995) (citing *Paxton v. Union National Bank*, 688 F.2d 552, 561 (8th Cir.1982)).

*10 Predominance is a test readily met in certain cases alleging consumer fraud. *Amchem*, 117 S.Ct. at 2250 (citing Advisory Committee's Notes). Where a common scheme of deceptive conduct is alleged, common question of law and fact will exist. *Walco Investments, Inc. v. Thenen*, 168 F.R.D. 315, 325 (S.D.Fla.1996)(citing *Green v. Wolf Corp.*, 406 F.2d 291, 198 (2d Cir.1968)). This is so notwithstanding the need for separate determination of damages suffered by individuals within the class. Fed.R.Civ.P. 23, Advisory Committee's Notes.

An underlying allegation here is based on how the plaintiffs were treated *as a group*-i.e., the block

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 12
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

of business to which they all belonged was closed and this fact, the events leading up to it, and its ramifications, were not disclosed. The contract language at issue is identical for each member of the proposed class, rate hikes were class wide, there is a singular state regulatory scheme involved, and defendants' defenses are asserted class-wide as well. The class action may not be the proper vehicle in certain fraud cases if there is significant variation in the representations made or in degrees of reliance by persons aggrieved. *See id.* However, that is not problematic here because, as addressed at length above, the plaintiffs' claims are based primarily on defendants' uniform failure to disclose to any and all members of the proposed class that which there was a duty to disclose, that the facts withheld were material in the sense that no reasonable person would have purchased or renewed the policies at issue had the alleged facts been known, and consequently reliance may be inferred from the circumstances. *See also cf. Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153-54 (1972)(noting that where a claim involves primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery; "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision").

"Where the question of basic liability can be established readily by common issues, then it is apparent that the case is appropriate for class action." *Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791, 796 (10th Cir.1970). Here, as in *Gold Strike Stamp,* the Court does not believe that the question of liability requires the "specific individualistic examination" proposed by the defendants. *See id.* That there may be individualized issues does not here outweigh the number, significance and predominance of the common questions of law and fact. The Court finds that the plaintiffs have met the commonality and predominance requirements.

### 4. Typicality

The typicality provision requires that plaintiffs show that other members of the proposed class have the same or similar grievances as the plaintiff. *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir1996); *Belles v. Schweiker,* 720 F.2d 509, 515 (8th Cir.1983). The typicality requirement is "fairly easily met so long as other class members have claims similar to the named plaintiff." *Alpern,* 84 F.3d at 1540. "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Id.* (citations omitted). A claim is typical if it challenges the same unlawful conduct affecting the named plaintiffs and the proposed class members. *Id.* (citation omitted).

*11 In the instant case, the Court finds that the named plaintiffs have met the typicality requirement.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 13
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

Here, plaintiffs have alleged unlawful conduct by defendants similarly affecting them and the proposed class members. The named plaintiffs have asserted the same claims based upon the same legal theories on behalf of themselves as well as all of the proposed class members.

### 5. Adequacy of Representation

The Court must also confirm that the "representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The focus of Rule 23(a)(4) is whether the class representatives have common interests with the members of the class, and whether the class representatives will vigorously prosecute the interests of the class through qualified counsel. *Paxton,* 688 F.2d at 562-63. Class representatives must be part of the class and possess the same interest and suffer the same injury as the proposed class members. *Amchem,* 117 S.Ct. at 2236; *Bishop,* 686 F.2d at 1289. The first element, whether the class representatives have common interests with the members of the class, has been sufficiently addressed by the Court in its discussion of commonality and typicality-there are no antagonistic interests.

The Court also concludes that the class representatives will vigorously prosecute the interests of the class through qualified counsel. Defendants assert that the representative of Mrs. Schimke's estate has no personal knowledge regarding the issues in this lawsuit and thus is not an adequate class representative. Defendants further assert that Mrs. McIlroy, who suffers from dementia, is not an adequate class representative either. But, the class representatives need not be perfect or the best of all possible representatives, rather, they must act in the best interests of the class. *Dura Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 101 (S.D.N.Y.1981). See also *Umbriac v. American Snacks, Inc.,* 388 F.Supp. 265, 275 (E.D.Pa.1975)("It is in the nature of motion practice on class action determination issues that defendants, who naturally have no interest in the successful prosecution of the class suit against them, are called upon to interpose arguments in opposition to class determination motions verbally grounded upon a concern for the 'best' representation for the class, while the implicit, but nonetheless real objective of their vigorous legal assault is to insure 'no' representation for the class.")(cited in *Dura-Bilt* ). Further, it can be argued that the adequacy of representation depends more on the integrity, skill and industry of plaintiffs' counsel than on personal qualities of the named plaintiffs. *Dura-Bilt,* 89 F.R.D. at 101 n14.

Here, defendants do not challenge the competency or expertise of plaintiffs' counsel, and the Court notes that plaintiffs' counsel are experienced in class action litigation and have already demonstrated competent and vigorous representation in this case. Nonetheless, the implications of plaintiffs' old age and/or ill health on their ability to vigorously and competently prosecute a class action are of some concern to the Court. Despite the Court's earlier conclusion that in this case a jury may infer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 14

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

reliance from circumstances proven, the Court cannot dismiss the reliance defense as irrelevant or insignificant. The named plaintiffs' ability to testify and actively participate may become more important as trial approaches. This is not to say that, because there may be difficulties in this regard, plaintiffs should automatically be precluded from pursuing the class action. Plaintiffs' advanced ages and health concerns go to the very heart of this case and certainly should not act as a bar to the action. Should this litigation be drawn out any more, we would soon be without any "adequate" plaintiffs as defendants would have them defined.

*12 In any event, one representative is sufficient for the prosecution of a class action, and no objection has been raised as to Mr. Hanson as an adequate representative plaintiff. *See* Fed.R.Civ.P. 23(a)(providing "*[o]ne* or more members of a class may sue ... as representative")(emphasis added). The Court here certifies the three named plaintiffs as adequate representatives at this juncture; the issue may be revisited upon a proper showing of necessity, and the Court may need, at some future date, to take remedial measures such as substitution of a new representative. *See James v. Jones,* 148 F.R.D. 196, 202 (W.D.Ky.1993); *Moskowitz v. Lopp,* 128 F.R.D. 624, 635 (E.D.Penn.1989).

### 6. Superiority

Under Rule 23(b)(3), the class action must be superior to other available methods for the fair and efficient adjudication of the controversy. Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1779 (1986). As mentioned above, relevant factors include: "the interest of members of the class in individually controlling the prosecution ... of separate actions;" "the extent and nature of any litigation concerning the controversy already commenced by ... members of the class;" "the desirability or undesirability of concentrating the litigation of the clams in a particular forum;" and "the difficulties likely to be encountered in the management of a class action." Fed.R.Civ.P. 23(b)(3). No single element is determinative, nor is the list exhaustive, and the Court has discretion to consider other factors when making the superiority determination. *Walco Investments, Inc. v. Thenen,* 168 F.R.D. 315, 337 (S.D.Fla.1996).

The class action device should achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness. Fed.R.Civ.P. 23, Advisory Committee's Notes. The Court must "balance, in terms of fairness and efficiency, the merits of a class action against those of alternate available methods of adjudication." *Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 632 (3d Cir.1996); *see also* Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1779 (court should justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court). The economy consideration

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 15
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

affects the time of judges and court personnel, as well as the parties.

A review of the (b)(3) factors indicates that a class action is the superior method of adjudicating this controversy. Initially, the Court is aware of no other actions filed by any of the individual class members. Thus, the interest of members of the class in individually controlling the prosecution of separate actions appears low. Further, the Court notes that it would be extremely costly, not to mention unnecessarily duplicative, for each proposed class member to try this action separately.

*13 The purposes behind class actions, "eliminating the possibility of repetitious litigation and providing small claimants with a means of obtaining redress for claims too small to justify individual litigation," *DeBoer,* 64 F.3d at 1175, are met here. *See also Amchem,* 117 S.Ct. at 2246 (Rule 23(b)(3) enables the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all"). The situation here is such that it may well be impossible for separate actions to proceed, i.e., the cost of doing so may exceed any recovery they might secure. Every class member is faced with the obstacle of having to establish the existence of the alleged fraud, whether it be actual, constructive, and/or fit the statutory strictures of consumer fraud or false advertising. This would not be a simple task for an individual. Although the potential individual recoveries here are not insignificant, the Court recognizes the considerable time, effort, and expense already invested by both parties and the Court related to discovery and pretrial motions. Certainly, the costs of pursuing these actions individually far outweigh any recovery any individual could hope to obtain. Certifying this class will prevent the duplication of effort and the possibility of inconsistent results.

Regarding the desirability of concentrating this action in this forum, the Court notes that this case has been actively litigated in this forum since its filing in 1997. In addition, given the nature of the class and the allegations, it can be safely presumed that most of the proposed class members, along with many of the witnesses, reside with the District of North Dakota.

Finally, the Court finds that there will be no major difficulties in the management of this case as a class action. There may be some minor difficulties, such as the reliance and individual recovery issues; but, these difficulties are nowhere near the magnitude of problems that will arise if this case were to be tried in several hundred separate trials. Thus, the Court finds that the existence of any individual issues will not make this case unmanageable as a class action.

The defendants propose no alternative, let alone preferable, method to litigate this controversy. Defendants do suggest that because treble damages and attorneys' fees are available under the consumer fraud statute, and punitive damages are available under the false advertising statute, there is sufficient incentive for proposed class members to pursue their claims individually. Mere

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)
(Cite as: Not Reported in F.Supp.2d)

feasibility of individual claims does not demonstrate that the method is preferable. Nor does the suggestion beget economies of time, effort and expense, and promote uniformity of result. The Court here suggests that the possibility of treble damages, attorneys' fees, and punitive damages would be an incentive for the defendants to keep plaintiffs' attorneys' fees in check, resolve the issue in one forum, and bind all proposed class members uniformly.

*14 Based on the above reasoning, the Court finds that a class action is the appropriate method for the action to proceed. The Court concludes that the superiority requirement is met in that the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### 7. Conclusion and Definition of Class

For the reasons set forth above, the Court concludes that the prerequisites for class certification under Rule 23(a) and (b)(3) are satisfied. Plaintiffs' motion for class certification is GRANTED, and defendants' motion to strike the class allegations is DENIED. Nonetheless, the Court agrees that, as a ministerial matter, a more precise definition of the class than that which appears at paragraph 53 of the Amended Complaint should be drafted and proposed by the plaintiffs. The definition should be limited to North Dakota purchasers of specifically identified policies within a specific time-frame. The plaintiffs are hereby DIRECTED to present within ten days of receipt of this Order such class definition for the Court's acceptance or rejection.

IT IS SO ORDERED.

D.N.D.,1999.
Hanson v. Acceleration Life Ins. Co.
Not Reported in F.Supp.2d, 1999 WL 33283345 (D.N.D.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**PLAINTIFF'S EXHIBIT B**


**PLAINTIFF ROBERT ALVAREZ'S**
**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**DEFENDANT, INA'S MOTION TO DISMISS**

San     o Superior Court, Ruling for Case GIC745641          http://www.sandiego.courts.ca.gov/scripts/seekrulingfile.cgi



# Superior Court
San Diego County, State of California



Business
Return to Request Ruling | Trouble printing?

The following is a Telephonic ruling for Monday, December 11, 2000,
Department 75, the Honorable Richard E. L. Strauss presiding.

Case Number GIC745641

THE COURT RULES AS FOLLOWS:

THE GENERAL DEMURRER OF DEFENDANTS AMERICAN TRAVELERS LIFE INSURANCE COMPANY,
dba ATL LIFE INSURANCE COMPANY, AND CONSECO SENIOR HEALTH INSURANCE COMPANY TO
PLAINTIFFS ALVA LANE AND LINDA PEQUEGNAT, INDIVIDUALLY AND ON BEHALF OF OTHERS
SIMILARLY SITUATED'S AMENDED COMPLAINT IS OVERRULED.

THE MOTION OF DEFENDANTS TO STRIKE PORTIONS OF PLAINTIFFS' COMPLAINT IS SIMILARLY
DENIED.

A DEMURRER IS A PLEADING USED TO TEST THE LEGAL SUFFICIENCY OF OTHER PLEADINGS, IT
RAISES ISSUES OF LAW, NOT FACT, REGARDING THE FORM OR CONTENT OF THE OPPOSING
PARTY?S PLEADING. (SEE: CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 422.10 AND 589)

FOR THE PURPOSE OF TESTING THE SUFFICIENCY OF A CAUSE OF ACTION, THE DEMURRER
ADMITS THE TRUTH OF ALL MATERIAL FACTS PROPERLY PLEADED. THE SOLE ISSUE RAISED BY
GENERAL DEMURRER IS WHETHER THE FACTS PLEADED STATE A VALID CAUSE OF ACTION - NOT
WHETHER THEY ARE TRUE. NO MATTER HOW UNLIKELY OR IMPROBABLE, THE ALLEGATIONS MUST
BE ACCEPTED AS TRUE FOR THE PURPOSE OF RULING ON THE DEMURRER. (SEE: SERRANO v.
PRIEST (1971) 5 CAL.3D 584; DEL E. WEBB CORP. v. STRUCTURAL MATERIALS CO. (1981) 123
CAL.APP.3D 593)

THE COURT FINDS PLAINTIFFS' COMPLAINT ADEQUATELY PLEADS FACTS SUFFICIENT TO STATE
CAUSES OF ACTION AS PLED.

DEFENDANTS FAIL TO SEE THE DISTINCTION IN PLAINTIFFS CLAIMS UNDER THE INSURANCE CODE.
DEFENDANTS CONTEND PLAINTIFFS ARE DISPUTING THE PROPRIETY OF THE PREMIUM
INCREASES. HOWEVER, THE COMPLAINT CLEARLY ASSERTS DEFENDANTS FAILED TO DISCLOSE
MATERIAL FACTS THAT WOULD HAVE EFFECTED THE DECISION OF SOMEONE, PRESUMABLY ON A
FIXED INCOME, WHEN DECIDING TO BUY LONG TERM OR HOME HEALTH CARE INSURANCE.
PLAINTIFFS DO NOT MAKE ANY ALLEGATIONS REGARDING THE AMOUNT OF THE INCREASES OR
THE PROPRIETY OF THE INCREASES. ONLY THAT DEFENDANTS MISLED PLAINTIFFS WHEN MAKING
THE SALES AND RENEWALS WITHOUT DISCLOSING THE PREMIUMS WERE PLANNED TO INCREASE
AND THE POLICIES WERE DEFECTIVE IN THE FIRST PLACE. THE ONLY REASON EXCLUSIVE
JURISDICTION WOULD GO TO THE INSURANCE COMMISSION IS IN MATTERS INVOLVING THE
PROPRIETY OF THE RATE INCREASES. SUCH IS NOT THE CASE HERE.

SIMILARLY, PLAINTIFFS DO NOT RELY ON PAROLE EVIDENCE IN MAKING THEIR CLAIMS, INSTEAD
PLAINTIFFS ASSERT ACTIVE CONCEALMENT OF MATERIAL FACTS IN THE INDUCEMENT OF THE
CONTRACT. PLAINTIFFS POINT OUT THROUGH THE STATEMENTS IN THE ADVERTISING MATERIAL
AND THE POLICY TERMS, THAT MATERIAL INFORMATION ALLEGEDLY KNOWN TO DEFENDANTS WAS
REQUIRED TO BE DISCLOSED.

FINALLY, ALL CAUSES OF ACTION IN THE NATURE OF FRAUD ARE ADEQUATELY PLED WITH THE
REQUISITE SPECIFICITY AND WITH SUFFICIENT FACTS TO DEMONSTRATE PLAINTIFFS' JUSTIFIABLY
RELIED UPON THE IMPLICATIONS OF THE REPRESENTATIONS.

ACCORDINGLY, THE COURT OVERRULES DEFENDANTS' DEMURRER AND ORDERS DEFENDANTS TO ANSWER PLAINTIFFS' AMENDED COMPLAINT NO LATER THAN DECEMBER 21, 2000.

IN LIGHT OF THE COURT'S RULING ON THE DEMURRER HEREIN, THE COURT DENIED DEFENDANTS' REQUEST TO STRIKE PORTIONS OF PLAINTIFFS' AMENDED COMPLAINT.

THE COURT WILL NOT ENTERTAIN ORAL ARGUMENT ON THIS MOTION. THIS RULING IS THE ORDER OF THE COURT AS OF DECEMBER 11, 2000. NO SUBSEQUENT FORMAL ORDER IS REQUIRED.

No oral arument

*This ruling file posted to web server:  Mon, Dec 11, 2000, 5:14 PM*
*This ruling file retrieved by browser:  Tue, Dec 12, 2000, 7:42 AM*



*Please send questions or comments about this page to the Superior Court Webmaster San Diego Superior Court, Systems Group, 330 West Broadway, San Diego, CA 92101*

12/12/00 9:41 AM

**PLAINTIFF'S EXHIBIT C**

**PLAINTIFF ROBERT ALVAREZ'S**
**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**DEFENDANT, INA'S MOTION TO DISMISS**

11/16/2005 15:38 FAX  2028724435          AGS_INSURANCE                     ☎002/012

## NATIONAL GROUP BENEFITS INSURANCE TRUST

THIS TRUST AGREEMENT, entered into as of this 1st day of September, 1986, by and between INABenefit Services Corporation, of New York, New York ("Settlor"), and National Bank of Washington, D.C. ("Trustee"), is made for the purpose of implementing a group insurance plan or plans for the benefit of individuals, firms, corporations and other organizations which elect to become Participants hereunder through execution of a Trust Subscription Agreement in accordance with the terms hereof, and employees, members and other eligible persons and their dependents, as designated by Participants.

In consideration of the declarations of trust and mutual covenants and agreements of the Settlor and the Trustee herein, it is hereby agreed as follows:

### ARTICLE I: PARTICIPANTS

1.01.   The participants hereunder (hereinafter called "Participants") shall be those individuals, firms, corporations and other organizations which shall agree in writing to be bound by the provisions of this Agreement (in accordance with Section 4.03 of Article IV) and who shall be approved for insurance coverage by an insurance company or companies (hereinafter called "Insurance Company") issuing the group insurance policy or policies to be held by the Trustee hereunder.

### ARTICLE II: CREATION OF THE INSURANCE FUND

2.01.   Accumulation of the Insurance Fund   -   Each Participant shall pay in advance to Trustee at such times as may be required under the terms of the group policy or policies amounts sufficient to pay when due (a) that portion of the premium payable under said policy or policies applicable to said Participant and the persons who shall be insured by said policy or policies; and (b) such Participant's administrative charge, if applicable, as calculated in accordance with any formula which trustee may establish for such purpose in order to pay that portion, if any, of Trustee's fees under Section 3.01(b) of Article III, which Trustee anticipates or intends will not be paid by the application of policy dividends, experience rating refunds and the like (if any) or otherwise. Contributions shall be paid in such manner as Trustee shall determine from time to time consistent with the requirements of the policies of insurance issued to the trust. Said contributions shall be deemed to be the contributions required from Participants and shall constitute the Insurance Fund.



EXHIBIT

C

11/16/2005 15:36 FAX  2028724435          ACS_INSURANCE                    ⓦ003/012

page 2

Trustee shall have no responsibility for determining the amount of any such contribution, or the source thereof, other than the responsibility of determining the formula, if any, which shall be used to calculate any Participant's administrative charges as set forth in this paragraph.

2.02. Default — If the contribution required to be paid by a Participant shall not have been paid to Trustee on or before the day such contribution shall become due, such Participant shall be deemed in default. In the event that any Participant shall be and remain in default for a period of more than thirty-one (31) consecutive days in the making of any required contribution, the participation of said Participant under this Agreement and in the Insurance Fund shall terminate as of the end of said thirty-one (31) day period, but said Participant shall nevertheless remain liable for the pro rata portion of said required contribution applicable to the thirty-one (31) day period following the date such contribution shall have become payable, and said Participant shall have no further right to, or interest in, the Insurance Fund. The group insurance policy or policies to be held by Trustee hereunder shall provide, in effect, that upon the termination of participation of a Participant under this Agreement and in the Insurance Fund, or upon the withdrawal of Participant in accordance with Section 4.07 of Article IV, the eligibility and insurance coverage of such Participant and eligible persons designated by such Participant under such group insurance policy or policies shall thereupon terminate except with respect to any extended insurance benefits or conversion privileges which may be applicable under the terms of said policy or policies.

2.03 Dividends — All dividends, experience rating refunds and the like (if any), ascertained and apportioned to the group insurance policy or policies held pursuant to Article II thereof, shall be used to increase the Insurance Fund, or, at the discretion of the Trustee, to reduce the premiums thereafter due on said policy or policies.

2.04. Declaration of Trust — Trustee hereby declares that with respect to any monies which it may receive constituting the Insurance Fund, it shall hold and disburse such monies solely for the uses and purposes set forth in this Trust Agreement.

2.05. Title to the Insurance Fund — Title to the Insurance Fund shall be vested exclusively in Trustee. The Insurance Fund shall not be subject to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge by any Participant, and any attempt to make it so subject shall be void and of no effect. This provision shall not be construed to prevent the assignment of medical benefits by any insured

page 3

person to a licensed practitioner of the healing arts; or to prevent the assignment or transfer of ownership of any individual coverage by an insured to a person designated by that insured.

2.06.  Situs of the Insurance Fund - This Trust is accepted by Trustee in the District of Columbia and all questions pertaining to its validity, construction, effect and administration shall be determined and governed in accordance with the applicable laws of that jurisdiction. The Insurance Fund shall maintain its place of business at such place in the District of Columbia as Trustee may determine from time to time.

ARTICLE III: APPLICATION OF THE INSURANCE FUND

3.01.  Holding and Disbursement of the Insurance Fund - All monies received by Trustee pursuant the terms hereof shall be held in trust for the purposes for which received but need not be segregated from any other funds. Trustee shall not be liable for interest on any monies received by it hereunder nor shall it be required to invest such monies so as to produce income for the Insurance Fund. The Insurance Fund shall be disbursed for the following purposes:

(a)  To pay or provide for the payment of all insurance premiums due from time to time (pursuant to the terms of any policy or policies of group insurance held by Trustee in accordance with the provisions of this Agreement) for the group insurance in effect as to all of the Participants hereunder at the date when each such premium shall become payable;

(b)  To pay all reasonable charges and administrative fees of Trustee; and, in addition, all reasonable and necessary expenses incident to the administration of the Insurance Fund, including, by way of example and not of limitation of the foregoing, any charges required to be paid by Trustee as filing fees by a state or governmental agency, or incurred by Trustee in the employment of legal counsel, accountants, auditors, and clerical and administrative personnel;

(c)  To provide, in the discretion of Trustee, a fidelity bond or bonds issued by a reputable insurance company in such amount or amounts as may be determined by Trustee or organization authorized to handle monies held as a part of the Insurance Fund, provided that this provision shall not be soconstrued as to require any such bond or bonds unless otherwise required by applicable laws; and

11/16/2005 15:38 FAX  2028724435          ACS_INSURANCE                            ☒005/012

page 4

(d) In the event that any tax or assessment shall be levied upon the Insurance Fund or any portion thereof, or upon Trustee by reason of the existence of the Insurance fund, to pay such tax or assessment notwithstanding any other provision of this Agreement and to charge the same against the Insurance Fund after notifying Settlor, in writing, of such tax or assessment.

(e) To promote the group insurance plan or plans.

3.02. Group Insurance Benefits

(a) The Trustee shall cause to be issued to it, as the policyholder, an insurance policy or policies which shall make available to Participants a plan or plans of insurance. The amounts of insurance coverage, the type of insurance, or combination of types, to be made available, the eligibility of persons for such coverage (and the evidence of insurability to be required in order to determine such eligibility), the effective date or dates of insurance coverage and the various other terms of the policy or policies to be issued (including the conditions precedent to such issuance) shall all be determined by agreement between Trustee and the Insurance Company.

(b) Once a group policy or policies of insurance shall have been issued to Trustee, Trustee shall have no responsibility for any determination that any person shall or shall not be eligible for coverage under such group insurance policy or policies. All benefits provided by the group insurance or policies shall be payable to the insured persons, or to their respective beneficiaries, or to such other person or persons, or institutions, to whom or to which payment may be permitted under the terms of said policy or policies and applicable law, except that all dividends, experience rating refunds and the like (if any) shall be paid to the Trustee to be applied by Trustee for the purposes specified in this Agreement. Upon acceptance of said group insurance policy or policies by Trustee, Trustee shall hold said policy or policies in accordance with the provisions of this Trust Agreement, and the terms of said policy or policies shall be binding upon the parties.

ARTICLE IV:  ADMINISTRATION OF THE INSURANCE FUND

4.01.    Power of Trustee  -  In addition to the powers conferred upon Trustee either expressly by, or by necessary implication of, the other provisions of this Agreement, Trustee

11/16/2005 15:40 FAX  2028724435          ACS_INSURANCE                    ☒ 008/012

page 5

shall have such other powers, not inconsistent with law or equity, as may be necessary and proper to attain the objectives of this Agreement.

4.02. _Authority to Borrow_ — Should the amounts paid to Trustee at any time be insufficient to pay the premiums required to maintain in full force and effect the group insurance policy or policies held by Trustee hereunder, Trustee shall have the power, but not the obligation, whenever and as often as any such insufficiency shall occur, to borrow from its own commercial department or from any other source or sources, as agent for the Participants, whatever sums may be required to pay such premiums. Trustee shall be under no liability in any capacity other than as Trustee hereunder to repay any such loan.

4.03. _Requests for Participation_ — Requests from individuals, firms, corporations or other organizations for participation hereunder shall be made by executing a Trust Subscription Agreement and Application for Group Insurance binding each such individual, firm, corporation or organization to the terms of this Trust Agreement and to the terms of the group insurance policy or policies issued pursuant to the provisions hereof. Each such request may be investigated by the Insurance Company and shall be subject to the Insurance Company's approval.

4.04. _Records and Information_ — By signing the Trust Subscription Agreement and Application for Group Insurance, each Participant shall be required to agree to furnish, and to permit the inspection of, any records or information which may be required by Trustee, or its representative in connection with the administration of the Insurance Fund.

4.05. _Successor Trustee_

(a) Any Trustee may be removed by the Settlor at any time upon thirty (30) days' written notice mailed to such Trustee. Any Trustee may resign at any time upon thirty (30) days' written notice mailed to the Settlor or its representative. Each such removal or resignation of a Trustee shall be effective without necessity of judicial action upon the acceptance of the trusts hereof, in the manner hereinafter provided, by such Trustee's successor. Within a period of sixty (60) days from and after such removal or resignation, Trustee thus removed or resigning shall mail to the Settlor or its representative an account of such Trustee's adminis- tration of the trusts hereof to the date of such; removal of resignation setting forth all receipts and disbursements and other transactions

11/18/2005 16:40 FAX 2028724435        ACS_INSURANCE                    ☒007/012

page 6

affecting the Insurance Fund since the date of the last such account (or if none, since the Agreement Date). Upon the expiration of a period of ninety (90) days from and after the date of such mailing, such Trustee shall be forever released and discharged from any and all liability or accountability for any and all acts or transactions shown in such account, other than acts or transactions as to which Settlor or its representative shall within such ninety (90) days period mail to such Trustee a written statement setting forth exceptions and/or objections.

(b) Upon the removal or resignation of any Trustee, Settlor or its representative shall, by instrument in writing, designate a successor Trustee to act hereunder which successor shall have the same powers and duties as those conferred hereby, or by necessary implication hereof, upon the original Trustee. Upon such designation Trustee thus removed or resigning shall surrender, assign and transfer to such successor Trustee at the place of business of the Insurance Fund all records, books, documents, monies and other property then constituting the Insurance Fund or held by Trustee thus removed or resigning for, or incident to, the fulfillment of the trusts of this Agreement and the administration of the Insurance Fund, provided that Trustee thus removed or resigning may reserve such reasonable sum or sums as may be deemed advisable for payment of proper charges against the Insurance Fund, including by way of example and not of limitation of the foregoing, expense in connection with such resignation or removal. Any balance of such reserve which may remain after the payment of all of such charges shall be paid over to the successor Trustee within a reasonable time.

(c) The appointment of any successor Trustee hereunder shall be effective without the necessity of judical action upon the execution, acknowledgment, and filing with Settlor or its representative of a written instrument by which such successor shall accept the trusts by this Agreement created.

4.06. **Audit and Report** - Trustee shall keep at its place of business the master group insurance policy or policies, and true and accurate records of all transactions of Trustee. The following pro- cedures shall apply in accounting for all receipts, disbursements and other transactions hereunder.

(a) Trustee's records shall reflect an account to which there shall be credited to total contribution of all Participants hereunder, and all other sum received

11/18/2005 15:41 FAX  2028724435          ACS_INSURANCE                    ☒008/012

page 7

hereunder relating to the group insurance to be provided hereunder for the eligible persons designated by all such Participants.

(b)   Trustee shall, annually or oftener in Trustee's discretion (the years for this purpose to be reckoned from the Agreement Date) mail to Settlor or its representative (and the Insurance Company if requested in writing by it so to do) an account of Trustee's administration of the trusts hereof setting forth all transactions of the Trustee affecting the Insurance Fund during the accounting period following the Agreement Date or from and after the date of the next prior account, as the case may be.

(c)   Upon the expiration of a period of ninety (90) days from and after the date of such mailing Trustee shall be forever released and discharged from any and all liability or accountability for any and all acts or transactions shown in such account, other than acts or transactions as to which Settlor or its representative shall within such ninety (90) day period mail to Trustee a written statement setting forth exceptions and/or objections.   If no such objections or exceptions shall thus be stated, then Trustee's transactions for such accounting period shall become an account stated, and shall be deemed to have been finally settled and shall be conclusive between and among Trustee, Settlor, Participants and all entities having or claiming to have any interest in the Insurance Fund.   Such settlement of Trustee's account shall constitute a full and complete acquittance, discharge and release of Trustee with like effect as if such account had been settled and allowed by a judgment or decree of a court of competent jurisdiction in an action of proceeding in which Trustee, Settlor, Insurance Company, Participants and all entities having or claiming to have any interest in the Insurance Fund were parties.   Notwithstanding any provision hereof, Trustee shall have the right to apply at any time to a court of competent jurisdiction for the judicial settlement of any such account, and in any such action or proceeding it shall be necessary to join as parties thereto only Trustee, Settlor, Insurance Company and Participants.   Any judgment or decree which may be entered in any such action or proceeding shall be conclusive and binding upon all entities having or claiming to have any interest in the Insurance Fund.

(d)   Settlor or its representative within a period of one hundred eighty (180) days from and after the close of

page 8

each fiscal year, may audit the accounts of Trustee for such fiscal year.

4.07  Withdrawal of Participant  - Any Participant may withdraw from the Insurance Fund as of any premium date of the group insurance policy or policies, subject to the following conditions:

(a)  Such withdrawing Participant shall give Trustee written notice of such intention at least thirty (30) days in advance of the date on which such withdrawal is to be effective;

(b)  Such Participant shall remit to Trustee with such notice an amount sufficient to provide insurance for all persons insured through such Participant until the date on which such withdrawal is to be effective; and

(c)  Withdrawal of a Participant shall be deemed, if prior to the termination of this Agreement in accordance with Article IX, as of the effective date of such withdrawal, automatically to release Trustee and any Insurance Company or Companies designated under this Agreement from any and all rights or claims whatsoever which such withdrawing Participant might be deemed to have against such parties.

The Trust Subscription Agreement and Application for Group Insurance to be signed by each Participant, by means of which such Participant shall be bound to the terms of this Agreement, shall state that in the event of such withdrawal or cancellation, such Participant shall relinquish any and all claims such Participant may then or thereafter have to any portion of the Insurance Fund.

4.08  Exoneration and Indemnification  - Trustee shall act hereunder only in a fiduciary capacity and shall not be liable in any other capacity for:

(a)  Any obligation of the Insurance Fund or any obligation incurred by Trustee acting as Trustee; nor

(b)  Any action taken or omitted in good faith by Trustee, or by any legal counsel, accountant auditor, or clerical or administrative personnel selected by Trustee with reasonable care; nor

(c)  Any action or omissions of Insurance Company and/or Administrator (appointed pursuant to the provisions of Article VII hereof) while acting on behalf of Trustee in the performance of any of the Administrative functions permitted by this Agreement.

NOV 22 05 TUE 04:41 PM   FERRE & ASSOCIATES LTD       FAX NO. 3036000020             P. 11
11/16/2005 15:48 FAX  2028724435          ACS_INSURANCE                          ☒010/012

page 9

Anything herein to the contrary notwithstanding, Trustee shall not be liable on account of any act or acts which Trustee may perform in the administration of this Trust on the express written instructions of Settlor or its representative and Settlor shall indemnify and save harmless Trustee against any and all loss, liability or damage which Trustee, acting in accordance with any such instructions may incur in the exercise and performance of any powers and duties hereunder. Trustee shall not be required to undertake or defend any litigation which may arise by reason of the existence of the Insurance Fund or this Agreement unless first satisfactorily indemnified by Settlor or its representative against Trustee's prospective costs, expenses and liabilities arising therefrom. Any party, including Insurance Company, which shall deal with Trustee may conclusively presume that any act by Trustee is in accordance with the provisions of this Agreement and shall not be obliged to take cognizance of the provisions of this Agreement nor to inquire into the necessity or expediency of any such act or the part of Trustee nor to see to the application of any monies or properties by Trustee.

## ARTICLE V:  SETTLOR

5.01  Settlor hereby covenants that Settlor is empowered to enter into this Agreement which may be (although it shall not be required to be) executed by the parties in multiple counterparts and each of such counterparts so executed shall collectively constitute this one Agreement and shall be deemed to establish this one Trust.

5.02  Settlor further covenants that all instructions from it shall be in writing and shall be binding upon Settlor.

5.03  Should Settlor at any time be acting in more than one capacity hereunder, any and all instructions received from the Settlor by Trustee may be conclusively presumed to have been issued to Trustee by Settlor acting as Settlor and in no other capacity.

## ARTICLE VI:  AGREEMENTS WITH THE INSURANCE COMPANY

6.01  Trustee may enter into any agreements with the Insurance Company which it may deem to be in the best interest of, and in furtherance of the purposes of, this Trust. Such agreement may include, by way of example and not of limitation of the foregoing, agreements pertaining to (a) any form of premium deposits and/or (b) the creation or disposition of any form of policy reserve or reserves, and/or (c) the disposition or application of dividends, experience rating refunds and the like.

11/16/2005 15:48 FAX  2026724435        ACS_INSURANCE                    ☒011/012

page 10

## ARTICLE VII: APPOINTMENT OF ADMINISTRATOR

7.01  Trustee, with the written approval of Settlor, may at any time and from time to time appoint such person, firm or corporation, including, but not limited to either Insurance Company or Settlor, as may be deemed acceptable, to be Administrator of the Insurance Fund.  Each such appointment shall be effective without the necessity of judicial action and shall be revocable at any time by Trustee acting with the written approval of Settlor.  The Administrator so designated shall have such ministerial responsibilities as may be determined by the Trustee.

## ARTICLE VIII: AMENDMENT OF THE TRUST AGREEMENT

8.01  Settlor reserves the right at any time and from time to time by an instrument executed, acknowledged and filed with Trustee to alter, amend or revoke this Agreement in whole or in part; provided that no such alteration, amendment or revocation which in the opinion of Trustee may affect Trustee's rights or duties shall be made without Trustee's written consent; and provided further, that no such alteration, amendment or revocation shall result in any part of the Trust Fund being used for or diverted to purposes other than for the exclusive benefit of the Participants having an interest in the Insurance Fund at the time of such alteration, amendment or revocation.

## ARTICLE IX: TERMINATION OF THE TRUST

9.01  Term  — The parties hereto contemplate that the trusts of this Agreement will continue in effect indefinitely.

9.02.  Automatic Termination  — The trusts of this Agreement shall terminate as of any premium due date of the group insurance policy or policies then held by Trustee when there shall be fewer than two (2) Participants or fewer than twenty (20) persons insured under said policy or policies. This Agreement shall in any event terminate upon the twentieth anniversary of the death of the last surviving person whose signature appears below.  Upon the happening of such event a new trust instrument may be executed to further the purposes of this Agreement.

9.03.  Unexpended Funds  — Should any surplus monies be held by Trustee upon the termination of the trusts of this Agreement, Trustee shall pay such monies over to the Insurance Company which shall have issued the group insurance policy or policies then held by Trustee hereunder to be applied toward the purchase of continued insurance benefits under said policy or policies then in force until such monies shall have been exhausted, provided that if there shall at the time be no persons then insured under such policy or policies, such monies

11/18/2005 15:49 FAX  2028724435          ACS_INSURANCE                          @ 012/012

page 11

shall be applied, in the discretion of the Insurance Company,
toward the purchase of insurance benefits under such policy or
policies for the persons insured through the last ten (10)
Participants in the Insurance Fund.

### ARTICLE X:  SEPARABILITY OF PROVISIONS

10.01.  If any provision of this Agreement shall prove to
be or shall be held by any court, tribunal or board of
authority of competent jurisdiction to be invalid, such invalid
provisions may be disregarded by the Trustee and in that event
shall be deemed to be null and void and no part hereof, but
invalidation of any provision shall not otherwise impair or
affect this Agreement or any of its other provisions or terms.

IN WITNESS WHEREOF, the parties hereto have caused this
Agreement
to be executed as of the Agreement Date stated above, to be
effective as of said date.

INABENEFIT SERVICES CORPORATION

By:     Thomas J. Joyce, Jr.
Title:  Senior Vice President

NATIONAL BANK OF WASHINGTON

By:  Leo J. Ryan
Title: Assistant Vice President

WEH/4079H

PLAINTIFF'S EXHIBIT D


PLAINTIFF ROBERT ALVAREZ'S
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT, INA'S MOTION TO DISMISS

Peter Brown
Assistant Director
Customer Advocacy



**CIGNA** Group Insurance
Life · Accident · Disability

November 18, 2004

Mr. Robert Alvarez
1419 SE 43rd Ter
Ocala, FL 34471-4943

1601 Chestnut St. TL23B
Philadelphia, PA. 19192
Telephone 215.761.1862
Facsimile 215.761.3135
Peter. Brown@cigna.com

Dear Mr. Alvarez:

This letter is in response to your recent inquiry regarding the increase in premium on your guaranteed renewable group long term care policy. You have been insured since 1992 under Group Policy ALT 1, issued in the District of Columbia, through your association with the American Chemical Society. Our records indicate that you were a resident of the State of Maryland when you applied for coverage under this policy. I can understand your concern regarding the increase and want to explain the reasons behind the premium change.

In your letter you seemed to feel that we considered rate adequacy on a state-by-state basis. However, that is not the case, and rate adequacy is considered based on the experience over the entire book of business. You also appeared to believe that it is only based on the price of nursing home care. However, that is only one of a large number of issues that come into play. To project rate adequacy into the future, we also consider utilization rates (i.e., the number of times insureds use their coverage, as opposed to the cost of that care), the average length of stay, mortality rates, the rate at which people usually drop their coverage, and anticipated investment rates, among other things.

You asked why we didn't make an adjustment before this. A review of this program was performed in 1997 to analyze whether premium levels were still considered adequate in light of our claim and other experience under the program up to that point, as well as on our reasonable projections for the future. At that time, premium levels were judged to be adequate. However, the amount of claims began to grow faster than expected in 2000 and later years. In 2003, we collaborated with independent actuarial consultants who specialize in this product, to assist us in our analysis of the claim projections. As a result of the analysis, we significantly strengthened our reserve levels and implemented the rate action to ensure that the program is adequately funded and remains a viable program to meet future claim activity. Given the magnitude of the needed rate action, we determined that it would be more beneficial to the insureds to phase in the increase over a 2 year period, rather than charging the increase all at once.

If you are currently enrolled in the high option plus plan, you may also wish to consider switching to the lower option plan as a means of reducing your premium. I regret that our reply cannot be more favorable, and I trust this responds to your inquiry, but please feel free to contact me if you have any additional questions.

Sincerely,

*Peter Brown*

Peter Brown, Assistant Director
Customer Advocacy



EXHIBIT

D

Life Insurance Company of North America
Connecticut General Life Insurance Company
CIGNA Life Insurance Company of New York

PLAINTIFF'S EXHIBIT E


PLAINTIFF ROBERT ALVAREZ'S
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT, INA'S MOTION TO DISMISS

Peter Brown
Asst. Director
Customer Advocacy

RECEIVED

JAN 0 6 2005

MARYLAND INSURANCE
ADMINISTRATION



CIGNA Group Insurance
Life · Accident · Disability

January 3, 2005

Routing TL23B
1601 Chestnut Street
Two Liberty Place
Philadelphia, PA 19192
Telephone 215.761.1862
Facsimile 215.761.3135
Peter.Brown@cigna.com

Michele McCoy
Insurance Investigator
Maryland Insurance Administration
525 St. Paul Place
Baltimore, Maryland 21202-2272

RE:   **Insurance Company of North America   NAIC# 22713**
      Insured:     Robert Alvarez
      Complainant: David Alvarez
      Dept. File #:   66248-L-2004-MM-C

Dear Ms. McCoy:

I am writing in response to your letter dated December 23rd which was received by our office on December 30th, 2004. The policy in question is a group policy and is sitused in the District of Columbia. In previous correspondence with a Ms. Spector of your Department regarding the long-term care policy rate increase, we explained the factors which would exclude this matter from Maryland's jurisdictional authority. We indicated that we were not aware of any requirement applicable in this situation at the time which would have required the filing of premium rates in your state. Following is a summary of the research on which we based our conclusion that Maryland's long-term care rate filing requirement does not apply to certificates issued in the state at the time ours were issued.

Regulation 31.14.02.06 limits the applicability of the rate increase filing requirements contained in Maryland statute §18-116 to long-term care policies or certificates issued in your state after October 1, 2002. The policy in question was issued in the District of Columbia in 1988, and the insured's certificate was issued in 1989.

For policies like this, which are not subject to the rate filing requirement, subsection 31.13.02.05 of the code imposes a minimum loss ratio requirement of 60%. When the recent rate increase and projected future rate increase for this policy are factored in, the loss ratio will continue to exceed the 60% minimum required by your state.  A more detailed explanation of the calculations used to support our minimum loss ratio conclusions was made available to your Department in our previous correspondence.



EXHIBIT
E

and "CIGNA Group Insurance" are registered service marks and refer to various operating subsidiaries of CIGNA Corporation. Products and services are

**PLAINTIFF'S EXHIBIT F**


**PLAINTIFF ROBERT ALVAREZ'S**
**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**DEFENDANT, INA'S MOTION TO DISMISS**

ROBERT L. EHRLICH, JR.
GOVERNOR

MICHAEL S. STEELE
LIEUTENANT GOVERNOR



ALFRED W. REDMER, JR.
COMMISSIONER

JAMES V. MCMAHAN, III
DEPUTY COMMISSIONER

STATE OF MARYLAND
## MARYLAND INSURANCE ADMINISTRATION
525 St. Paul Place, Baltimore, Maryland 21202-2272
Facsimile Number:410-468-2260

January 11, 2005

Mr. David L. Alvarez
4424 S.E. 11th Place
Ocala, Florida  34471

RE:    MIA File Number: 66248-L-2004-MM-C
       Insured: Robert Alvarez
       Complainant: David Alvarez

Dear Mr. Alvarez:

Thank you for your complaint regarding coverage provided by CIGNA Group Insurance. We have determined the coverage at issue is subject to the insurance laws of another state.  Therefore, we have no jurisdictional authority in this matter.

If you wish to pursue this matter further, please forward your complaint to the agency listed below:

          Dept. of Insurance & Securities Reg.
          Government of the District of Columbia
          810 First Street, N.E.
          Suite 701
          Washington, DC 20002
          (202) 727 – 8000

Thank you again for contacting us.  We were pleased to be of service to you, but regret we could not resolve this dispute.

Sincerely,

Michele McCoy
Insurance Investigator
Life and Health Unit
410.468.2274

cc: Peter Brown



EXHIBIT
F

www.mdinsurance.state.md.us
Outside Baltimore Metro Area, Toll Free 1-800-492-6116
TTY Users via the Maryland Relay Service at 1-800-735-2258