# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Robert Alvarez,<br>1419 Southeast 43rd Terrace,<br>Ocala, FL 34471,<br>individually, and on<br>behalf of all others similarly<br>situated, | )<br>)<br>)<br>)<br>)<br>)<br>) | Civil Case No. 1:06CV00145 |
| Plaintiff, | )<br>) | The Honorable Emmet G. Sullivan |
| v. | )<br>) | |
| CIGNA and<br>The Insurance Company of<br>North America, | )<br>)<br>)<br>) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    FACTUAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.    Defendants Market A "Guaranteed Renewable" Policy  . . . . . . . . . . . . . . . . . . . 3

       B.    Defendants' LTC Policies are Defective  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       C.    Defendants "Close the Block" of their LTC Insurance  . . . . . . . . . . . . . . . . . . . 5

       D.    Defendants' Raise Premiums on the LTC Insurance . . . . . . . . . . . . . . . . . . . . . . 6

III.   ARGUMENT: THIS ACTION IS APPROPRIATE FOR CLASS TREATMENT  . . . . . 9

       A.    Courts Have Certified Litigation Classes in Long-term Care Insurance Fraud
             Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       B.    The Question of Class Certification is Ripe and Distinct from the Merits  . . . . . 12

       C.    Efficiency and Judicial Economy Demand Certification . . . . . . . . . . . . . . . . . . 14

       D.    This Action Fulfills All Prerequisites for Class Treatment . . . . . . . . . . . . . . . . . 17

             1.    Existence of a Class Is Ascertainable  . . . . . . . . . . . . . . . . . . . . . . . . . 17

             2.    Plaintiffs Meet the Requirements of Rule 23(a)  . . . . . . . . . . . . . . . . . 19

                   a.    The Proposed Class Has Three to Five Thousand Members and Thus,
                         Is So Numerous That Individual Joinder Is Impracticable . . . . . . 19

                   b.    There Are Questions of Law and Fact Common to the Class  . . . 21

                   c.    The Claims of Plaintiffs Are Typical of the Class . . . . . . . . . . . . 24

          d.    Class Representatives and Their Counsel Will Adequately Represent
                the Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                (1) Class Representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

                (2) Class Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      3.    Plaintiffs Have Met the Requirements of Rule 23(b)(3) . . . . . . . . . . . . 34

          a.    Common Questions of Fact and Law Predominate . . . . . . . . . . 33

          b.    The Proposed Class Action is a Superior Method to Resolve Plaintiff
                and the Class' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    E.    THE RATIONALE FOR CLASS TREATMENT . . . . . . . . . . . . . . . . . . . . . . . . 39

IV.    PROVISIONS AS TO NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## TABLE OF AUTHORITIES

### Cases

\* *Adair v. England,* 209 F.R.D. 5 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15, 19, 20

*Adams v. United States,* No. 90-162 C (Ct. Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Amchem Products, Inc. v. Windsor,* 117 S.Ct 2231 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Anthony v. General Motors Corp.,* 33 Cal. App. 3d 699 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Atraqchi v. GUMC Unified Billing Services,* 788 A.2d 559 (D.C. 2002) . . . . . . . . . . . . . . . . . 38

*Bennet v. Kiggins,* 377 A.2d 57 (D.C. 1977),
    *cert denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978) . . . . . . . . . . . . . . . . 38

*Berry v. Federal Kemper Life Assur. Co.,* 99 P.3d 1166 (N.M.App. 2004) . . . . . . . . . . . . . . . 38

*Bishop v. Perdue Farms, Inc.,* WMN 00-CV-1456 (D. Md.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Blackie v. Barrack,* 524 F.2d 891 (9th Cir. 1975),
    *cert. denied,* 429 U.S. 816 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Bonilla v. Trebol Motors Corp. et al.,* Civ. Act. No. 92-1795 (JP) . . . . . . . . . . . . . . . . . . . . . . 30

\* *Bynum v. District of Columbia,*
    214 F.R.D. 27 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 18-21, 23, 28, 34, 40

\* *Chang v. United States,* 217 F.R.D. 262 (D.D.C.2003) . . . . . . . . . . . . . . . . . . . . 14, 18, 20, 21, 23

*Citizens Banking Co. v. Monticello State Bank,* 143 F.2d 261 (8th Cir. 1944) . . . . . . . . . . . . . 30

*City of Independence v. Amoco Oil Co.,* Civ. Act. No. 95-0121-CV-W-2 (W.D. Mo.) . . . . . . . 30

*Coleman v. Block,* No. A1-63-4 (North Dakota) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Coleman v. Pension Benefit Guar. Corp.,* 196 F.R.D. 193 (D.D.C.2000) . . . . . . . . . . . . . . . . . 20

*Committee of Blind Vendors v. District of Columbia,* 695 F.Supp. 1234
    (D.D.C.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Cook v. Rockwell Intern. Corp.*, 151 F.R.D. 378 (D. Colo. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 29

*Cummins v. Maryland National Bank*, No. 83-096010/L-4034, 33 ATLA L. Rep. 338
    (Circuit Ct. Baltimore City, MD Oct. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Daniels v. Perdue Farms, Inc.*, WMN 00-CV-1455 (D. Md.) . . . . . . . . . . . . . . . . . . . . . . . . . 33

\* *Does I through III v. District of Columbia*,
    232 F.R.D. 18 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17, 19-21, 24, 25, 28

*Donaldson v. Pillsbury, Co.*, 554 F.2d 825 (8th Cir. 1977),
    *cert. denied*, 434 U.S. 856 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

\* *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ellis v. O'Hara*, 105 F.R.D. 556 (E.D. Mo. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Epstein v. Weiss,* 50 F.R.D. 387 (E.D. La. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Escott v. Barchris Const. Co.*, 340 F.2d 731 (2d Cir. 1965),
    *cert. denied*, 382 U.S. 816 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Esler v. Northrop Corp.*, 86 F.R.D. 20 (W.D. Mo. 1979) . . . . . . . . . . . . . . . . . . . . . . 20, 25, 27

*Franklin v. Barry*, 909 F.Supp. 21 (D.D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21

*Freeland v. Iridium World Communications, Ltd.*, No. CIV.A. 99-1002,
    2006 WL 56536 (D.D.C. Jan. 9, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Geraghty v. United States Parole Comm'n*, 579 F.2d 238 (3d Cir. 1978),
    *cert. denied*, 434 U.S. 1986 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) . . . . . . . . . . . . . . . . 14, 28

*Glass, Molder, Potters, Plastics and Allied WorkersInternational Union, AFL-CIO
    v. Wickes Companies, Inc.*, No. L-06023-88 (Sup. Ct. February 24, 1992) . . . . . . . . . . 31

*Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791 (10th Cir. 1970) . . . . . . . . . . . . . . . 34, 35

*Handy v. Perdue Farms, Inc.*, MV 03-CV-2281 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

\*      *Hanson v. Acceleration Life,* No. CIV A3-97-152,
         1999 WL 33283345 (D.N.D. March 16, 1999) . . . . . . . . . . . . . . . . . . . . . . . 9-12, 30-32

\*      *Hanson v. Acceleration Life,* No. CIV A3-97-152,
         2000 WL 33340298 (D.N.D. June 21, 2000) . . . . . . . . . . . . . . . . . . . . . . . 12, 35-37, 43

*Harman v. LymphoMed, Inc.*, 122 F.R.D. 522 (N.D. Ill. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Heastie v. Community Bank of Greater Peoria*, 125 F.R.D. 669 (N.D. Ill. 1989) . . . . . . . . . . . 38

*Heath v. Perdue Farms, Inc.*, WMN 98-CV-3159 (D. Md.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Ampicillin Antitrust Litigation,* 55 F.R.D. 269 (D.D.C. 1972) . . . . . . . . . . . . . . . . . . . . . 40

\*      *In re Federal Skywalk Cases,* 93 F.R.D. 415 (W.D. Mo. 1982) . . . . . . . . . . . . . . . . 20, 25, 27, 39

*In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106 (7th Cir.),
         *cert. denied*, 444 U.S. 870 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Glassine & Greaseproof Paper Antitrust Litigation,* 88 F.R.D. 302 (E.D. Pa. 1980) . . . . 25

\*      *In re Lorazepam & Clorazepate Antitrust Lit.,*
         202 F.R.D. 12 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 20, 21, 25, 26, 28, 34

*In re Newbridge Networks Sec. Litig.*, 926 F.Supp. 1163 (D.D.C.1996) . . . . . . . . . . . . . . . . . 35

*In re Screws Antitrust Litigation*, 91 F.R.D. 52 (D. Mass. 1981) . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y.1998) . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Synthroid Marketing Litigation*, MDL 1182, 264 F.3d 712 (7th Cir. 2001) . . . . . . . . . . . 30

*In re Three Mile Island Litigation*, No. 79-0432 (M.D. Pa.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . 21, 40

\*      *Johns v. Rozet*, 141 F.R.D. 211 (D.D.C. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 37

*Joseph v. Norman's Health Club, Inc.*, 336 F. Supp. 307 (E.D. Mo. 1971) . . . . . . . . . . . . . . . 39

*Junkert v. First Bank, et al*, Civil No. 98-015777,
    District Court, State of North Dakota, Cass County, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Kahan v. Rosenstiel*, 424 F.2d 161 (3d Cir. 1970),
    *cert. denied*, 398 U.S. 950 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Lemmings v. Second Chance Body Armor, et al.*, No. CJ-2004-64
    (Mayes County District Court, OK Feb. 19, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Lewis v. Nat'l Football League*, 146 F.R.D. 5 (D.D.C. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Lightbourn v. County of El Paso*, 118 F.3d 1101 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 21

*Lightfoot v. District of Columbia*, Civ.A. No. 01-1484CKKJMF,
    2006 WL 16304 (D.D.C. Jan. 3, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 40

*Local 7-515, Oil Chemical and Atomic Workers International Union (OCAWIU), et al. v.*
    *American Home Products, et al.*, Civ. No. 92-1238,
    *consolidated with* 92-1238 (JP) (D.P.R.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Longden v. Sunderman,* 123 F.R.D. 547 (N.D. Tex. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*McCarthy v. Kleindienst*, 741 F.2d 1406 (D.C.Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Mersay v. First Republic Corp. of America*, 43 F.R.D. 465 (S.D.N.Y. 1968) . . . . . . . . . . . . . . 25

\*    *Milkman v. American Traveler's Life Ins.*, No. 3775,
    2002 WL 778272 (Pa. Com. Pl. April 1, 2002) . . . . . . . . . . . . . . . . . . . . . . . 12, 30, 31, 43

*Montgomery Ward & Co. v. Langer*, 168 F.2d 182 (8th Cir. 1948) . . . . . . . . . . . . . . . . . . . . . 40

*Olenhouse v. Commodity Credit Corp.*, 136 F.R.D. 672 (D. Kan. 1991) . . . . . . . . . . . . . . . . . 15

*Ouellette v. International Paper Co.*, 86 F.R.D. 476 (D. Vermont 1980) . . . . . . . . . . . . . . . . . 25

\*    *Pigford v. Glickman*, 182 F.R.D. 341 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . 18-20, 25, 28

*Redmond v. Commerce Trust Co.*, 144 F.2d 140 (8th Cir. 1944),
    *cert. denied*, 323 U.S. 776 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

\*    *Reed v. Philip Morris Inc.*, 1999 WL 33714707 (D.C.Super. 1999) . . . . . . . . . 20, 21, 23, 28, 34

-vii-

*Rodgers v. U.S. Steel Corp.*, 508 F.2d 152 (3rd Cir.),
    *cert. denied*, 423 U.S. 832 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

\*    *Rose v. United Equitable*, 651 N.W.2d 683 (N.D. 2002). . . . . . . . . . . . . . . . 12, 24, 32, 35, 36, 43

*Satchell v. Perdue Farms, Inc.,* WMN 01-CV-2340 (D. Md.). . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Siegel v. Chicken Delight, Inc.*, 271 F. Supp. 722 (N.D. Cal. 1967) . . . . . . . . . . . . . . . . . . . . . . 17

*Sollenbarger v. Mountain States Tel. & Tel. Co.*,121 F.R.D. 417 (D.N.M. 1988) . . . . . . . . . . 39

*State of Illinois v. Harper & Row Publishers, Inc.*, 301 F. Supp. 484 (N.D. Ill. 1969) . . . . . . . 41

*Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188 (6th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . 40

*Susman v. Lincoln American Corp.*, 561 F.2d 86 (7th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . 28

*Tompkins, et al. v. BASF Corporation, et al.*, Civ. No. 96-59
    (Traill County District Court) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Transamerican Refining Corp. v. Dravo Corp.*, 130 F.R.D. 70 (S.D. Tex. 1990) . . . . . . . . . . 38

*United States v. Trucking Employers, Inc.*, 75 F.R.D. 682, 688 (D.D.C.1977) . . . . . . . . . . . . 23

*Vargas v. Calabrese*, 634 F. Supp. 910 (D.N.J. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

\*    *Wells v. Allstate Ins. Co.*, 210 F.R.D. 10 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . 23, 24, 25, 35, 37

## **Rule**

\*    Fed. R. Civ. P. Rule 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ibid

## **Miscellaneous**

Kalven & Rosenfeld, *The Contemporary Function of Class Actions*,
    8 U. CHI. L. REV. 684 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Allan Kanner, *Interpreting the Class Action Fairness Act In a Truly Fair Manner*,
    80 Tul. L.Rev. (forthcoming Summer 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Allan Kanner and Tibor Nagy, *Exploding the Blackmail Myth: a New Perspective on Class Action Settlements*, 57 Baylor L. Rev. 681 (Fall 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

KANNER, ENVIRONMENTAL AND TOXIC TORT TRIALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

NEWBERG ON CLASS ACTIONS 3D § 3.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

NEWBERG ON CLASS ACTIONS § 3.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1778 . . . . . . . . . . . . . . . . . . . . . . . 34

WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1764 . . . . . . . . . . . . . . . . . . . . . 24, 25

MAY IT PLEASE THE COURT:

Plaintiff, Robert Alvarez ("Alvarez" or "Plaintiff") hereby moves this Court pursuant to Fed. R. Civ. P. Rule 23(a)(1)-(4) and 23(b)(3) for an Order certifying this case as a class action against Defendants, CIGNA Corp. d/b/a CIGNA Group Insurance ("CIGNA") and the Insurance Company of America ("INA")(collectively, "Defendants"), on behalf of the following proposed Class:

> All individuals who purchased, between 1988 and the present, Group Long Term Care Insurance from the Insurance Company of North America under the terms of the Master Policy ATL-1 issued by the Insurance Company of North America to the Trustee of the National Group Benefits Insurance Trust and whose premiums on those policies have been increased, but excluding from such class, the Defendants, any and all officers, directors, employees, and agents of the Defendants, their affiliates, and/or subsidiaries who are or have been employed by Defendants.

As set forth below, it is only through class-wide relief that Defendants' unlawful conduct can be remedied. Moreover, this case squarely meets the criteria set forth in the Federal Rules for class certification: the proposed class is numerous and presents predominant common questions of law and fact; the class representative has claims typical of the class as a whole; and the class representative will fairly represent the interests of the Class. This case amply meets the criteria delineated in Rule 23. For these reasons, Plaintiff respectfully submits that his motion should be granted, and the proposed Class should be certified.

## I.     INTRODUCTION

This matter arises out of the fraudulent sale and renewal of defective long term care ("LTC") insurance polices to senior citizens by INA and CIGNA. All liability issues turn on common questions of fact and law. Specifically, Plaintiff alleges that common and material facts were intentionally withheld from all Class Members.

Alvarez and similarly situated Class Members acted reasonably and responsibly in purchasing Defendants' insurance, so as not to place a burden on their families or on society in the event they became ill or disabled in their old age. During the class period, despite their planning and dutiful payment of premiums, these individuals have been forced to pay the ever-increasing premiums or to give up their LTC coverage as a result of the increased premiums. Plaintiff and the proposed Class Members all purchased and renewed LTC insurance from Defendants pursuant to uniform written marketing materials, uniform insurance forms, and uniform letters, which accompanied premium increases.

These uniform written communications from Defendants to Alvarez and the Class were fraudulent because the Defendants failed to disclose facts material to the LTC insurance contract. Specifically, the Defendants failed to disclose that the LTC insurance at issue had been defectively underpriced and the Defendants planned to remedy this defect by passing the risk of loss on these policies back to Alvarez and the Class through premium increases. Even Defendants' defenses are uniform. Defendants argue that a uniform disclosure indicating premiums "may change" vitiates the fraud of failing to disclose the defective nature of the LTC polices and the initial underpricing of these policies. Alvarez respectfully requests class certification because he and the Class are part of and represent a similarly situated group of persons.

## II.    FACTUAL BACKGROUND

### A.    Defendants Market A "Guaranteed Renewable" Policy.

LTC insurance generally refers to the category of insurance products that provide coverage for a wide range of maintenance and health services for the elderly who need assistance in daily

2

living. First Amended Complaint ¶ 2. The purpose of LTC insurance is to provide policyholders with coverage for their long term nursing home care and other related needs.[1] *Id.*

In 1988, INA began to market a group LTC policy, which was underwritten by CIGNA, to groups and organizations. Complaint ¶ 19. The policy was administered through the National Group Benefits Insurance Trust with the National Bank of Washington, D.C. acting as trustee. On July 1, 1988, INA issued the "Master Policy" Form No. ATL-1 to the Trustee. Complaint ¶ 19. INA then entered into Participating Organization Agreements ("POA") with various groups in order to market group LTC insurance under the Master Policy to their memberships. Alvarez purchased his policy as a member of the American Chemical Society ("ACS"), which was one of the Participating Organizations to which INA marketed LTC insurance under the Master Policy. Complaint ¶ 23. The insurance coverage marketed to the members of all Participating Organizations was identical as contained in the Master Policy, which was applicable to all LTC coverage sold by the Defendants. Complaint ¶ 22.

Defendants' sale of the group LTC policy to Alvarez and to the Class was based on Defendants' uniform written application and promotional materials. Complaint ¶ 24. Defendants misrepresented to Plaintiffs that the LTC policies could realistically be maintained for the rest of their lives, or until needed, i.e. they were "guaranteed renewable" policies. *Id.* This is an important

---

[1] Insurance, especially long term care insurance, is an essential ingredient in the economic planning of the elderly. They purchase this insurance for the opportunity to pay a fixed amount into an insurance fund knowing that any losses will be covered by insurance.

sales device as LTC insurance is worthless unless the insured can afford to keep it in force for the rest of their life, or until it is needed.  *Id.*

       **B.**     **Defendants' LTC Policies are Defective.**

      Despite Defendants' affirmative representations to Plaintiffs that the policies were guaranteed renewable, the LTC policies were defective from the outset.  Complaint ¶ 32.  The policies were intentionally underpriced, a condition which meant that the original premiums for the LTC policies would not be sufficient to support future claims on the LTC policies.  *Id.*  However, in order for the LTC policies to remain in force as Defendants originally represented to Plaintiffs, it was Defendants' undisclosed plan to pass the cost of the defective underpricing of the LTC polices back onto Alvarez and the Class through premium increases.  *Id.*  Such increases subsequently occurred in the form of an eighty (80) percent increase in 2004 and a proposed additional eighty (80) percent increase in the next two years.  *Id.*  In effect, every $100 originally owed by Alvarez and the Class rises to $324 dollars with an accompanying threat of additional future increases.

      At all relevant times, the Defendants knew that the initial premiums on the LTC policies were too low, in part, because the lapse rates used to originally price the policies were artificially set too high by the Defendants.  Complaint ¶ 33.  In addition, the policies were underpriced in that the original pricing did not take into account the risks associated with the way policies were

underwritten.[2] Complaint ¶ 35. This underpricing produced a market advantage for the Defendants and enabled them to generate a high volume of policy sales and profits. *Id.*

At no time prior to Plaintiffs' execution or renewal of their LTC policy contracts did Defendants disclose the known risk of premium increases, the plan to increase premiums, and the inevitable resulting unaffordability of the LTC policies. Complaint ¶ 36, 37 and 53. At all relevant times, Defendants knew that they would increase premiums on the LTC policies, but nevertheless sold and renewed the LTC policies without disclosing this to Plaintiff and the Class. *Id.* By failing to disclose this material information, CIGNA and INA fraudulently induced Alvarez and the Class to purchase and renew these seemingly lower priced LTC policies instead of purchasing alternative LTC insurance policies or no LTC insurance at all.

**C.     Defendants "Close the Block" of their LTC Insurance.**

In 1992, CIGNA and INA ceased selling their LTC policies to new customers. Complaint ¶ 39. This is an act known in the insurance industry as "closing the block" of business. *Id.* The negative ramifications of the decision to close this block of business were never disclosed to Plaintiff and the Class. *Id.* CIGNA and INA knew that by closing the LTC policy block of business, the pool of insureds under those policies, including Alvarez and the Class, would be permanently capped. Complaint ¶ 40. All sales and renewals after this decision was made were fraudulent because Defendants did not disclose the negative ramifications of this decision to purchasers.

---

[2] "Underwriting" is the process of screening risks for insurance and determining in what amounts and on what terms the insurance company will accept the risk.

Closing a block of business, which ensures that no new insureds will enter the pool covered by the policy, coupled with premium increases, inevitably leads to a decrease in the size of the pool as healthy insureds switch to cheaper policies. Complaint ¶ 41 and 42. This in turn leads to additional increased premiums, as the risks and costs associated with the pool are shared by fewer and fewer people. As the premiums increase, even more healthy insureds flee the policy leaving only those unhealthy insureds who cannot buy insurance elsewhere. Complaint ¶ 41 and 42. Premiums eventually become so high that the remaining insureds must give up their so-called "guaranteed renewable" policies due to the exorbitant premiums. Complaint ¶ 43. This oppressive circle of higher premiums and a shrinking pool to share the increased costs is known in the insurance industry as a "selection spiral" or "death spiral." Complaint ¶ 44. Insurance companies, like Defendants, know that in a "death spiral" situation, the premiums become too high for the insured to pay and often the insured will be forced to let the policy lapse. *Id.*

Despite Defendants' knowledge of the ramifications of closing the block of insurance, Defendants did not inform Plaintiff and the Class of the problem during the sale of the policy or anytime thereafter. Complaint ¶ 53.

### D. Defendants' Raise Premiums on the LTC Insurance.

CIGNA and INA were aware of the defective nature of these policies and the impact of closing the book of business would have from the inception. Complaint ¶ 45. By 1997, CIGNA began to create a rationale for future premium increases by conducting a review of the LTC policies to analyze whether premium levels were adequate in light of the experience of the LTC policies. *Id.* Further, in the years following this study, CIGNA's and INA's knowledge of the defective nature of

the LTC policies and the need for future premium increase was reiterated by an experience of growth in claims for benefits by policyholders.  Complaint ¶ 46. This claim experience led CIGNA and INA to commission yet another review of the LTC policies, this time by an outside actuarial consultant. *Id.*

In 2002, Defendants began implementing plans for premium increases to be applied to LTC policyholders in 2004, but did not inform its policyholders of these planned eighty percent (80%) increases or the problems associated with these policies until 2004 when annual renewals were due. Instead, Defendants continued to accept annual renewal premiums in 2002 and 2003 from Alvarez and the Class knowing that many would lapse their policies when the premium increases were announced.  Instead of giving up these premiums and permitting LTC policyholders to make informed decisions about their group LTC policies, Defendants chose to withhold material information about these policies to obtain more premium dollars.

In 2004, Defendants increased Alvarez and the Class' LTC policy premiums, thereby passing on the costs of Defendants' underpricing of the LTC policies directly onto their policyholders. Complaint ¶ 47.  CIGNA and INA were aware such a course of action would be necessary from the time that they commenced the sale of the LTC policies, and at the time of subsequent renewals of the LTC policies.  *Id.*  Additionally, the Defendants have also indicated the they will be seeking an additional eighty (80) percent increase in the next two years.  Complaint ¶ 32.  These premium increases were designed to cause lapses.  Although loss ratios were unfavorable to Defendants, overall profits were good.

7

In conjunction with the 2004 LTC premium increase, CIGNA and INA sent unsigned form letters to Alvarez and the Class which misrepresented the reasons for the increase.  Complaint ¶ 48.  These letters stated that the increase was due to "emerging claim experience" and "the increase in long term care costs."  *Id.*  This letter also fraudulently stated that the policy "continues to provide valuable long term care benefits."  *Id.*  At no time did Defendants advise Alvarez and the Class of the inherent defects in these LTC policies and that the premium increases were CIGNA's and INA's attempt to pass the costs of these defects and decision back to Alvarez and the Class.  *Id.*

In 1992, Alvarez's contract for annual premium payment on his Form 003039 LTC policy was $1,188.00.  Complaint ¶ 50.  After the eighty (80) percent premium increase in 2004, his annual premium payment was $2,138.00.  *Id.*  After the additional eighty (80) percent premium increase promised by CIGNA and INA in the next two years, his premium will balloon to approximately $3,848.00, resulting in an aggregate increase of 223 percent.  *Id.*  This is an unregulated, unilateral escalation in premium which has effectively deprived Alvarez and the Class of the benefit of the bargain, including their right to "guaranteed renewable" premium LTC policies.  *Id.*

Alvarez and others in the Class, unaware of Defendants' deceptive and wrongful course of conduct, have continued to make their LTC premium payments to keep their LTC policies in force in order to prevent forfeiture of their policies and the loss of premiums paid in to date.  Complaint ¶ 51.  Other Class members were unable to pay Defendants' ever-increasing insurance premiums and were forced to drop their LTC policies.  Complaint ¶ 52.  When that occurred, Defendants obtained windfall profits by retaining all of the prior premium payments on the lapsed policies and avoiding the possibility of future claims on those LTC policies.  *Id.*

8

III.     **ARGUMENT: THIS ACTION IS APPROPRIATE FOR CLASS TREATMENT**.

A.     **Courts Have Certified Litigation Classes in Long Term Care Insurance Fraud Cases.**

The claims in this case are similar to the plaintiffs' successful claims in *Hanson v. Acceleration Life Insurance Company*, No. CIV A3-97-152, 1999 WL 33283345 (D.N.D. March 16, 1999). The *Hanson* case was a class action brought on behalf of a class of LTC insurance policyholders against their insurers. In *Hanson*, the United States District Court for the District of North Dakota certified a litigation class of LTC policyholders who claimed that the insurance company defendants had fraudulently misled the policyholders through misrepresentations and omissions of material facts concerning the policyholders' LTC policies. *Hanson, supra*. The *Hanson* court found that the following requirements of Fed. R. Civ. P. 23 had all been met:

1.     Numerosity

Here, the named plaintiffs have demonstrated that the class may include up to approximately 2,000 members. The plaintiffs are not required to specify an exact number or prove the identity of each class member, but must only show a reasonable estimate of the number of class members. Given the group's advanced age, with naturally increased health and other mental or physical concerns, the finite size of the individual claims, and the inconvenience of trying individual suits (not only to individual plaintiffs, but to the defendants and judicial system as well), the Court finds that joinder here is impracticable.

*Hanson, supra,* at *9 (internal citations omitted).

2.     Commonality

Here, as in *Gold Strike Stamp*, the Court does not believe that the question of liability requires the "specific individualistic examination" proposed by the defendants. That there may be individualized issues does not here outweigh the number, significance and predominance of the common questions of law and fact. The Court finds that the plaintiffs have met the commonality and predominance requirements.

9

*Id.* at *10 (internal citations omitted).

3.      Typicality

In the instant case, the Court finds that the named plaintiffs have met the typicality requirement. Here, plaintiffs have alleged unlawful conduct by defendants similarly affecting them and the proposed class members. The named plaintiffs have asserted the same claims based upon the same legal theories on behalf of themselves as well as all of the proposed class members.

*Id.* at *11 (internal citations omitted).

4.      Adequacy of Representation

Here, defendants do not challenge the competency or expertise of plaintiffs' counsel, and the Court notes that plaintiffs' counsel [counsel identical too those in this case] are experienced in class action litigation and have already demonstrated competent and vigorous representation in this case. Nonetheless, the implications of plaintiffs' old age and/or ill health on their ability to vigorously and competently prosecute a class action are of some concern to the Court. Despite the Court's earlier conclusion that in this case a jury may infer reliance from circumstances proven, the Court cannot dismiss the reliance defense as irrelevant or insignificant. The named plaintiffs' ability to testify and actively participate may become more important as trial approaches. This is not to say that, because there may be difficulties in this regard, plaintiffs should automatically be precluded from pursuing the class action. Plaintiffs' advanced ages and health concerns go to the very heart of this case and certainly should not act as a bar to the action. Should this litigation be drawn out any more, we would soon be without any "adequate" plaintiffs as defendants would have them defined.

*Id.* at *11.

5.      Superiority

A review of the (b)(3) factors indicates that a class action is the superior method of adjudicating this controversy. Initially, the Court is aware of no other actions filed by any of the individual class members. Thus, the interest of members of the class in individually controlling the prosecution of separate actions appears low. Further, the Court notes that it would be extremely costly, not to mention unnecessarily duplicative, for each proposed class member to try this action separately.

10

The situation here is such that it may well be impossible for separate actions to proceed, i.e., the cost of doing so may exceed any recovery they might secure. Every class member is faced with the obstacle of having to establish the existence of the alleged fraud, whether it be actual, constructive, and/or fit the statutory strictures of consumer fraud or false advertising. This would not be a simple task for an individual.  Although the potential individual recoveries here are not insignificant, the Court recognizes the considerable time, effort, and expense already invested by both parties and the Court related to discovery and pretrial motions. Certainly, the costs of pursuing these actions individually far outweigh any recovery any individual could hope to obtain. Certifying this class will prevent the duplication of effort and the possibility of inconsistent results.

* * *

Finally, the Court finds that there will be no major difficulties in the management of this case as a class action. There may be some minor difficulties, such as the reliance and individual recovery issues; but, these difficulties are nowhere near the magnitude of problems that will arise if this case were to be tried in several hundred separate trials. Thus, the Court finds that the existence of any individual issues will not make this case unmanageable as a class action.

* * *

Based on the above reasoning, the Court finds that a class action is the appropriate method for the action to proceed. The Court concludes that the superiority requirement is met in that the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

*Id.* at *13-14.  The *Hanson* court then certified the litigation class.  The case eventually settled on

the eve of trial and the Federal Court approved the class action settlement.  *Hanson v. Acceleration*

*Life Insurance Company*, No. CIV A3-97-152, 2000 WL 33340298 (D.N.D. June 21, 2000).

Similarly, the North Dakota Supreme Court upheld the certification of a litigation class in

a second class action case brought by LTC policyholders against their insurer.  *Rose v. United*

*Equitable Insurance Co.*, 651 N.W.2d 683 (N.D. 2002)("We conclude the trial court did not abuse

its discretion in determining common questions predominated over individual questions, and the

11

court did not abuse its discretion in determining a class action will provide a fair and efficient adjudication of the controversy in this case"). Finally, in *Milkman v. American Traveler's Life Ins. Co.*, No. 3775, 2002 WL 778272 (Pa. Com. Pl. April 1, 2002), the court certified a national class action and approved of the settlement under Pennsylvania law.

All of these cases involved a fraudulent LTC insurance product. Either the policy was "experimental" or it was intentionally underpriced. In all cases, the result was the same: common questions of law and fact predominated in assessing the liability of the insurer to the class of insureds.

### B.     The Question of Class Certification is Ripe and Distinct from the Merits.

Fed. R. Civ. P. 23(c)(1) requires the question of class certification to be determined "as soon as practicable after the commencement of the action." *Bynum v. District of Columbia,* 214 F.R.D. 27, 30 (D.D.C. 2003); *Adair v. England,* 209 F.R.D. 5, 8 (D.D.C. 2002); *In re Lorazepam & Clorazepate Antitrust Lit.*, 202 F.R.D. 12, 21 (D.D.C. 2001). Due process requires this early attention which is possible pre-discovery because the issues to be resolved in certifying a class are purely procedural. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

The legal standard is whether the evidence presented by plaintiffs establishes a "reasonable basis for crediting [plaintiffs'] assertion[s]." *Bynum,* 214 F.R.D. at 31 (citing *Wagner v. Taylor*, 836 F.2d at 578, 587 n. 57 (D.C.Cir.1987)); *Eisen*, 417 U.S. at 178 ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."). Thus, the

allegations set forth in the complaint should be accepted as true. 202 F.R.D. at 21; *Adair*, 209 F.R.D. at 9.

Further, the question of class certification is a preliminary question distinct from the merits of the case. *Does I through III v. District of Columbia*, 232 F.R.D. 18, 24 (D.D.C. 2005) (citing *Eisen, supra*); *In re Lorazepam*, 202 F.R.D. at 21. Courts must not venture too deeply into the merits of a case in deciding whether to certify a class. *Freeland v. Iridium World Communications, Ltd.*, No. CIV.A. 99-1002, 2006 WL 56536 (D.D.C. Jan. 9, 2006) (citing *Eisen, supra; Bynum, supra*); *Adair*, 209 F.R.D. at 8-9 (citing *Eisen*, 417 U.S. at 177-78); *In Re Lorazepam*, 202 F.R.D. at 14.

Plaintiff filed this suit on February 27, 2006 and this motion was filed on June 2, 2006. Plaintiff has alleged sufficient facts to support class certification in the First Amended Class Action Complaint and in this Memorandum of Points and Authorities in Support of Class Certification. Therefore, it is timely and practicable for this Court to certify this Class.

C.     **Efficiency and Judicial Economy Demand Certification.**

A primary purpose behind the establishment of class action lawsuits is to advance the efficiency and economy of multi-party litigation. *Lightfoot v. District of Columbia*, Civ.A. No. 01-1484CKKJMF, 2006 WL 16304,*1 (D.D.C. Jan. 3, 2006)(citing *Chang v. United States*, 217 F.R.D. 262, 268 (D.D.C.2003)). "[T]he class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23." *Id.* (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)); *Chang*, 217 F.R.D. at 268.

Class actions are procedural instruments for removing obstacles to the just, speedy, and inexpensive determination of multiple claims of right. *Chang,* 217 F.R.D. at 268 (citing *McCarthy v. Kleindienst,* 741 F.2d 1406, 1410 (D.C.Cir.1984)).[3]  In recognition of this function, Courts have consistently held that the class action rule should be given a liberal rather than a restrictive interpretation.[4]  Although the district court enjoys wide discretion in determining whether a suit should be maintained as a class action,  Rule 23 requires liberal interpretation and all doubts should be resolved in favor of class certification.  Lastly, if there remains any doubt in the Court's mind, it should err in favor of allowing a class.  *Adair,* 209 F.R.D. at 8; *Olenhouse v. Commodity Credit Corp.,* 136 F.R.D. 672, 679 (D. Kan. 1991).  The rule of liberal interpretation is not a plea for a knee-jerk decision.  Rather, it expresses the ideal of efficiency in litigation.

When, as here, a case satisfies each of the Rule 23(a) requirements (that essentially guarantee fairness) and the Rule 23(b)(3) requirement of superiority, then liberality means that the court and

---

[3] *See also* Kalven & Rosenfeld, *The Contemporary Function of Class Actions*, 8 U. Chi. L. Rev. 684 (1941).  The significant remedial function of class actions cannot be gainsaid:

> In our complex modern economic system where a single harmful act may result in damages to a great many people there is a particular need for the representative action as a device for vindicating claims which, taken individually, are too small to justify legal action, but which are of significant size if taken as a group.

*Escott v. Barchris Const. Co.,* 340 F.2d 731 (2d Cir. 1965), *cert. denied,* 382 U.S. 816 (1965).

[4] *See, e.g., McCarthy v. Kleindienst,* 741 F.2d 1406, 1410 (D.C.Cir.1984)*.  See also Kahan v. Rosenstiel,* 424 F.2d 161 (3d Cir. 1970), *cert. denied,* 398 U.S. 950 (1970).  Indeed, in case after case decided under the state and federal rules involving allegations of violations of statutes and common law causes, the class action device has been sustained and, at times, orders dismissing such actions as class actions have been vacated and reversed.  *See also Anthony v. General Motors Corp.,* 33 Cal. App. 3d 699 (1973); *Geraghty v. United States Parole Comm'n,* 579 F.2d 238, 252-54 (3d Cir. 1978), *cert. denied,* 434 U.S. 1986 (1978).

the parties should commit to class treatment in order to enhance the overall efficiency and fairness of our civil justice system.

This Class consists of a group of senior citizens who are vulnerable and may require nursing care services soon for which they may not currently be covered. For them, justice delayed is truly justice denied. Some class members may not have the financial resources to realistically afford to retain hourly counsel. In a class action, costs are shared, netting each class member a greater recovery if the claim has merit. Moreover, the claims here are identical and Plaintiff's are similarly situated. Complaint ¶ 60, 61. Each Class Member has identical contracts and Defendants' anticipated defenses are likewise identical. Complaint ¶ 24. Accordingly, commonality, typicality, numerosity and adequacy cannot be seriously disputed.

Plaintiff has alleged that Defendants had a plan to defraud consumers, and that as part of this plan it was the regular policy and practice of Defendants to conceal certain material facts. Complaint ¶ 32. Specifically, Defendants failed to disclose material facts such as their plan to pass the costs associated with the defective nature of the LTC policies back onto the policyholders through premium increases and their knowledge that their guarantee of renewability was worthless. Complaint ¶ 53. Plaintiff has also alleged that Defendants failed to disclose the negative ramifications of their decision to close the block and its inevitable impact on premiums. *Id.* This plan can be shown without looking at any individual transaction. It is precisely this sort of consumer fraud class action that the Supreme Court <u>approved</u> in contrast to a mass tort personal injury class action, including futures claims. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624, 117 S.Ct 2231, 2250 (1997) ("Predominance is a test readily met in certain cases alleging consumer or

15

securities fraud or violations of antitrust laws."). If Plaintiff's allegations are accepted as true, this alone is sufficient to warrant class certification.

The argument for class treatment here is straightforward: Common facts predominate, making class treatment an economical and cost efficient litigation mechanism from the perspectives of the Court, the parties, and the unnamed class members. There is no reason for each class member to undertake the separate discovery battles to unearth evidence and then needlessly recreate or produce similar proof. There is similarly no reason for each class member to incur the cost of providing such proof to be deducted from his or her recovery.

At least with respect to the common facts relating to the basis of liability, the Court has the power to certify a class. The same rationale applies to issues relating generally to the Defendants' conduct or the consequences of said conduct as it applies to each claim. This is not to say that all issues relating to every single claim are identical.[5] For example, Plaintiff's damages claims may vary. However, individual damages can readily be determined based in part on a formula rather than individual proof. *See Does I through III*, 232 F.R.D. at 26 ("Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality").

Plaintiff's Complaint alleges that Defendants conspired to defraud vulnerable and elderly customers into purchasing defective LTC insurance policies, thus depriving them of the benefit of their bargain while enriching Defendants. These allegations, shared by Alvarez and Class Members

---

[5] The appropriateness of class treatment derives from the fact that the central issues in such cases are the relation between the parties, and the occurrence and nature of the wrong. *Siegel v. Chicken Delight, Inc.*, 271 F. Supp. 722, 726 (N.D. Cal. 1967).

alike, are ideal for class certification. This Court can thus efficiently and fairly administer the claims

through the class action vehicle.

### D.  THIS ACTION FULFILLS ALL PREREQUISITES FOR CLASS TREATMENT.

#### 1.  Existence of a Class Is Ascertainable.

"It is axiomatic that for a class action to be certified a 'class' must exist." *Bynum*, 214 F.R.D.

at 31 (quoting *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir.1981)).  On the subject of whether a class

exists, this Court has explained that

> [a]lthough Rule 23 of the Federal Rules of Civil Procedure does not specifically require plaintiffs to establish that a class exists, this is a common-sense requirement and courts routinely require it.  The requirement that a class be clearly defined is designed primarily to help the trial court manage the class.  It is not designed to be a particularly stringent test, but plaintiffs must at least be able to establish that the general outlines of the membership of the class are determinable at the outset of the litigation.  In other words, the class must be sufficiently definite that it is administratively feasible for the court to determine whether a particular individual is a member.

*Id.* (quoting *Pigford* v. *Glickman*, 182 F.R.D. 341, 346 (D.D.C.1998) (internal citations and

punctuation omitted)); *Chang*, 217 F.R.D. at 268-69.  The Court must determine whether Plaintiff's

proposed class definition sets forth general parameters that limit the scope of the class to such a

degree that it is administratively feasible for this Court to determine whether a particular individual

is a member of the class. *Bynum*, 214 F.R.D. at 32.  The Court considers whether "by looking at the

class definition, [if] counsel and putative class members can easily ascertain whether they are

members of the class." *Id.* (citing *Pigford*, 182 F.R.D. at 346).  Plaintiff proposes the following class

definition:

17

> All individuals who purchased, between 1988 and the present, Group Long-term Care Insurance from the Insurance Company of North America under the terms of the Master Policy ATL-1 issued by the Insurance Company of North America to the Trustee of the National Group Benefits Insurance Trust and whose premiums on those policies have been increased, but excluding from such class, the Defendants, any and all officers, directors, employees, and agents of the Defendants, their affiliates, and/or subsidiaries who are or have been employed by Defendants.

This definition sets forth parameters of time and specific LTC group insurance policies.  An individual would be able to determine, simply by reading the definition, whether he/she is a member of the class.  *See Id*.

### 2.    Plaintiff Meets the Requirements of Rule 23(a).

Rule 23(a) provides that a class action may be maintained if:

> (1)    The class is so numerous that joinder of all members is impracticable; (2) There are questions of law or fact common to the class; (3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) The representative parties will fairly and adequately protect the interest of the class.

Plaintiff meets all four of these requirements.

### a.    The Proposed Class Has Three to Five Thousand Members and Thus, Is So Numerous That Individual Joinder Is Impracticable.

The first prerequisite for certification under Rule 23 is that the putative class be so large that joinder of all class members would be impracticable. Fed. R. Civ. P. 23(a)(1).  There is no specific threshold that must be surpassed in order to satisfy the numerosity requirement; rather, each decision turns on the particularized circumstances of the case.  *Does I through III*, 232 F.R.D. at 25 (citing *Franklin*, 909 F.Supp. at 30).  Plaintiff need not "provide an exact number of putative class members

in order to satisfy the numerosity requirement." *Id.* (citing *Pigford*, 182 F.R.D. at 347); *Adair*, 209 F.R.D. at 8; *Bynum*, 214 F.R.D. at 32.

The second part of Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is *impracticable*. A Court may use common sense assumptions to determine impracticability. *See, Bynum*, 214 F.R.D. at 32; *In Re Lorazepam*, 202 F.R.D. at 26 (citing *Kifafi v. Hilton Hotels Retirement Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999)); *Pigford*, 182 F.R.D. at 347). Courts refuse to interpret "impracticable" to mean "impossible". *See Reed v. Philip Morris Inc.*, 1999 WL 33714707 at *4 (D.C.Super. 1999); *In re Federal Skywalk Cases*, 93 F.R.D. at 421 ("A showing of strong litigational inconvenience in the prosecution of claims separately by the proposed class members is sufficient."); *Esler v. Northrop Corp.*, 86 F.R.D. 20, 34 (W.D. Mo. 1979) (citing 7C CHARLES WRIGHT, *et al.*, FEDERAL PRACTICE & PROCEDURE, § 1762 at 593 (1972)).

According to the records Plaintiff has been able to review to date, the Class includes between three thousand and five thousand members who currently have LTC policies in force pursuant to the Master Policy Form No. ATL-1 through CIGNA and INA. Complaint ¶ 59. An undetermined number of people have been forced to let their policies lapse because of the excessive premium increases brought on by the closing of the block of business. Joining several thousand persons who

currently hold or have held policies is clearly impracticable.[6]  Thus the numerosity requirement of

Rule 23(a)(1) has been met.

###### b.    There Are Questions of Law and Fact Common to the Class.

Rule 23(a)(2) requires that there be questions of law or fact common to the class.  Fed. R.Civ.

P. 23(a)(2).  "The commonality test is met where there is at least one issue, the resolution of which

will affect all or a significant number of the putative class members." *Does I through III,* 232 F.R.D.

at 26; *Adair,* 209 F.R.D. at 9*; In Re Lorazepam,* 202 F.R.D. 12 at 26 (quoting *Lightbourn v. County*

*of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)).  The threshold for commonality is not high and is

"often easily met.  *Does I through III*, 232 F.R.D. at 26 (citing *In re Vitamins Antitrust Litig.*, 209

F.R.D. at 259; *Reed*, 1999 WL 33714707 at *5; *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472

(5th Cir.1986)).  The commonality test is met when there is at least one common issue, the resolution

of which will affect all or a significant number of the class members.  *Chang,* 217 F.R.D. at 269.

*See also*, *Lightbourn v. County of El Paso*, 118 F.3d 1101 (5th Cir. 1997).

---

[6] Courts in this jurisdiction have observed that a class of at least forty members is sufficiently large to meet this requirement. *Does I through III,* 232 F.R.D. at 25 (citing *Thomas v. Christopher*, 169 F.R.D. 224, 237 (D.D.C.1996).  *See also Comm. of Blind Vendors v. District of Columbia*, 695 F.Supp. 1234, 1242 (D.D.C.1988) (class of 63 members satisfies numerosity requirement); *Chang,* 217 F.R.D. at 269 (citing *Pigford*, 182 F.R.D. at 347-48 (400 sufficient to establish numerosity, especially when the class members are located in different states); *Coleman v. Pension Benefit Guar. Corp.,* 196 F.R.D. 193, 198 (D.D.C.2000) (noting that numerosity requirement is satisfied where it is clear that joinder would be impracticable; *Franklin v. Barry*, 909 F.Supp. 21, 30 (D.D.C. 1995)(finding class of 200 was "sufficiently large");  *Lewis v. Nat'l Football League*, 146 F.R.D. 5, 8-9 (D.D.C. 1992)(finding numerosity satisfied in proposed class of 250 geographically dispersed players).

It is well settled that the existence of factual distinctions between the claims of putative class members will not preclude a finding of commonality. *Chang,* 217 F.R.D. at 270 (citing *Prado-Steiman v. Bush,* 221 F.3d 1266, 1279 n. 14 (11th Cir.2000); *Bynum,* 217 F.R.D. at 46-47 ("it is not necessary that every issue of law or fact be the same for each class member. Rather, factual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members."); *Franklin v. Barry,* 909 F.Supp. at 30-31 (holding that there need not be "commonality on each fact or every issue," and finding the commonality requirement met in a case brought by Hispanic prisoners in the D.C. correctional system who experienced varying conditions of confinement, had varying degrees of fluency with the English language, and different medical histories); *Lewis v. Nat'l Football League,* 146 F.R.D. at 9 ("the presence of individual issues does not destroy commonality.... particularly ... when ... common--even identical--issues of liability are present.")

Plaintiff submits that his and the Class' claims arise out of the same set of operative facts and are based on the same legal theories. Here, in essence, the who, what, where, when and why of this case reflect common issues. Underlying every plaintiff's claim for relief lies a core of common issues of law and fact. These common questions include the following:

(1)    The terms of the uniform written marketing materials, policy forms, and correspondence under which CIGNA and INA sold and renewed the LTC policies to Alvarez and the Class;

(2)    Whether CIGNA and INA fraudulently induced the sale and renewal of the LTC polices by withholding material information from Alvarez and the Class;

(3)    Whether CIGNA and INA affirmatively concealed from Alvarez and the Class the defects inherent in the LTC policies;

(4)     Whether CIGNA and INA wrongfully underpriced their LTC policies;

(5)     Whether CIGNA and INA "closed the block" of LTC policies and failed to inform Alvarez and the Class of the negative ramifications of this decision;

(6)     How much CIGNA and INA profited, or diminished its losses, as a result of its fraudulent sale and renewal of the LTC policies to Alvarez and the Class;

(7)     Construction of D.C. Statute §§ 28-3901 et. seq. which prohibits Unlawful Trade Practices;

(8)     Construction of common law claims of Constructive Fraud;

(9)     Construction of common law claims of Actual Fraud;

(10)    Construction of common law claims of Tortious Breach of Implied Covenant of Good Faith and Fair Dealing (Bad Faith);

(11)    Whether Alvarez and the Class have sustained damages and the proper measure of those damages;

(l2)    Whether the aforementioned acts of CIGNA and INA were done intentionally and/or as part of a scheme reasonably calculated to deceive and defraud consumers of its product; and

(13)    Whether the conduct of CIGNA and INA demonstrates sufficient evil motive, actual malice, deliberate oppression, intent to injure, and willful disregard for the rights of Alvarez and the Class and/or CIGNA's and INA's fraudulent conduct itself was outrageous and grossly fraudulent in order to warrant the imposition of punitive damages.

Complaint ¶ 60.

(14) Whether the defenses offered by CIGNA and INA have any legal significance, including proof of Class Member reliance, whether Defendants have a duty to disclose, whether the Defendants intended their actions, and whether Defendants have a contractual right to increase premiums.

Defendants' Motion to Dismiss at 2.

Potentially some factual differences may exist among the claims, but such differences are not

fatal if common questions of law are also present. *See Bynum*, 214 F.R.D. at 33 (Factual variations

22

among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members) (citing *Wagner v. Taylor*, 836 F.2d 578, 591 (D.C.Cir.1987) (noting that "typicality is not destroyed merely by factual variations"); *United States v. Trucking Employers, Inc.,* 75 F.R.D. 682, 688 (D.D.C.1977) (citing numerous cases for the proposition that "where the claims or defenses raised by the named parties are typical of those of the class, differences in the factual patterns underlying the claims or defenses of individual class members will not defeat the action")); *Reed, supra,* at *9; *Chang*, 217 F.R.D. at 269. *See also Wells v. Allstate Ins. Co.*, 210 F.R.D. 10, 6 (D.D.C. 2002)(finding that issue of "whether the lack of disclosure relative to changed claims handling procedures" was a common issue of law").

The necessity of determining monetary damages on an individual basis does not preclude a commonality finding. *Does I through III,* 232 F.R.D. at 26 (citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 428 (4th Cir.2003) ("Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality"); 5 MOORE'S FEDERAL PRACTICE § 23.23[2] (2004) ("The need for an individualized determination of damages suffered by each class member generally does not defeat commonality")). Nor does the proffering of an anticipated defense based on allegedly individual causation and damages bar class certification. *Wells,* 210 F.R.D. at 6; *Johns v. Rozet,* 141 F.R.D. 211, 216 (D.C.Cir. 1992); WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1764, 235-41. In *Hanson, supra* and *Rose, supra,* the trial courts granted certification with the understanding that damage could be calculated pursuant to a formula. This approach appears to be appropriate in this case as well.

This case inarguably presents a "common core of questions," which focus on the overriding issues of law and fact concerning Defendants' alleged wrongful acts, which have harmed plaintiff and the Class Members.  The commonality requirement of Rule 23 is thus easily satisfied.

**c.      The Claims of Plaintiff Are Typical of the Class**

The third requirement under Rule 23(a) is that plaintiff establish that the claims of the class representative are typical of those of their class.  Fed. R. Civ. P. 23(a)(3).  The typicality requirement is "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented."  *In Re Lorazepam*, 202 F.R.D. at 27 (quoting *Kifafi*, 189 F.R.D. at 177); *Does I through III,* 232 F.R.D. at 27 (citing *In re Vitamins Antitrust Litig.*, 209 F.R.D. at 260).  Typicality is met "if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability."  *In Re Lorazepam*, 202 F.R.D. at 27 (citing *Pigford*, 182 F.R.D. at 349); *Johns v. Rozet,* 141 F.R.D. 211, 216 (D.C.Cir. 1992).  *See also* NEWBERG ON CLASS ACTIONS § 3.13.  Courts construe Rule 23(a)(3) liberally, holding that a claim is typical where there is no express conflict between the representative parties and the class "over the very issue in litigation."  *Does I through III,* 232 F.R.D. at 27 (citing *In re Vitamins Antitrust Litig.*, 209 F.R.D. at 260).  *See also Vargas v. Calabrese*, 634 F. Supp. 910 (D.N.J. 1986); *Mersay v. First Republic Corp. of America*, 43 F.R.D. 465, 468 (S.D.N.Y. 1968).

Numerous courts, including those within this Circuit, have  observed that "typical" does not mean "identical."  *See, e.g., In Re Lorazepam*, 202 F.R.D. at 12; *In re Federal Skywalk Cases*, 93

24

F.R.D. at 421-22; *Esler*, 86 F.R.D. at 35 (typicality requirement "does not require identity or substantial identity"); *In re Glassine & Greaseproof Paper Antitrust Litigation*, 88 F.R.D. 302, 304 (E.D. Pa. 1980). Each Class Member's damages will naturally vary. But it is the nature of the claim, and not the amount of each individual's damages, that determines typicality. *See, e.g., Wells*, 210 F.R.D. at 6; *In re Federal Skywalk Cases*, 93 F.R.D. at 421-22; *Esler*, at 35; *Ouellette v. International Paper Co.*, 86 F.R.D. 476 (D. Vermont 1980) (stating that damages of property owners for environmental waste potentially varied according to proximity to waste source did not make named plaintiffs' claims atypical); WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE, § 1764 at 235-41 (1986) ("[T]he [typicality] requirement may be satisfied even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages claimed by the representative parties and the members of the class").

> There has been general agreement that the existence of varying fact patterns to support the claims of individual class members does not mandate a finding of a lack of typicality, as long as the claims arise out of the same legal or remedial theory.... As noted above, there is nothing in Rule 23(a)(3) which requires named plaintiffs to be clones of each other or clones of other class members. The diversity of named plaintiffs who differ in their methods of operation and conduct is often cited by defendants as an impediment to class certification. However, as long as the substance of the claim is the same as it would be for other class members, then the claims of named plaintiffs are not atypical.

*In re Lorazepam*, 202 F.R.D. at 12.

Class Representative Alvarez purchased his group LTC insurance coverage under the Master Policy from INA pursuant to a Participation Organization Agreement between INA and ACS, of which Alvarez was a member. Complaint ¶ 10. Other Class Members purchased identical group LTC insurance coverage from INA under the same Master Policy pursuant to their membership in

ACS or membership in some other Participating Organization.  Complaint ¶ 21.  The fact that Class Members may have purchased their coverage from INA pursuant to membership in a group other than ACS is irrelevant to the issue of typicality.  The fact that a Class Members purchased coverage through a membership in a Participating Organization other than ACS did not affect the insurance coverage the class member purchased.  On the contrary, regardless of the Participating Organization to which a class member belonged, they were insured under the same Master Policy as Class Representative Alvarez and, therefore, receive the same LTC insurance coverage that Alvarez did. Further, all of the class members have been subject to the same eighty (80) percent premium increase Alvarez experienced when INA increased premiums in 2004 and all class members face additional eighty (80) percent premium increases that Alvarez does in the near further pursuant to INA's plan to institute a two-step premium increase.

CIGNA and INA's sale of form LTC policies to the class was based on uniform written promotional materials and the uniform written policy forms.  Defendants' decisions to close the block and raise premiums were on a class and policy-wide basis.  These decisions were not made on an individual basis.  The overarching scheme is the linchpin of the complaint. Any difference in individual claims are differences in degree, not in kind.  All claims are similar because they "emanate from the same legal theory, remedial theory or offense." 202 F.R.D. at 27 ("Although [the plaintiffs] may not have suffered identical damages, that is of little consequence to the typicality determination when the common issue of liability is shared.").  *See also Ellis v. O'Hara*, 105 F.R.D. 556, 561 (E.D. Mo. 1985); *Donaldson v. Pillsbury*, 554 F.2d 825, 830 (8th Cir. 1977), *cert. denied*, 434 U.S. 856 (1977) (Rule 23(a)(3) requires "a demonstration that there are other members of the

class who have the same or similar grievances as the Plaintiff."); *In re Federal Skywalk Cases*, 93 F.R.D. at 422;  *Esler*, 86 F.R.D. at 35; *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 88 (S.D.N.Y.1998) ("[F]actual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class.") (citing *Green v. Wolf*, 406 F.2d 291, 299-301 (2d Cir.1968); WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE, § 1764.  Nothing in the nature of the injuries alleged by Plaintiff could conceivably set him at odds with any other Class Members. Plaintiff clearly satisfies the typicality requirement.

### d.    Class Representatives and Their Counsel Will Adequately Represent the Class

"This prerequisite requires that the Court examine such factors as the quality of class counsel, the existence of any adverse interests between class representatives and other class members, communication between class counsel and the class, and the overall context of the litigation." *Does I through III,* 232 F.R.D. at 27; *In Re Lorazepam*, 202 F.R.D. at 28 (citing *Kifafi*, 189 F.R.D. at 177; *Pigford*, 182 F.R.D. at 350).  Rule 23(a)(4) is satisfied if the Class Representatives will "fairly and adequately protect the interests of the class," they have no interests antagonistic to the class, the suit is not collusive and the Class Representative's attorneys are qualified, experienced, and generally able to conduct the litigation.  3 NEWBERG ON CLASS ACTIONS 3D § 3.22; *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982); *Redmond v. Commerce Trust Co.*, 144 F.2d 140, 151 (8th Cir. 1944), *cert. denied*, 323 U.S. 776 (1944); *Susman v. Lincoln American Corp.*, 561 F.2d 86, 90 (7th Cir. 1977); *Harman v. LymphoMed, Inc.*, 122 F.R.D. 522, 528 (N.D.Ill. 1988).  Minor factual

differences do not indicate antagonism of a claim nor do differences in the degree in severity of injury. *Reed*, 1999 WL 33714707, at *10. The size of a named plaintiff's financial stake in the action is not the determinative issue; rather the issue is whether the named plaintiff will adequately protect the interests of the class. *Bynum*, 214 F.R.D. at 36.

### (1)     Class Representatives

Here Plaintiff's interests are co-extensive and are not in conflict with the interests of the other Class Members. Moreover the absence of any disabling antagonism or conflict is demonstrable from the preceding discussion of Rule 23(a)(2) and (3) in connection with the requirement that the claims of the representatives parties be "common" and "typical" of those of the class.

The proof regarding the presence of common questions of fact or law and the typicality of the Plaintiff's claims establishes their interests in the outcome of this litigation and coincidence of those interests with the rest of the Class. Where identical evidence will be proffered by each plaintiff as to all of the fundamental liability issues, Plaintiff's interests will be fully aligned with those of the Class Members they seek to represent, and this element of Rule 23(a)(4) will be satisfied as well.

The claims of the Representative Plaintiff here are typical of the claims of the proposed Class, there being a substantial number of common and overlapping questions of fact and law. Defendants sold the form LTC policies to the class based on uniform application and promotional materials and uniform policy forms. Defendants had a scheme to pass the costs of the defects in the group LTC insurance policies back on to Alvarez and the Class through premium increases. These decisions were not made on an individual basis. Each Class Member has suffered damage as a result of Defendants' conduct in the form of being required to pay ever increasing premiums and/or being

forced to let their policy lapse. Each Class Member shares the Representative Plaintiff's interest in establishing Defendants' liability for its conduct. Thus, it may safely be presumed that no disabling conflict exists, absent contrary evidence put forth by Defendants. *See*, *Cook v. Rockwell Intern. Corp.*, 151 F.R.D. 378, 386-87 (D. Colo. 1993); *Citizens Banking Co. v. Monticello State Bank*, 143 F.2d 261, 264 (8th Cir. 1944).

**(2)     Class Counsel**

Class Counsel must have extensive experience in prosecuting claims like those which are the subject of this class action, and must be found by the Court to have adequate qualifications and experience to serve as class advocates. Here, Plaintiffs has retained counsel with considerable experience in class action litigation.

The attorneys of Kanner & Whiteley, L.L.C. have extensive experience representing plaintiffs in class action litigation, including consumer fraud, mass tort, and product liability litigation, as well as experience defending class actions. The firm has successfully resolved several LTC cases, namely *Hanson, supra* and *Milkman*, *supra*. The firm has also successfully handled class actions throughout the United States in both state and federal courts, e.g. *Lemmings v. Second Chance Body Armor, et al.*, No. CJ-2004-64 (Mayes County District Court, OK) (2/19/05)(certification of class of bullet proof vest purchasers/users); *In re Synthroid Marketing Litigation*, MDL 1182, 264 F.3d 712 (7th Cir. 2001); *Coleman v. Block,* No. A1-63-4 (North Dakota) and *Tompkins v. BASF*, Civ. No. 96-59 (Traill County District Court, North Dakota); *City of Independence v. Amoco Oil Co.*, Civ. Act. No. 95-0121-CV-W-2 (W.D. Mo.). In addition to *Coleman v. Block*, an injunctive case, the firm has successfully tried two other damages class action cases to verdict. *Bonilla v. Trebol Motors Corp.*

*et al.*, Civ. Act. No. 92-1795 (JP) and *Cummins v. Maryland National Bank,* No. 83-096010/L-4034,

33 ATLA L. Rep. 338 (Oct. 1990) (Circuit Ct. Baltimore City, MD) (Order of December 28, 1984).[7]

Mr. Kanner has 27 years of class action experience, beginning with *In re Three Mile Island.* He has

taught complex litigation courses at Yale and Duke law schools. Most recently, he has authored

*Interpreting the Class Action Fairness Act In a Truly Fair Manner*, 80 Tul. L.Rev. (forthcoming

Summer 2006) and co-authored *Exploding the Blackmail Myth: a New Perspective on Class Action*

*Settlements*, 57 Baylor L. Rev. 681 (Fall 2005). He authored ENVIRONMENTAL AND TOXIC TORT

TRIALS and serves on the Louisiana Supreme Court Committee for Complex Litigation. He has

lectured and written on class action litigation. Ms. Whiteley has also been involved with the

prosecution or defense of the firm's commercial class actions during the past 12 years and served

as court appointed class counsel in the *Hanson* and *Milkman* cases mentioned herein. Ms.

Maklansky clerked for Louisiana Civil District Court Judge Nadine M. Ramsey prior to joining

Kanner & Whiteley, where she worked on several class actions.

Perry Elizabeth Pearce Benton is a seasoned litigator with 26 years of complex commercial

litigation experience, including class action consumer fraud, antitrust, and shareholder derivative

cases. Ms. Benton has served as co-counsel with Kanner &Whiteley, LLC on several class actions,

including *Hanson* and *Milkman.* After graduation from the University of Alabama School of Law

---

[7] *See also, Local 7-515, Oil Chemical and Atomic Workers International Union (OCAWIU), et al. v. American Home Products, et al.*, Civ. No. 92-1238, *consolidated with* 92-1238 (JP) (D.P.R.) ($24 million civil RICO class action settlement); *Glass, Molder, Potters, Plastics and Allied Workers International Union, AFL-CIO v. Wickes Companies, Inc.*, No. L-06023-88 (Sup. Ct. February 24, 1992) ($5 million tortious interference class action settlement); *In re Three Mile Island Litigation*, No. 79-0432 (M.D. Pa.) ($25 million toxic tort recovery for economic loss and medical monitoring).

in 1980, Ms. Benton clerked for the Hon. Robert S. Vance on the United States Court of Appeals for

the Fifth Circuit and was a litigation associate at North Haskell and later King & Spalding prior to

joining the Mead Corporation in 1988 as an Associate General Counsel with primary responsibility

for litigation.

The attorneys from the Vogel Law Firm have extensive experience in prosecuting class

actions. Vogel attorney Timothy Q. Purdon has previous served as court appointed class counsel for:

(1)     A class of approximately 23,000 North Dakota banking customers in an
action against their bank for release of confidential customer information. *Junkert
v. First Bank, et al*, District Court, State of North Dakota, Cass County, Civil No.
98-015777;

(2)     A class of over 2,000 North Dakota senior citizens in a fraud-based action
over LTC insurance, *Hanson v. Acceleration Life, United States District Court,
District of North Dakota,* No. A3-97-152 (D.N.D.); and

(3)     A class of over 8,000 North Dakota senior citizens in a fraud-based action
over LTC insurance, *Rose v. United Equitable*, District Court, State of North Dakota,
Cass County, No. CV-00-02248.[8]

Vogel attorney Monte L. Rogneby also served as class counsel in the *Rose* case. The Vogel Law

Firm is the largest law firm in the State of North Dakota and its attorneys have a long history of

involvement in complex civil litigations.

Edgar James is admitted to the bar of the District of Columbia and Maryland. He earned his

J.D. from the Harvard Law School and an M.P.H. from the Harvard School of Public Health in 1979.

At Harvard, he was an editor of the Harvard Civil Rights and Civil Liberties Law Review and author

---

[8] *Rose v. United Equitable Insurance Co.*, 651 N.W.2d 683 (N.D. 2002)(affirming class
certification).

of an article on labor law. Upon graduating from Harvard Law School, Mr. James practiced general corporate and labor law and spent several years litigating cases, including class actions arising out of a strike by the United Mine Workers against the Pittston Coal Company and by the various airline unions at Eastern Air Lines.

Edgar James' practice is concentrated in complex civil litigation. Since 1991, for example, Mr. James has been co-counsel in *Adams v. United States*, No. 90-162 C (Ct. Fed. Cl.), a case involving over 14,500 federal criminal investigators and a smaller number of technical employees at the FBI, DEA, Secret Service, the Department of Homeland Security, IRS, BATF and other law enforcement agencies seeking wages owed under the Fair Labor Standards Act (AFLSA). Mr. James represented members of Perdue's chicken catching crews in a succession of FLSA cases brought in the Maryland federal district court in which we successfully sought overtime pay. *Heath v. Perdue Farms, Inc.*, WMN 98-CV-3159 (D. Md.); *Daniels v. Perdue Farms, Inc.*, WMN 00-CV-1455 (D. Md.); *Bishop v. Perdue Farms, Inc.*, WMN 00-CV-1456 (D. Md.); *Satchell v. Perdue Farms, Inc.*, WMN 01-CV-2340 (D. Md.). Mr. James is currently in the process of administering the settlement of a class action brought against Perdue pursuant to ERISA, *Handy v. Perdue Farms, Inc.*, MV 03-CV-2281. In addition, Mr. James has successfully defended against a large class action that went to the 5th Circuit, a class action in 9th Circuit involving Reno pilots, and a class action in 3rd Circuit involving TWA pilots.

Class Counsel retained by Plaintiff will more than adequately be able to prosecute this litigation on behalf of all Class Members. Combined with the fact that the interests of the Class

Representatives fully conform with those of the Class at large, there is no question of adequacy of representation in this case.

### 3.     Plaintiff Has Met the Requirements of Rule 23(b)(3).

For an action to be maintained as a class action, Rule 23(b)(3) requires that two additional findings be made: (1) that common questions of law and fact predominate ("predominance"); and (2) that a class action is superior to other forms available for fair and efficient adjudication ("superiority"). "Judicial economy factors and advantages over other methods for handling the litigation as a practical matter underlie the predominance and superiority requirements [of the rule]." *Reed*, 1999 WL 33714707, at *12 (quoting Newburg & Conte, § 4.23 at 4.79).

### a.     Common Questions of Fact and Law Predominate.

"[W]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though important matters will have to be tried separately. *Bynum*, 214 F.R.D. at 39 (quoting 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1778 (2d ed. 1986)). There are no bright line tests for determining whether common questions predominate, but in general a claim will suffice "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." *Id.* The common issues must only predominate; they do not have to be dispositive of the litigation. *In Re Lorazepam*, 202 F.R.D. at 29 (citing *Potash*, 159 F.R.D. at 693).

33

In determining whether common questions predominate, it is clear that the Court's inquiry should focus on liability. *Gold Strike Stamp Co.*, 436 F.2d 791, 796 (10th Cir. 1970). That class members may suffer damages in varying amounts does not change this result. *See Id.* ("The fact that there may have to be individual examinations on the issue of damages has never been held . . . a bar to class actions."). "'[W]here members of a class are subject to the same misrepresentations and omissions, and where alleged misrepresentations fit within a common course of conduct, common questions exist and a class action is appropriate.'" *Wells*, 210 F.R.D. at 10 (holding that insurance company's alleged failure to disclose material changes to its claims handling procedures with respect to claimants represented by counsel was a predominating legal basis for all class members' claims) *See also In re Newbridge Networks Sec. Litig.*, 926 F.Supp. 1163, 1176 (D.D.C.1996).

In both *Hanson*, *supra*, and *Rose*, *supra*, courts found that common questions of law and fact predominated over individual issues and certified litigation classes. Both of those cases involved claims of fraudulent omission of material facts by a class of LTC policyholders against their insurers identical to the claims made by Alvarez in this case.

In *Hanson*, the Court noted that the contract language at issue was identical for each member of the proposed class and that the class wide premium increases were identical as they were class wide as well. The *Hanson* Court went on to hold that

> The class action may not be the proper vehicle in certain fraud cases if there is significant variation in the representations made or in degrees of reliance by persons aggrieved. However, that is not problematic here because . . . the plaintiffs' claims are based primarily on defendants' uniform failure to disclose to any and all members of the proposed class that which there was a duty to disclose, that the facts withheld were material in the sense that no reasonable person would have purchased or renewed the policies at issue had the alleged facts been known, and consequently reliance may be inferred from the circumstances.

34

\* \* \*

> Here, as in *Gold Strike Stamp*, the Court does not believe that the question of liability requires the "specific individualistic examination" proposed by the defendants. That there may be individualized issues does not here outweigh the number, significance and predominance of the common questions of law and fact. The Court finds that the plaintiffs have met the commonality and predominance requirements.

*Hanson, supra,* at \*10 (internal citations omitted).  Similarly, in *Rose*, the North Dakota Supreme

Court held the trial court had not abused its discretion in finding that common questions of law and

fact arising out of the defendant insurers uniform failure to disclose material facts predominated over

purported individual issues of proximate cause and damages raised by the defendant insurers.  *Rose*,

651 N.W.2d 683, Para.13-19 (N.D. 2002).

As in *Hanson* and *Rose,* the Plaintiff and the Class' claims in this case are based primarily

on (1) defendants' uniform failure to disclose to any and all members of the proposed class that

which there was a duty to disclose, i.e. that the LTC insurance at issue had been defectively under

priced and the Defendants planned to remedy this defect by passing the risk of loss on these policies

back to Alvarez and the Class through premium increase, Complaint ¶ 53, and (2) that the facts

withheld were material in the sense that no reasonable person would have purchased or renewed the

policies at issue had the alleged facts been known.  Complaint ¶ 55.  Plaintiff and the proposed

Class Members all purchased and renewed LTC insurance from Defendants pursuant to uniform

marketing materials, uniform insurance forms, and uniform letters which accompanied premium

increases.  These uniform communications between the Defendants and Alvarez and the Class were

fraudulent because the Defendants failed to disclose facts material to the LTC insurance contract.

Plaintiff anticipates that Defendants will argue that there are individual questions of reliance which make class certification improper. However, in the context of class action lawsuits, "challenges pursuant to Rule 23(b)(3) because of reliance have usually been rejected, because reliance goes to the issue of damages rather than to the underlying, predominant, common issue of liability." *Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 11 (D.D.C. 2002)(quoting *Johns v. Rozet*, 141 F.R.D. 211, 218 (D.D.C.1992) (citing H. Newberg, 1 Newberg on Class Actions § 4.26, at 326 (2d ed.1985)). In *Rozet*, this Court rejected defendants' challenge to class certification on the grounds that the fraud count raised individual reliance questions such that questions of law or fact common to the class do not predominate over questions affecting only individual members.[9] The Court concluded that based on the written consent decree, plaintiffs were treated in an identical manner. The Court observed that "Professor Newberg has noted that challenges pursuant to Rule 23(b)(3) because of reliance have usually been rejected, because reliance goes to the issue of damages rather than to the underlying, predominant, common issue of liability." *Id.* (quoting H. Newberg, 1 Newberg on Class Actions § 4.26, at 326 (2d Ed.1985)). The Court would consider a separate proceeding on the issue if it later appeared that there would be a large number of individual factual questions on the issue of reliance. *Id.* (citing Fed.R.Civ.P. (c)(4), Advisory Committee Notes, 1966 Amendment). *See also Hanson, supra* at *5 (stating that "reliance, and inducement, may be inferred from the facts and circumstances surrounding a transaction").

---

[9] In *Rozet*, the fraud count concerned a consent decree which, plaintiffs alleged, made identical promises to plaintiffs on behalf of the class.

36

Similar to *Rozet*, this case is in substantial part about the uniform written Master Policy. Complaint ¶ 21.    Based on the Master Policy and uniform omissions, the Plaintiff and the Class were treated identically.  Plaintiffs have put at issue the inescapable common facts of a written form contract, common marketing decisions, and uniform omissions and decisions to pass costs of the defective nature of these policies back onto the class through premium increases.  Complaint ¶ 21-22.  Here, all class members' claims arise from the same nucleus of operative facts, and the same alleged course of fraudulent conduct, *i.e.*, Defendants' plan to pass the costs back onto the class and Defendants' suppression of this plan while continuing to accept ever-increasing premium payments.  This fraudulent course of conduct thus presents predominant questions of law which may be determined without reference to the individual circumstances of any class member, chief among them: whether Defendants' conduct gives rise to liability under the substantive law governing the class members' claims.[10]

>    **b.    The Proposed Class Action is a Superior Method to Resolve Plaintiff and the Class' Claims.**

Not only do common questions predominate, but the proposed class action is "superior to other available methods for the fair and efficient adjudication of the controversy" as required by Rule

---

[10] The substantive law of the District of Columbia allows the inference of fraud when the facts have been sufficiently pled, particularly in a fraud by omission case. *See Atraqchi v. GUMC Unified Billing Services*, 788 A.2d 559 (D.C. 2002); *Bennet v. Kiggins*, 377 A.2d 57, 59-60 (D.C. 1977), *cert denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). *See also Berry v. Federal Kemper Life Assur. Co.*, 99 P.3d 1166, 1168 (N.M.App. 2004)(stating that "it would be an unrealistic burden on a plaintiff to prove how he would have acted if the omitted material had been disclosed" and that "[a] court may presume reliance where it is logical to believe that a reasonable person–– or insured–– would attach importance to the omitted fact in his choice of action on the transaction in question")(internal citations omitted).

23(b)(3). Numerous district courts have held class actions to be the superior method for the fair and efficient adjudication of commercial fraud claims. *Rozet*, 141 F.R.D. 211; *Transamerican Refining Corp. v. Dravo Corp.*, 130 F.R.D. 70 (S.D. Tex. 1990); *Heastie v. Community Bank of Greater Peoria*, 125 F.R.D. 669 (N.D. Ill. 1989).

Where, as here, common issues predominate, courts generally find the class procedure to be the best and, indeed, normally the only realistic means of disposing of a large number of potential claims arising out of the same transactions or based on the same operative facts. *See, e.g., In re Federal Skywalk Cases*, 93 F.R.D. at 422; *In re Screws Antitrust Litigation*, 91 F.R.D. 52, 58 (D. Mass. 1981). The policy underlying class actions is to dispose of litigation where common questions prevail in a single lawsuit. *Rodgers v. U.S. Steel Corp.*, 508 F.2d 152, 163 (3rd Cir.), *cert. denied*, 423 U.S. 832 (1975); *In re Federal Skywalk Cases*, 93 F.R.D. at 420. This Class Action is clearly manageable. The proposed Class is much more manageable than classes that have been certified in other cases. *See, e.g., Sollenbarger v. Mountain States Tel. & Tel. Co.*, 121 F.R.D. 417 (D.N.M. 1988) (antitrust class consisting of all telephone customers in seven states approved); *Joseph v. Norman's Health Club, Inc.*, 336 F. Supp. 307 (E.D. Mo. 1971) (class of security fraud plaintiffs numbering between 2,500 and 4,000).

### E.    THE RATIONALE FOR CLASS TREATMENT

In terms of an appropriate litigation structure, the rationale for class treatment in this case is two-fold: judicial economy and the economic necessities of scale relative to the named and unnamed class members. These interests are promoted when multiple legal contests have a suitably common

subject matter and are resolved in single adjudication rather than piecemeal.  As the Eighth Circuit

Court of Appeals has stated:

> The class action was an invention of equity . . . mothered by the
> practical necessity of providing a procedural device so that mere
> numbers would not disable large groups of individuals, united in
> interest, from enforcing their equitable rights, nor grant them
> immunity from their equitable wrongs.

*Montgomery Ward & Co. v. Langer*, 168 F.2d 182, 187 (8th Cir. 1948).

The purpose of the procedural device of a class action is to "conserve 'the reserves of both

the courts and the parties by permitting an issue potentially affecting every [class member] to be

litigated in an economical fashion.'"[11]  To ensure that this purpose is served, the prerequisites of

Rules 23(a)(1)-(4) and at least one of the three alternate subprovisions of Rule 23(b) must be

satisfied to maintain a class action.  *In Re Lorazempam,* 202 F.R.D at 28; *Bynum,* 214 F.R.D. at 37.

*See also Jenkins,* 782 F.2d at 471; *Longden v. Sunderman,* 123 F.R.D. 547, 550 (N.D. Tex. 1988).

In determining whether the prerequisites of Rule 23 have been met, the Court must look to the

contents of the pleadings, particularly to the allegations of the Complaint, which must be accepted

as true.  *See, Longden,* 123 F.R.D. at 551; *Blackie v. Barrack,* 524 F.2d 891, 901 n.17 (9th Cir.

---

[11] *See Lightfoot,* 233 F.R.D. at 30; *Jenkins v. Raymark Ind., Inc.,* 782 F.2d 468, 471 (5th Cir.
1986) (quoting *Gen. Tel. Co. of Southwest v. Fallon,* 457 U.S. 147, 155 (1982)); *Sterling v. Velsicol
Chem. Corp.,* 855 F.2d 1188, 1196-97 (6th Cir. 1988).  *See also In re Gen. Motors Corp. Engine
Interchange Lit.,* 594 F.2d 1106, 1136 (7th Cir.), *cert. denied,* 444 U.S. 870 (1979) ("purpose of the
class action device [is] to vindicate the interests of the victims of mass production wrongs"); *In re
Ampicillin Antitrust Lit.,* 55 F.R.D. 269, 276 (D.D.C. 1972) ("[U]nless the claims of the members
of these classes can be litigated on a class basis they cannot be feasibly litigated at all.  While the
total alleged injury to the class is large, many individual class members may not have a large enough
stake to justify litigating their individual claims."); *Epstein v. Weiss,* 50 F.R.D. 387, 395 (E.D. La.
1970) (class action certified, in part, because "no one person may have been damaged to the degree
which would have induced him to institute litigation solely on his own behalf").

1975), *cert. denied,* 429 U.S. 816 (1976). The District Court has "wide discretion in deciding whether or not to certify a proposed class." *In Re Lorazempam,* 202 F.R.D at 28.

From a judiciary perspective, there are two alternatives available regarding prospective class treatment. The Courts could try a vast multitude of individual suits based upon the common acts of these Defendants; or this Court could and should avoid that option by certifying the action as a class action. The prosecution of this lawsuit as a class action will obviate the necessity for multiplicity of individual actions to be brought by the plaintiff class. Individual actions would further be impracticable because the expense of litigation to the individuals would be great.

An equally unattractive alternative is a single action rendered unmanageable and costly by continued intervention and joinder. Ordinarily, applications for joinder are treated liberally.[12] However, joinder of the thousands of interested parties in this action would be impracticable and would waste judicial resources.

From the perspective of the individual class members, the cost attendant to litigation of this magnitude, including those costs generated by the expected vigorous defense, would frustrate, if not defeat, the bringing and prosecution of individual actions. Fairness to the class of victims demands that they have the opportunity to further their claims as a unified class and to obtain some measure of strength which is enjoyed by Defendants.

## IV.    PROVISIONS AS TO NOTICE

------------------------

[12] *See State of Illinois v. Harper & Row Publishers, Inc.*, 301 F. Supp. 484, 490 (N.D. Ill. 1969) (noting that "the prospect of further intervenor and joinder, combined with the inevitable proliferation of lawsuits, is inimicable to economical adjudication.").

Local Rule 23.1(c) states, in pertinent part:

the plaintiff shall include in the motion for certification a statement proposing (1) how, when, by whom, and to whom the notice required by Rule 23(c)(2) shall be given, (2) how and by whom payment therefore is to be made, and (3) by whom the response to the notice is to be received. In lieu of such a statement the movant may state reasons why a determination of these matters cannot then be made, and offer a proposal as to when the determination should be made.

Pursuant to the local rule, Plaintiff hereby submits that at the time of filing this Motion a specific proposal for the notice plan is premature.[13] However, based on Plaintiffs' counsel's experience in several other LTC class actions, *see* Section III.D.2.d(2), *supra*, and other types of class actions, a general proposal is set forth herein.

The notice plan will include the presentation of two or three experienced class action administrators with a recommendation by Class Counsel to the Court as to which company should be selected for approval by the Court.[14] This administrator will finalize and prepare the court-approved notice and receive inquiries via telephone, U.S. mail and email to preempt any burden on the Court. This also allows for an experienced third party to verify that notice was given and provide affidavits as to the response to such notice, as well as direct legal inquiries to Class Counsel.

The preferred form of notice in this case will be by direct mail to all Class Members. Defendants have in their possession the names and current or last known address for all Class Members. Plaintiffs will request that this information be provided in electronic format and it will

---

[13] Prior to filing a notice plan, Plaintiff will need information from Defendant regarding the number and addresses of class members. This information will be given to the administrators in order for them to make a proposal and provide an estimate as to the costs of their services.

[14] Estimates for the preparation and administration of the notice program are often submitted with this proposal.

41

be placed into a database by the administrator to be used for the mailing and tracking of class notice.

Prior to class notice, Plaintiff will prepare a draft form of notice for approval by the Court. Typically, the Defendant is given an opportunity to review the notice prior to filing and present the Plaintiff with any changes prior to filing.

Once the notice is approved by the Court, it will be submitted to the administrator for mailing directly thereafter. The notice will include a toll free number with a live voice answering service, an email address, website with frequently asked questions and other information and a mailing address for inquiries. At this time, publication via internet, press releases and/or public service announcements may also be used to provide additional notice.

During the notice period, the administrator will provide periodic reports as to the responses received, including inquiries, requests for exclusion, or objections. After the notice period, the administrator will prepare an affidavit confirming the actions directed by the Court were taken and providing the Court with the results of the notice.

In *Rose, supra*, notice of the litigation and settlement class went out to approximately 8,000 potential class members. *Hanson, supra,* had over 13,000 class members receiving settlement notice and in *Milkman, supra,* settlement notice went out to 751,374 identifiable class members. Each of these notice programs worked efficiently and with good results.

Although class notice is from the Court to the Class Members, typically, Plaintiff bears the overall expense of pendency notice. However, the relatively modest obligation and expense of providing the names of each Class Member in electronic format is usually borne by the defendant to minimize undue expense.

Plaintiff proposes that the Court allow him until after pre-certification discovery has been completed and/or 10 days before the class certification hearing to file its specific Notice Plan as required by the rules.

## V.     CONCLUSION

For all the foregoing reasons, this case should be certified as a class action and allowed to proceed on behalf of the class as defined by Plaintiff.  Notice of class certification should be disseminated immediately following such certification in the form and content to be determined by this Court.

Dated this 2nd day of June, 2006.

Respectfully submitted,

JAMES & HOFFMAN
EDGAR N. JAMES (DC Bar No. 333013)
AMY FETTIG (DC Bar No. 484883)
1101 Seventeenth St. N.W., Suite 510
Washington, D.C. 20036
(202) 496-0500

KANNER & WHITELEY
ALLAN KANNER (DC Bar # 292425)
CONLEE S. WHITELEY (LA#22678)
AYLIN R. ACIKALIN MAKLANSKY (LA#30195)
701 Camp Street
New Orleans, LA  70130
(504) 524-5777

43

VOGEL LAW FIRM
TIMOTHY Q. PURDON (ND#05392)
MONTE L. ROGNEBY (ND#05029)
200 North 3rd Street, Suite 201
P. O. Box 2097
Bismarck, ND 58502-2097
(701) 258-7899

PERRY PEARCE BENTON, ESQ.
(Bar No. ASB-2159-N66P)
32330 Sandpiper Dr.
Orange Beach, AL 36561
(251) 980-2640

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of June, a copy of the foregoing has been served

by first class U.S. Mail, postage pre-paid on the following:

        James F. Jorden
        Raul A. Cuervo
        Stephen H. Goldberg
        Jorden Burt LLP
        1025 Thomas Jefferson Street, N.W.
        Suite 400 East
        Washington, D.C.  20007-5208

                        EDGAR N. JAMES